DEBORAH M. SMITH
Acting United States Attorney

SUSAN LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
susan.lindquist@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BRENDA J. PRUITT<br><br>Plaintiff,<br><br>v.<br><br>R.L. BROWNLEE, Acting Secretary of the Army<br><br>Defendant. | Case No. 3:04-cv-00086-RRB<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Mr. Brownlee, through counsel, moves pursuant to Fed. R. Civ. P. 56 for summary judgment. Ms. Pruitt claims that she was discriminated against on the basis of age and race in her civil employment by the United States Army. Complaint ¶5. She also complains that she was harassed based on race and age and she lists several specific events, including wrongful termination. No decision

maker was motivated by age or race.  Moreover, Ms. Pruitt failed to exhaust her

administrative remedies for her claims of wrongful denial of training, transfer of

work from her to Caucasian males, and wrongful discharge.

## FACTS

A.    Factual Events

Brenda Pruitt was employed as a Licensed Practical Nurse in the Preventive

Medicine department at Bassett Army Community Hospital located at Fort

Wainwright, Alaska since 1989.  Ex. B at 144.  Since February of 1994 she

worked as a Health Risk Appraisal Coordinator at the Kammish Clinic ("Clinic").

Id.  At all times, Colonel William H. Candler, M.D., a white male, was the Chief

of Preventive Medicine, Ms. Pruitt's department.  Ex. K at 313.  Ms. Pruitt's

supervisor was Hazel Ivey, a black registered nurse, until Ms. Ivey left in July

1996.  Ex. A at 9, 127.  After she left, Carole E. Gallimore, a white registered

nurse, took her place, but she was Ms. Pruitt's second level supervisor.  Ex. A at

146.  Shelby Butler, a white civilian R.N., worked under Ms. Ivey and after Ms.

Ivey left, Ms. Butler became Ms. Pruitt's first level supervisor.  Ex. I at 253-54.

All of the Preventive Medicine employees, except for Ms. Pruitt, were located at

the hospital, which is a half a mile from the Clinic.  Ex. A at 23, 40-41, 75.

The Clinic was operated by Primary Care Department, a completely

different organization from the Preventive Medicine Department.  Ex. K at 342.

Dr. Candler was not in charge of the Clinic.  Ex. K at 318.  He did not have daily

contact with Ms. Pruitt when she was at the Clinic.  Id. at 317.  The Clinic

personnel moved Ms. Pruitt, as well as others, from different offices to meet its

needs.  Ex. K at 315, 341.  Eventually, sometime in 1995, Ms. Pruitt moved into a

room that had been used for storage and she fixed it up.  Ex. A at 57; Ex. B at 155.

She obtained carpet squares to put over some old cracked vinyl tile squares.  Ex. B

at 156.  She had a nice office, she was by herself, and she could maintain her own

schedule at the Clinic.  Ex. I at 304.

    While at the Clinic, Ms. Pruitt claims that someone left a racial slur on her

desk on September 19, 1996.  Ex. B at 148; Ex. H.  She also claimed that someone

left telephone messages reciting Baa Baa Black sheep.  Ex. B at 148.  There is no

evidence that she ever told any supervisor about the telephone messages and there

is no evidence about when they occurred.  Ex. K at 319.  She also claims someone

spray painted her car with the word, "nigger," but that was when she first moved

to the Clinic.  Ex. A at 163-64.  After Ms. Pruitt left the Clinic, a Primary Care

employee, Ms. Sarah Schulze allegedly sent some racially inappropriate e-mails

that Ms. Pruitt never saw, or saw a copy of once.  Ex. A at 81-2; Ex. B at 148.

    When Ms. Gallimore and Ms. Butler took charge, they had some concerns

about Ms. Pruitt's work performance.  Ex. K at 320.  They believed Ms. Pruitt did

not keep adequate records and was frequently not available at her office.  Ex. I at

257, 302, 309-10; Ex. K at 320; Ex. P at 355-59.  There were also discrepancies

with Ms. Pruitt's time cards regarding leave that was taken and not recorded.  Ex.

F at 127; Ex. K at 321.  Ms. Pruitt's supervisors wanted to give her more

supervision and to analyze whether she needed more training.  Ex. K at 321.

Ms. Pruitt did not move to the hospital until September 30, 1996.  Between

Ms. Ivey's departure in July and the move, she took more than a month's vacation.

Ex. B at 146; Ex. I at 279.  She came back in September but was on sick leave for

an extended period.  Ex. B at 160, 193.  When Ms. Pruitt left the Clinic, she

attempted to take the carpet squares with her to the hospital, but Primary Care

employees stopped that activity.  Ex. A at 75.

Ms. Pruitt's job duties included seeing patients, including some with

sexually transmitted diseases ("STD").  Ex. B at 168.  She had to keep those

records locked up.  Id.  She also saw patients for other health risks, like cold

weather injuries.  Id.  She told the EEO investigator that before she moved to the

hospital, she had been doing patient follow-up for two years and she had done it

on over 200 people.  After she moved to the hospital Ms. Butler gave her a list of

patients with STD's to follow-up.  At the EEO investigation, Ms. Pruitt said Ms.

Butler had given her about 42 people to call. Ex. M at 56.  At her deposition she

said that Ms. Butler gave her the task of following up 15 STD patients.  Ex. A at

22.  At her deposition, she also said that follow-up for patients was not in her job

description and that she had never done it before.  Id.

After Ms. Pruitt finished this task, the husband of one patient complained to

Ms. Butler that Ms. Pruitt inappropriately called him about his wife's medical

care.  Ex. M at 56-57; Ex. T (statement of facts by patient's husband).  Thereafter,

Ms. Pruitt was then taken off of patient duties, restricted from the computer, and

later she was terminated for breach of patient confidentiality.  Ex. F at 110; Ex. I at

274-78.

B.     EEO Procedural Events

On her informal EEO complaint, Ms. Pruitt listed October 1, 1996 as the

last date of the event that was discriminatory .  That is the day she moved and was

reported to the Military Police ("M.P.") for possible theft of the carpet and for

damaging the tiles.  She listed Maj Wilson, Maj Robert Tenhet, Dr. Candler, Nurse

Gallimore and Nurse Butler as the individuals responsible for the discrimination.

Ex. D.  In her EEO interview with the investigator she explained why she thought

each person discriminated against her.  As to Maj. Wilson, Ms. Pruitt believed that

she called the M.P.'s about the carpet.  Ex. M at 6.  She alleged Maj Tenhet

discriminated against her because he made the allegation to the M.P.'s that

someone ransacked the room and destroyed government property.  Ex. M at 6-7.

Nurses Gallimore and Butler were her supervisors who made allegedly adverse

decisions and Dr. Candler was the Chief.  The main events of the processing of her

EEO claim were as follows:

| | |
|---|---|
| September 16, 1996 | Ms. Butler requests forms from EEO.  Ex. Q, ROI at 22. |
| October 1, 1996 | Event when discrimination occurred according to her EEO complaint.  Ex. D |
| October 23, 1996 | Informal EEO complaint - Ex. D |
| February 4, 1997 | Formal EEO Complaint.  Ex. E. |

Her formal EEO complaint, at Ex. E, alleged the following incidents:

1.  "Racial slurs were placed on my desk at work questioning the definition

of a 'nigger.'  This note was placed on my desk deliberately for me to see to harass

(sic) me into quiting (sic) my job."  See Complaint ¶ 9.

2.  "Denial by my supervisor to take any action or even investigate this

matter thus contributing to an untenable working environment."  See Complaint ¶

9.

3.  "Shelby Butler, my immediate supervisor in collusion with staff, LTC

Candler (sic), LTC Galimore (sic) and others have fabricated a lie [that

complainant stole carpet from her office] to have me fired or constructively discharged from my job." <u>See</u> Complaint ¶ 10.

4.  "I was moved on 30 SEPT 96 to another location, given less responsibility and smaller office with no equipment to carry out my duties because of racism and sexism and because of a perception that I was protected by my former supervisor who happened to be a black female.  In the words of my current supervisor, 'LTC Ivey had different sets of rules for you than me.'" <u>See</u> Complaint ¶ 6 (a general allegation).

5.  "LTC Candler has been counseled by his supervisor for racism in the past and is still continuing to conduct racist behavior by refusing to give me a key to my office while 'white' employees have no problems getting keys to their offices or supplies and equipment needed." <u>See</u> Complaint ¶ 6 (a general allegation).

6.  "I have been moved 4 times in two and a half years while 'white' staff members have been undisturbed." <u>See</u> Complaint ¶ 6 (a general allegation). She reiterated these issues in either general or specific terms in the Complaint that she filed in District Court.

May 11, 1999      EEO Hearing Held: wrongful termination claim not considered. Ex. V.

July 6, 2000        EEO Decision in Ms. Pruitt's favor on racial harassment claim.
                    Ex. W.

August 24, 2000     Army appeal of decision to OFO

January 20, 2004    OFO denies reconsideration

June 25, 2004       Army complies with decision and pays Ms. Pruitt $1,000 and
                    her attorney fees of $5.588.75.  Ex. X.

April 20, 2004      Ms. Pruitt files in District Court


## STANDARD OF REVIEW

Summary Judgment is appropriate when there "is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law," F. R. Civ. P. 56(C);  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party has the burden of showing that there is no genuine dispute as to material fact.  Celotex, 477 U.S. at 323-35.  To withstand summary judgment, the non-moving party must establish that there are genuine factual issues that may be reasonably resolved in favor of either party.  California Architectural Building Products v. Franciscan Ceramics., Inc., 818 F.2d 1466 (9th Cir. 1987).  There is no genuine issue of material fact when the relevant evidence in the record, taken as a whole, indicates that a reasonable fact finder could not return a verdict for the non moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## ANALYSIS

Title VII prohibits discrimination in employment decisions on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  In disparate treatment cases brought under Title VII, the complainant must establish a prima facie case of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To establish a prima facie case, she must show that she (1) belongs to a protected class; (2) was qualified for the position; (3) was subjected to adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.  Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004).

Any action that is "reasonably likely to deter employees from engaging in protected activity" is an adverse employment action.  Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).  The action must be reasonably likely to deter either the charging party or other employees.  Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2003).  The definition focuses on the deterrent effect of conduct on employees, not the severity or ultimate impact of the action.  Ray, 217 F.3d at 1243.  The Supreme Court has cited "hiring, firing, failing to promote,

reassignment with significantly different responsibilities [and] a decision causing a significant change in benefits" as examples of adverse employment actions. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

If the complainant succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the illegal act. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The complainant then retains the opportunity to show that the employer's reason is pretext, that a discriminatory reason is more likely, or that the proffered explanation is unworthy of belief. Id. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Id.

Ms. Pruitt also alleges that she was working in a hostile work environment. In order to prevail on a hostile work environment claim based on race, Ms. Pruitt must show: (1) that she was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and, (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir.1998) (citation omitted); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57(1986). In order for conduct to be actionable, the environment

must be one which, viewed objectively, a reasonable person would find hostile or abusive, and the plaintiff must have subjectively perceived the environment to be abusive. Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). A few isolated incidents are not sufficient to prove harassment under Title VII. Jones v. Flagship Intern., 793 F.2d 714 (5th Cir. 1986), cert. denied, 479 U.S. 1065 (1987). Sporadic conversation does not rise to the level of racial harassment. Snell v. Suffolk County, 782 F.2d 1094 (2d Cir. 1986). "Instead, there must be a steady barrage of opprobrious racial comment." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1412-1413 (1987)(Hicks I); 928 F.2d 966, 972-973 (10th Cir. 1991)(Hicks II) quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981). Comments that are merely inappropriate or degrading do not necessarily cause a violation of Title VII. Sauers v. Salt Lake County, 1 F.3d 1122 (10th Cir. 1993). The conduct must be racial, not merely boorish or belligerent. See Hicks II, 928 F.2d at 972. "The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the eradication of discrimination by employers against employees." Silver v. KCA, 586 F.2d 138, 141 (9th Cir. 1978) "Even a continuing course of racial harassment by a co-employee cannot be imputed to the employer unless the latter both knows of it and fails to take remedial action." Id. at 142. When there is no

evidence to show that the employer or any of its supervisory personnel authorized a discriminatory remark or approved of it, either before or after the incident, and the employer reprimanded the employee who made the comment, the employer is not liable.  See Id.

In Farragher v. Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), the Court explained that to be actionable, a hostile environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 2283.  To determine whether an environment is hostile or abusive the court is to look at the totality of the circumstances, including "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (citation omitted).  The Court noted that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" The court "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . ." Id. and cases cited therein.

Ms. Pruitt also claims that she was discriminated against on the basis of age. The Age Discrimination in Employment Act ("ADEA") provides that it is

unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.  29 U.S.C. § 623(a)(1).  In an ADEA case, the Plaintiff must prove that age was a determinative factor in the employment decision.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11 (1993).

## I.    MS. PRUITT REMOVED CARPET FROM HER OFFICE AND THE SUPERVISOR'S REACTION HAD NOTHING TO DO WITH THE REPORT TO THE M.P.'S.

Ms. Pruitt alleges that she was discriminated against when federal employees called the M.P.'s and reported that she was stealing the carpet from her office.  Complaint ¶ 10.  She was planning on taking it with her to her new office at the hospital.  Ex. M at 40.  She complains that it was Maj Wilson, Ms. Gallimore and Dr. Candler who are responsible for the discrimination.  Ex. M. at 38.  She claims Ms. Wilson, of Primary Care, called the M.P.'s.  Ex. M at 45.  Ms. Pruitt first claimed that the Army was installing new carpet in Preventive Medicine, but it was not doing it for her.  Ex. B at 156.  She spoke with the contractors about getting any left over carpet.  Ex. B at 156; Ex. M at 38-9.  Then one day the contractors, or some unknown person, left a box of carpet by her office.  Ex. B at 156-57, 157.  She allegedly asked her supervisor, Ms. Ivey, to install the carpet, but she refused.  Id.  She got Sgt Wiggins from Primary Care to

help put down the carpet.  Ex. B at 157.  But at her deposition in 2005, Ms. Pruitt

testified that she got the carpet from a dumpster.  Ex. A at 64 & 143-44.  She said

Mr. Candler would not give her money to install it so Sgt Wiggins and she put the

carpet down.  Ex. A at 144-45.

Military records indicate that in July 1995, the military requested the

purchase of floor carpet for Room 266, in building 3406.  Ex. G.  Ms. Pruitt's

office, as identified by herself, was Room 266 in building 3406.  Ex. H.  Dr.

Candler talked with the people who installed the carpet and found out that it was

government purchased carpet.  Ex. K at 327-28.

Ms. Pruitt testified at the EEO hearing that she did not talk to her

supervisor, Ms. Gallimore, about the carpet before she pulled it up.  Ex. B at 159.

At her deposition, she testified that she got permission from her supervisor, Ms.

Gallimore to take up the carpet.  Ex. A at 75.  Ms. Gallimore testified that Ms.

Pruitt asked her about the carpet and she told her on more than one occasion not to

remove the carpet.  Ex. F at 106.

When Ms. Pruitt pulled the carpet, some employees noticed that the tiles

were damaged, though Ms. Pruitt states that they were damaged before she put the

carpet squares down.  Ex. B at 163.  Maj Robert Tenhet, Chief of the Clincial

Support division at the Clinic, called the Military Police ("M.P.") about the carpet.

Ex. L at 373.  He observed significant damage to the underlying vinyl tile.  Ex. L at 375-76.  Ms. Pruitt was told by some unknown person that two Clinic employees, Ms. Schulze and Ms. Wilson, had called the M.P.'s about the carpet removal.  Ex. A at 76; 161.  But at a meeting a few days later, Mr. Tenhet told Ms. Pruitt that he called the M.P.'s.  Ex. L at 379.  He had previously called the M.P.'s about two other incidents involving white employees.  Ex. L at 378.

No employee involved in this incident reacted because of Ms. Pruitt's race or age.  It is an unusual event for an employee to take up the carpet in her office and move it to another room.  When damage to the existing tile is added to that scenario, the event becomes even more alarming.  Ms. Pruitt was the only Preventative Medicine employee in the Clinic and she was taking something that could be perceived as belonging to Primary Care to the hospital.  Because her supervisors, Dr. Candler, Ms. Gallimore and Ms. Butler, were located at the hospital, they did not even participate in the event.  They did not call the M.P.'s.  Mr. Tenhet called the M.P's and he has no connection with Preventive Medicine.  Moreover, he did not treat white employees differently.

Race and age had nothing to do with the issue that arose when Ms. Pruitt removed her carpet.  There is no discriminatory comment.  There is no similarly situated white employee removing carpet.  There was an obvious lack of

communication between Ms. Pruitt and her supervisors.  This claim should be

dismissed because there is no evidence of discrimination and the Army provided a

legitimate reason for its actions.

## II.    MS. PRUITT WAS NOT MOVED FOR DISCRIMINATORY REASONS.

Ms. Pruitt alleges that the Army discriminated against her because it moved

her office many times.  It moved her office four times from October 18, 1994

through September 30, 1996.  Ex. H at 2.  Ms. Pruitt was the only employee of

Preventive Medicine to be housed in the space allocated to Primary Care.  Ms.

Pruitt believes someone at the Clinic wanted to move her and spoke with Dr.

Candler and she moved.  Ex. A at 29, 31.  She does not know how they were

discriminating against her, but she thinks they were discriminating against her on

the basis of race, sex and age.  Ex. A at 31-32.

For the first move, Ms. Pruitt was moved within the clinic from an office by

Aviation to an office by the eye clinic.  Ex. A at 29.  Then after two months she

was moved back to the office by Aviation.  Ex. A at 29.  Then someone moved her

to another office where she stayed for six months Ex. A at 29.  When someone was

going to move her back to a small office she was allowed to move to the larger

storage area, instead.  Ex. A at 29.  She believes that the people who wanted her

moved went to Dr. Candler and asked that she be moved. Ex. A at 30-31. Their requests were all discrimination against her. Ex. A at 30-31.

Dr. Candler was not the person initiating the moves because the Clinic space was not his department. Ex. K at 316. The Clinic was constantly moving people around to different offices. Id. On one occasion, despite having little control at the Clinic, Dr. Candler was able to stop a proposed move of Ms. Pruitt within the Clinic. Ex. K at 316. In general, people move offices a lot in the Army. Within a year and a half, Ms. Butler had moved offices three times, and since Ms. Pruitt's move, she was moved an additional three times. Ex. I at 257.

Ms. Pruitt moved from the Clinic to the hospital on September 31, 1996. Ex. A at 136.[1] Ms. Gallimore made the decision to move Ms. Pruitt to the hospital and Dr. Candler approved the decision. Ex. K at 314. Ms. Pruitt believes that Ms. Butler requested that she move out of the Clinic to the hospital. Ex. A at 68. Ms. Butler said she could better utilize Ms. Pruitt at the hospital, but Ms. Pruitt did not believe her. Ex. A at 68-9. Ms. Pruitt thought that Ms. Butler wanted to give her job to Ms. Schulze, who was not even an employee in Preventive Medicine. Ex. A at 68-69; Ex. F at 105. Kevin Williams, a black active duty soldier, was moved to

---

[1] On her EEO complaints, Ms. Pruitt states that the acts of discrimination occurred on October 1, 1996. Exs. C & D.

the Clinic to do her job instead.  Ex. A at 69.

Ms. Butler stated that the supervisors wanted to move Ms. Pruitt for several reasons.  First, the Clinic doctors did not perceive that Preventive Medicine was helping them and they wanted the space to provide offices for their employees .  Ex. I at 254, 258.  Second, the Preventative Medicine Department needed to supervise Ms. Pruitt because she was not available over at the Clinic.  And lastly, the Preventive Medicine Department at the hospital had lost three employees and it needed the man power.  Ex. I at 254.

Ms. Pruitt was very adverse to the move, in part, because she had made a beautiful office for herself.  Ex. I at 255.  She did not like the hospital and she did not want people breathing down her neck.  Id.; Ex. F at 103.  She said she would not go to the hospital and that she would fight the move.  Ex. I at 256.  As early as July 24, 2006, Ms. Butler spoke to Ms. Pruitt about the move to the hospital and Ms. Pruitt.  Ex. R.  The next day, Ms. Pruitt again spoke with Ms. Butler about how upset she was about the move to the hospital.  Ex. R.  Ms. Pruitt spoke with Dr. Candler and reported to Ms. Butler that Dr. Candler wanted her at the hospital because he wanted to watch what she was doing.  Ex. R.

On July 30, 1996, Ms. Butler and Ms. Gallimore spoke to Ms. Pruitt and discussed the information they needed to prepare for coverage when Ms. Pruitt

was going to be on vacation.  Ex. R.  They discussed the type of patient follow-up records they wanted in place for use by her replacement in August.  Ex. R.

On her first day back from vacation, September 9, 1996, Ms. Butler spoke with Ms. Pruitt.  Ex. R.  She explained that Ms. Pruitt needed to turn in slips for the sick leave she took in June and July.  Ex. R.  They also discussed training Ms. Pruitt would get.  Id.  On September 11, 1996, they had another discussion about the move.  Ex. R.  Ms. Pruitt informed Ms. Butler that she was not excited about the move and that she had a meeting with her union steward.  Ex. R.  Ms. Pruitt requested forms and information about how to file an EEO claim from the EEO counselor on September 16, 1996, a few weeks before she was moved and the carpet incident occurred.  Ex. Q, ROI at 22.

Ms. Pruitt does not even know who was making the decisions about moving her within the Clinic.  She was occupying space in a Clinic that was not even controlled by her Department of Preventative Medicine.  Dr. Candler had little control over how Primary Care used its space.  There is no evidence about who decided to make the moves or about any motive related to race or age for the moves.  Ms. Pruitt did not contact an EEO counselor when the moves within the Clinic were made and they occurred so long ago that the information is lost.  These claims should be dismissed.

As to the move to the hospital, Preventive Medicine was simply moving Ms. Pruitt back to its department. There were issues about her being at a remote location, unaccountable for her time, lacking paper work follow-up, and the main office needed the personnel. Ms. Pruitt can not point to any comment that indicates that race or age had anything to do with the move. This claim should be dismissed.

## III.    MS. PRUITT WAS NOT GIVEN EVERYTHING SHE HAD AT THE CLINIC BECAUSE OF A CHARGE OF BREACH OF PATIENT CONFIDENTIALITY.

Ms. Pruitt claims that she was given a smaller office, no key, was deprived of essential equipment and that her computer was taken from her. Dr. Candler decided not to give Ms. Pruitt a key to her hospital office because the M.P.'s were still investigating the allegation of theft of the carpet and destruction of government property. Ex. K at 328-29. Dr. Candler told Ms. Pruitt that she did not get a key because the department did not trust her after the incident with the carpet. Ex. A at 74. Dr. Candler had concerns about Ms. Pruitt's state of mind and her anger about the carpet incident. Ex. K at 329. After a couple of weeks, it was discovered that Ms. Pruitt could not do her job without a key to her office, and she was given a key. Id.

Ms. Pruitt claims that she got a smaller office when she moved to the

hospital. She was put in that office because it was the only place Preventive
Medicine had to put her. Ex. I at 262. Ms. Butler had been assigned the same
office herself. Id.

Ms. Pruitt complains that after she moved to the hospital, her duties
changed and she was not allowed to use the computer. When she first came to the
hospital, Ms. Pruitt had a computer at her desk, but later she was restricted on the
computer. Ex. M at 63; Ex. I at 273-76. The reason she was restricted was that a
patient alleged that Ms. Pruitt breached patient confidentiality by telling a husband
about his wife's STD test. Ex. I at 274-76; Ex.O; Ex. T. This occurred soon after
she arrived at the hospital. Ex. I at 278. This was also the reason why Ms. Pruitt
was terminated. Ex. O.

## IV.    MS. PRUITT'S SUPERVISORS NEVER SUBJECTED HER TO A HOSTILE WORK ENVIRONMENT BASED ON AGE OR RACE.

### A.    The Supervisors Did Not Know about Any Racial Slur Placed on Ms. Pruitt's Desk Until After the EEO Complaint Was Filed.

Ms. Pruitt claims that on September 19, 1996, she found on her desk a
"racial slur." Ex. M at 7-9  She suspects that someone from the Clinic put it there.
Ex. A at 63. The paper is a "practice exercise with a situation between two Afro-
American soldiers." Ex. C. The paper crosses out the word "Homy" and inserts
the words "my nigger" in one place and "nigger" in another place.   The question

on the paper then became: "What do you think of the term nigger in this context?"
Ms. Pruitt calls the paper a racial slur.

Ms. Pruitt testified that she first told Anna Tate about it and they chuckled
about it. Ex. B at 150-51. She then told Sgt Wells. Id. They both suggested that
she do something about it, but she declined. Id. She did not tell Dr. Candler about
the slur. Ex. B at 171. During the investigation, Ms. Pruitt said she told Ms.
Butler about the racial slur on her desk on September 19, 1996. Ex. M at 33. In
the answers to her questionnaire for the EEO proceeding, Ms. Pruitt stated that the
slur was left on her desk on September 19, 1996 and that she reported the slur left
on her desk to Ms. Butler on that day. Ex. H. She also testified at the EEO
hearing that she told Ms. Butler. Ex. B at 177. Ms. Butler testified that she found
out about the note during the EEO process. Ex. I at 258.

At the EEO hearing, Ms. Pruitt testified that she told her supervisor Ms.
Ivey, not Ms. Butler, about the racial slur, but she did not give Ms. Ivey a copy of
the paper. Ex. A at 83-4, 92. As a result, Ms. Pruitt stated that meetings took
place to explore whether racial issues were present at the work place. Ms. Ivey
left Fairbanks on July 20, 1996, before Ms. Butler became Ms. Pruitt's supervisor.
Ex. A at 64; Ex. J at 13. Also, the slur appeared in September, after Ms. Ivey left,
so Ms. Pruitt must be confused about either telling Ms. Ivey or the date that the

slur appeared on her desk.  It cannot be both ways.

Dr. Candler did not hear about the racial slur until after the EEO was filed. Ex. K at 318.  Ms. Gallimore took Ms. Ivey's place around July 16, 1996 and at that time she assigned Shelby Butler as Ms. Pruitt's supervisor.  Ex. F at 101-2. Ms. Gallimore found out about the slur during the EEO process.  Ex. F at 109. Thus, they did not have any part of handling the allegation of a racial slur.

If Ms. Ivey had direct information about it, Ms. Pruitt testified that something was done about it by having meetings about racism.  Ex. A at 92.  If Ms. Butler was told about it, by September 19, 1996, there was a plan in place to move Ms. Pruitt to the hospital, which would take Ms. Pruitt out of the area where the act occurred.  According to Ms. Pruitt, Ms. Butler told her that one of the reasons she was moving her to the hospital was to stop Clinic employees from messing with her.  Ex. B at 177.

The slur incident occurred at the Clinic by an unknown employee.  It was not an incident that was condoned by the employer.  According to Ms. Pruitt, Ms. Ivey did something about it because the meetings about racism occurred afterwards and Ms. Butler did something about it because she moved Ms. Pruitt out of the hospital.  Thus, under Silver, the employer cannot be held liable for the slur.  At the most, the slur was an isolated incident and it did not affect Ms.

Pruitt's terms and conditions of employment.

Evidence that the note did not affect Ms. Pruitt's employment is that she did not even want to do anything about it. In her Complaint, Ms. Pruitt alleges that the Army failed to investigate the racial slur left on her desk. Complaint ¶ 9. She told the EEO investigator that she told Ms. Butler about the slur, but she did not expect any reaction out of Ms. Butler or for her to do anything. Ex. M. at 33. At her EEO hearing, Ms. Pruitt testified that she was not going to do anything about the note because she was not going to give whoever did it the pleasure. Ex. B at 151. Thus, it appears that Ms. Pruitt did not really want anything done about it. Moreover, as stated above, she was in the process of leaving that environment where the slur occurred and the move itself would ostensibly prevent any future events of this nature.

> B.    Ms. Pruitt Did Not Complain about Racial E-mails to the EEO Even Though She Allegedly Saw One Before She Contacted EEO.

Ms. Pruitt bases her racial harassment claim on events that occurred at the Clinic. She bases it on the Baa Baa black sheep telephone calls, the racial slur placed on her desk, and e-mails from a Primary Care employee, Ms. Schulze. She also spoke about her car being spray painted, but that occurred in 1994 or 1995, but there is no evidence that she ever reported it to anyone. It is simply not part of

the claims that she exhausted before the EEO and it should not be considered.

The allegations regarding e-mail first surfaced during the investigation on July 23, 1997, some nine months after they were (or it was) sent. In lengthy and rambling testimony to the investigator, the complainant mentioned a single e-mail (which she did not see), which allegedly was sent by Ms. Schulze. The alleged e-mail spoke of "cleaning up the black palace," referring to the Clinic. The allegation was offered as evidence that her relocation from the Clinic to the main hospital was racially motivated. Ex. Q, ROI at 19-24. At the time of the EEO investigation there was no allegation about an e-mail regarding a black witch, but the government does not deny that Ms. Schulze referred to Ms. James, a black Clinic employee, as a witch. See Ex. A at 48, 97. It denies she referred to Ms. James as a black witch.

One of Ms. Pruitt's witnesses, Gloria Evans, also recalled a single e-mail, sent by Ms. Schulze, which she believed was rumored throughout the hospital. Ex. Q, ROI at 247-52. She did not actually see the e-mail herself. Ex. Q, ROI at 248. She recalled that the e-mail, which she referred to as a note, was sent after the complainant had been moved from the Clinic. Ex. Q, ROI at 249. She identified a Dr. Mee as one of the doctors in the Clinic who had seen the note and taken offense at it. Ex. Q, ROI at 248-49.

The EEO investigator also obtained a statement from Dr. Mee.  Dr. Mee recalled that Ms. Schulze sent an e-mail that he "took offense to, but it was not directed at Ms. Pruitt."  He said he was offended because "it contained derogatory information directed at one of the NCO (noncommissioned officers) leaders in the clinic originating from another NCO leader."  He did not state that the e-mail was racially motivated or confirm the term "black palace."  Ex. Q,  ROI at 140-42.

The investigator obtained a statement from Ms. Schulze, who allegedly sent the e-mail.  Ms. Schulze stated that she had begun working in the Clinic as of August 1, 1996.  The investigator asked if she wrote and sent a message "making a reference to 'cleaning out the black palace (Kamish Clinic).'"  She responded that she "did not say that and [she] never heard anything like that before.  [She] never saw any message like that."  Ex. Q, ROI at 135-36.

Ms. Schulze, who worked directly for Primary Care at the Clinic, had no official contact with Ms. Pruitt.  Ex. A at 43, 128.  Ms. Pruitt only spoke casually with Ms. Schulze and she did not discuss work with her.  Ex. A at 159.  In her EEO testimony Ms. Pruitt  testified that she never saw the e-mails, but she heard about one about a black palace and one about a black witch.  Ex. B at 148.  She believes that there were more than a couple of e-mails.  Id.  At her deposition, she testified that she saw the e-mail about the witch.  Ex. A at 153.  When questioned

why she did not mention the e-mails in her EEO complaints, she said that they happened after she filed her EEO claim. Ex. B at 198-99. Ms. Pruitt stated that Ms. Schulze wrote about the black witch being gone after she moved to the hospital. Ex. A at 81. She said there was an e-mail about cleaning out the black palace and that it occurred in October 1996, after she moved to the hospital. Ex. M at 19-20.

But the e-mail was about the "witch," not the "black witch." Ex. N at 74; Ex. P at 368. The e-mail referred to Ms. James, who is also black. Id.; Ex. M at 247-49. Maj Wilson, who definitely saw the e-mail, said the e-mail about the witch issued after Ms. Pruitt left the Clinic and it was about Ms. James. Ex. M at 227-28, 247-49.

For purposes of summary judgment, the Court can accept that Ms. Schulze sent out two e-mails with racial overtones. Testimony from the people who actually saw the e-mails affirm that the one about the witch did not contain the word black and that it was about Ms. James. The most important fact is that the e-mails were sent by a member of Primary Care, they were never sent to Ms. Pruitt, and they did not form a basis of her EEO complaint, as she either never saw them or saw them after she filed her EEO complaint. She based her claim of hostility on the seven events she listed in her EEO complaint and they did not include the e-

mails.

Even if the Court included the e-mails, all the events with racial overtones together (slur, Baa Baa black sheep, and e-mails) do not amount to employer action of a racial nature that was severe and pervasive, such that it altered the conditions of her employment.  The e-mails originated out of Primary Care and the racial slur on the desk and the Baa Baa black sheep originated by unknown people who may or may not have been on staff.  Even if one added in the moves and carpet incident there is still not enough to prove a hostile work environment based on race that was severe and pervasive.  The events were sporadic, the racial slur was a little enigmatic, and the activity was not pervasive in Ms. Pruitt's Department.  The Clinic simply had no supervisory control over Ms. Pruitt.

Ironically, if there was even arguably a racial hostile work environment, it was at the Clinic, and not the hospital.  For relief in her EEO Complaint, Ms. Pruitt wants her job and old office back.  She is litigating in order to go back to the Clinic where allegedly all the racially hostile events were occuring.  The reality is that Ms. Pruitt did not even subjectively perceive the Clinic as racially hostile. She perceived the hospital as hostile, but not on the basis of race.  She is trying to prove a hostile work environment based on e-mails that she did not even know about at the time she made her EEO complaint, which were made by a different

department employee, which were not about her, and which did not alter the terms and conditions of her work.

The other events did not alter the terms and conditions of her employment. Ms. Pruitt never reported the Baa Baa black sheep telephone messages to any supervisor. No one knows who did it. There was no opportunity for management to do something about it. As to the racial slur left on her desk, at the EEO hearing she testified that she told Ms. Ivey and that in response Ms. Ivey did something about it because meetings occurred and if Ms. Butler was told, she also did something by moving Ms. Pruitt out of the Clinic. These are the acts of a responsible employer who takes action when it hears about untoward events.

The reality is that as soon as the supervisors announced in July of 1996 that Ms. Pruitt was moving to the hospital, Ms. Pruitt was going to fight it. She got her EEO forms and contacted her union steward two weeks before the move. It's unfortunate that there was miscommunication about the carpet. That incident, however, occurred two weeks after Ms. Pruitt decided that she was being discriminated against. The move precipitated the EEO complaint. As unfortunate as the carpet miscommunication was, race and age had nothing to do with it. Ms. Pruitt's supervisors did not precipitate the events or report it to the M.P.'s. The Army, through Mr. Tenhet, gave a non-discriminatory reason for the report to the

M.P.'s.  The Primary Care Clinic employees perceived Ms. Pruitt as stealing the carpet.  Moreover, there is no evidence of verbal or physical harassment based on age or race because of the carpet allegations.  Ms. Pruitt fails to make a hostile work environment case because her work environment at the Clinic was neither subjectively or objectively hostile at the time Ms. Pruitt requested EEO forms, or later.  The events she claimed occurred were not severe and pervasive and did not alter the terms and conditions of her employment.  The only thing that altered her employment was the move.  The Army has given legitimate non-discriminatory reasons for the move.  Race and age had nothing to do with it.

## V.   MS. PRUITT FAILED TO TIMELY ALLEGE ANY DISCRIMINATION ON THE BASIS OF AGE.

Prior to initiating a federal court suit for a claim of employment discrimination under Title VII, a federal employee must bring a timely administrative complaint to the agency and exhaust all applicable administrative remedies.  Brown v. General Services Administration, 425 U.S. 820, 829 (1976); 29 C.F.R. § 1614; see Kizas v. Webster, 707 F.2d 524 (D.C. Cir. (1983); cert denied 464 U.S. 1042 (1984).  Exhaustion is "an inexorable rule."  Rivera v. United States Postal Service, 830 F.2d 1037, 1039 (9th Cir. 1987), cert. denied, 486 U.S. 1009, reh'g denied 487 U.S. 1228 (1988).

If a plaintiff fails to exhaust her administrative remedies, a district court lacks subject matter jurisdiction over her claim.  EEOC v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994).  Under Title VII's statutory scheme, a federal employee must notify an EEO counselor of discriminatory conduct within 45 days of the alleged conduct.  29 C.F.R. § 1614.105(a)(1).  The notice requirement provides the employer with notice of the claim, and narrows the issues for prompt adjudication and decision.  B.K.B. v. Maui Police Department, 276 F.3d 1091, 1099 (9th Cir. 2002) (citation omitted).  If the matter is not resolved, the employee must be notified in writing of her right to file a formal EEO complaint.  29 C.F.R. § 1614.105(d).

The Supreme Court has held that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.  National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 108 (2002).  By choosing short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination.  Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980).  Although the 45-day requirement is promulgated by regulation, instead of by statute, failure to comply with this regulation is fatal to an employee's claim.  Lyons v. England, 307 F.3d 1092, 1105 (9th Cir. 2002).  Substantial compliance with the presentment of

discrimination complaints to an appropriate administrative agency is a jurisdictional prerequisite. <u>Sommatino v. United States</u>, 255 F.3d 704, 709 (9th Cir. 2001).

Ms. Pruitt alleges discrimination on the basis of age. Complaint at ¶ 5. She does not complain about any specific decision she is challenging. In her EEO complaint she did not indicate that age was a basis of discrimination because she did not check the box. Exs. D & E. In her letter to EEO she stated that she is filing a case based on sex and race. Ex. Q, ROI at 36. In her initial interview she did not mention age. <u>Id.</u> at 41. As a result, the EEO Investigator specifically told Ms. Pruitt that training was not an accepted issue in her EEO claim and it would not be investigated. Ex. M at 102-3.

Her informal and formal complaints list seven incidents that she alleged were discriminatory. Exs. D & E. Therefore, she failed to exhaust her administrative remedies as to any claim that she was discriminated against on the basis of age when she was denied training.

Should the court concluded that her claim is not time barred, the government can only present evidence about the training issue Ms. Pruitt identified as age discrimination at her deposition. In 1996, Ms. Pruitt, whose birthday is (12/16/1946), was approximately 50 years old. She claims that Dr.

Candler discriminated against her on the basis of age.  Ex. A at 6.  She alleges that

he promoted and gave training opportunities to younger people.  Id.  At the time

she was the only person working as a Licensed Vocational Nurse.  Ex. A at 7.  The

younger person who apparently got some training was below Ms. Pruitt in

education.  Ex. A at 7.  Ms. Pruitt said that she applied to Ms. Ivey for the training,

but Mr. Candler was above Ms. Ivey.  Ex. A at 8-9.  Ms. Pruitt believes that Ms.

Ivey approved the training, but Dr. Candler said no.  Id.  This event occurred in

October 1996, and she immediately thought it was discriminatory.  Ex. A at 9-11.

She's not sure how many days lapsed after the denial of training occurred before

she contacted an EEO counselor because she first went to Ms. Ivey.  Ex. A at 12.

The course she wanted was offered at Fort Sam Houston in Texas.  Ex. A at 16.

     Ms. Ivey left in July of 1996, and therefore the denial of any training could

not have been in October 1996.  Ms. Ivey, however, recalled the training at issue

in 1996 as the health risk assessment course  and she stated that she made the

decision to send Ms. Butler to the training.  Ex. J. at 16-17.  Ms. Butler was the

same age as Ms. Pruitt. Ex. I at 258-59.  Ms. Butler was new to the system and

according to Ms. Ivey, Ms. Pruitt had already attended a two week HRA course.

Ex. J at 15, 17.

     There may be some confusion about who went to the training which Ms.

Pruitt complains about.  Ms. Butler remembers Ms. Pruitt stating to her that under Ms. Ivey another person got to go to training and Ms. Pruitt thought that was unfair.  Ex. I at 267.  The training that the unnamed person got occurred within a year and a half after Ms. Pruitt went to the Clinic, which places it sometime in 1995.  Ex. A at 18.

When a second training came up in April or May, 1996, during the transition time when Ms. Ivey, Ms. Gallimore and Ms. Butler were at the hospital, Ms. Gallimore approved the training for Ms. Pruitt, but Ms. Ivey did not because the training was not for a Licensed Professional or Vocational Nurse.  Ex. I at 267-69.  Ms. Pruitt did not claim that anything Ms. Ivey did was discriminatory.

Lastly, as part of the move, Ms. Gallimore and Ms. Butler had arranged for training for Ms. Pruitt, even without her requesting it.  Ms. Gallimore testified that with the move, Ms. Pruitt would get more responsibility and more training.  Ex. F at 103-4.  Before July 24, 1996, Ms. Gallimore had already submitted the paper work for Ms. Butler to enroll Ms. Pruitt in the HIV/AIDS symposium in New Jersey.  Ex. R.

Ms. Pruitt did not exhaust her administrative remedies and contact a counselor within 45 days of the alleged discriminatory act, and because she did not, she does not even know the age, name or position of the younger person who

allegedly got the training, or when the denial occurred. Ex. A at 7-8. She also did

not include the denial of training as an issue in her informal complaint or her

formal EEO Complaint. Exs. D. & E. Ms. Pruitt's claim about training is time

barred.

Even if the claim was not time barred, neither Ms. Gallimore nor Ms. Butler

acted against Ms. Pruitt on the basis of age in denying training. Ms. Ivey wanted

Ms. Butler to go to training. Ms. Gallimore and Ms. Butler had actually arranged

for her to have training in New Jersey and informed her of this before the move.

There is no evidence that Ms. Pruitt's age had anything to do with decisions

awarding or denying her training.

A.    Ms. Pruitt Failed to Exhaust Her Administrative Remedies As to Her
      Claim That Someone Who Took Work Assignments Away From Her
      and Gave Them to Caucasian Men.

Ms. Pruitt complains that "Defendant's agents took work assignments away

from [her] and awarded the assignments to Caucasian men, based upon the

Defendant's perception that white males are superior to African-American

females." Complaint ¶ 8. This issue never arose before the EEO. See Exs. D &

E. To this date, the Army does not know who she is referring to or what

assignments were given to Caucasian males. As this was not one of the seven

events listed in her EEO complaint, she failed to exhaust her administrative

remedies on this claim and it is barred.


## VI.   MS. PRUITT FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES AS TO HER WRONGFUL DISCHARGE CLAIM.

On April 8, 1997, Ms. Pruitt received notice that her federal employment

would be terminated effective April 11, 1997, because of her unauthorized

disclosure of confidential information and insubordination.  Ex. O.  The

termination decision letter provided her with notice of her appeal and grievance

rights, and her right to file an EEO complaint. Id.  She timely contacted an EEO

counselor about her termination, received counseling, and on May 15, 1997, was

provided notice of her right to file a formal complaint within 15 days of receiving

such notice (i.e., by May 30, 1997).  Ex. S.  She did not thereafter file a formal

EEO complaint concerning her removal.  Ex. U.

As stated above, prior to bringing suit in district court, a plaintiff suing her

employer for violating Title VII must first exhaust her administrative remedies.

See supra at 30-32.  Failure to file a formal complaint within 15 days of the notice

of right to file precludes a plaintiff from pursuing a discrimination claim in federal

court, unless the plaintiff "'can prove waiver, estoppel, or equitable tolling.'"

Girard v. Rubin, 62 F.3d 1244, 1246 (9th Cir. 1995); Boyd v. U.S. Postal Service, 752 F.2d 410, 414-15 (9th Cir. 1985). Ms. Pruitt voluntarily abandoned her EEO complaint and pursued a grievance remedy through her union. Ex. V. Ms. Pruitt had actual knowledge of the filing deadline and did not timely file a formal complaint, and has no equitable grounds to excuse her abandonment of Title VII's administrative process. When she did not file a formal complaint by May 30, 1997, her claim of discriminatory wrongful termination lapsed.

That claim cannot be resurrected, by presenting it as a matter "like or related to" the complaint which she actually did pursue through the administrative process. In Morgan, 536 U.S. at 102, the Supreme Court held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. The Supreme Court listed termination, failure to promote, denial of transfer, or refusal to hire, as examples of discrete and easily identifiable acts. Id. at 114.

Morgan overruled the "continuing violation" doctrine which allowed Courts to entertain claims which were not timely filed with the EEO Commission. Raad v. Fairbanks Northstar Borough, 323 F.3d 1185, 1192 (9th Cir. 2003). The Ninth Circuit wrote that "a discriminatory practice, although it may extend over time and through a series of related acts, remains divisible into a set of discrete acts, legal

action on the basis of which must be brought within the statutory limitations period." Id.

In Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003), the Court applied Morgan to discrete events occurring after a valid claim is filed and wrote:

> In Morgan, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been sought, when those incidents occurred more than 300 days *prior* to the filing of plaintiff's EEO complaint. The rule is equally applicable, however, to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint. As the Court stated "[t]he existence of past acts ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." Id. at 113.

In Romero-Ostolaza v. Ridge, 370 F. Supp.2d 139, 149 (D.C. Cir. 2005), the court summarized how the majority of the courts have treated discrete acts which arise after an EEO claim has been filed:

> Although Morgan bars recovery for, on its facts, discrete acts occurring before the statutory time period, Morgan has, on the whole, been understood to also bar discrete acts occurring after the time period, after the filing of an administrative complaint, when a plaintiff does not file a new complaint or amend the old complaint but instead presents these acts for the first time in federal court. Martinez v. Potter, 347 F.3d 1208, 1210-11 (2003); Velikonja v. Mueller, 315 F.Supp.2d 66, 74 (D.D.C. 2004); Bowie, 283 F.Supp.2d at 34; see also Delisle v. Brimfield Tp. Police Dept., 94 Fed.Appx. 247, 258 (6th Cir. 2004) (Batchelder, J., dissenting). But see Delisle, 94 Fed.Appx. 247, 252-53 (reaching the opposite conclusion without mentioning the Tenth Circuit's decision in Martinez, thus creating a circuit split); . . .

Given <u>Morgan</u>'s emphasis on strict adherence to procedure and on the severability of discrete acts such as termination, failure to promote, and denial of transfers, <u>see</u> 536 U.S. at 114, 122 S.Ct. 2061, and given <u>Morgan</u>'s rejection of the various continuing violation doctrines of the Circuit Courts, it makes sense to apply <u>Morgan</u> to bar subsequent discrete acts that a plaintiff fails to exhaust in the administrative process. Requiring a plaintiff to exhaust each discrete claim of discrimination or retaliation "comports with the purpose of the exhaustion doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive." <u>Velikonja</u>, 315 F.Supp.2d at 74 (citations omitted). Further, requiring exhaustion encourages internal, less costly resolution of Title VII claims. <u>Martinez</u>, 347 F.3d at 1211 (citing <u>Brown v. Gen. Servs. Admin.</u>, 425 U.S. 820, 832-35, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)).

Thus, a growing weight of precedent holds that <u>Morgan</u> also applies to bar untimely claims arising after an EEO claim on another matter is filed. Although Ms. Pruitt also contacted a counselor about her termination, she abandoned that claim when she failed to file a formal complaint after receipt of notice of her right to do so. She could not tack on her termination claim to her prior EEO complaint because termination is one of the matters which the Supreme Court listed as a discrete act. As such, if Ms. Pruitt thought that the person terminating her employment did so because of her age or race, Ms. Pruitt had to timely file a formal complaint following EEO counseling. She did not file a formal complaint on that matter, and thus failed to exhaust her administrative remedies regarding her claim of discriminatory termination of her employment. That claim is now

time barred.

## CONCLUSION

This suit started because Ms. Pruitt did not want to leave her lovely office at the Clinic and her unsupervised work schedule. She was going to fight it and she started the fight by contacting an EEO counselor for forms on September 16, 1996, and by contacting her union steward. This occurred long before the carpet incident, the racial slur, and any racial e-mails came to light. The reality is, Ms. Pruitt contacted EEO because she was angry about the move, and not because she perceived that she was working in a hostile work environment.

The e-mails came from a Primary Care employee in the Clinic. The racial slur on the desk occurred at the Clinic. The Baa Baa black sheep messages occurred at the Clinic. No employee at the Clinic was her supervisor who could alter the terms and conditions of her employment. Although there was not a hostile work environment based on race anywhere, it was certainly not at the hospital which was a half a mile away. But as a remedy to the hostile work environment claim, Ms. Pruitt wants to go back to the Clinic. She wants to go back because she, herself, does not subjectively regard the Clinic as a hostile work

environment. She perceived the hospital as hostile, where she had to be accountable for her time and work.

No employee discriminated against Ms. Pruitt on the basis of age and race. They responded to events that arose involving Ms. Pruitt in a legitimate and non-discriminatory manner.

Ms. Pruitt's claim that she was denied training which was given to a younger person is time barred. Ms. Pruitt's claim that Caucasian males were assigned her work fails because it is time barred.

Ms. Pruitt' claim for wrongful termination is time barred. Although she started the EEO process, she abandoned it when she failed to file her formal complaint after her May 15, 1997 notice. Thus she failed to exhaust her administrative remedies on the wrongful discharge claim.

The government asks the Court to grant it summary judgment.

Respectfully submitted, on May 31, 2006.

DEBORAH M. SMITH
Acting United States Attorney

s/ Susan J. Lindquist
Assistant U. S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail:susan.lindquist@usdoj.gov
AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2006,
a copy of the foregoing **DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT** was served by
U. S. Mail on:

Brenda J. Pruitt
104 Muldoon Rd Unit 222
Anchorage, AK 99504

s/ Susan J. Lindquist