**Date:** 24 July 1996, 1000 hrs

**Memorandum for Record**

**Subject:** First Counseling Session with Ms Pruitt.

**Attendance:** Ms Pruitt, LTC Gallimore, and Mrs. Butler.


Discussed with Ms Pruitt the re-location of her office from Kamish Clinic to hospital.

Ms Pruitt states she did not want to work in the hospital.  She stated the only reason she took the HRA program job was to get away from the hospital.  When asked what specifically kept her from wanting to re-locate, she replied, "I just don't want anybody looking down my neck watching me all the time."  She added that she had had some problems with employees in the hospital when she worked here before and that she, "wouldn't be able to perform her job over here."

I told her if there were any problems when she came over, she could come to me and if I couldn't resolve the problem, we would go to LTC Gallimore.  LTC Gallimore re-emphasized her support to Ms Pruitt if she experienced any problems on the job.

Ms Pruitt said she liked where she was,  that she had been moved six times, and felt like she couldn't be made to come over to the hospital.

I replied that I thought this could be a good career move for her because she would be gaining higher visibility by expanding her patients from chiefly in-processing soldiers to working with family members and civilians.

Ms Pruitt said she did  80% of the patients seen by the doctors at the TMC, and that the doctors would not like for her to be moved, because they depended upon her. She asked who would do the in-processing and the STDs?

SFC Williams would.  I went on, the HRA job is expanding and we're going to be working more closely with OB/GYN, IM, and Family Practice, so we really need you to be over here.  Hopefully, we are going to work with the well-women also.

Ms Pruitt repeated she didn't want to come over here to the hospital, but that she needed a job, and she would be very honest, "Right now, I will be looking for another job because I know I will not be able to do a good job over here."

I explained the benefits of :  (a)  more teaching experiences
(b)  more team involvement
(c)  opportunity to implement more HRA programs

EXHIBIT R

**000001**

**page 2**
**Memorandum for Record**
**First Counseling Session with Ms Pruitt**

(d)  more exposure to the entire scope of PM

LTC Gallimore talked about her plans of setting up an educational module in our area for both the patients and the nurses.  She also emphasized our networking with each other.

Ms Pruitt said LTC Gallimore and myself couldn't possibly imagine how hard it was for her at the hospital when she worked here before.  She emphasized again that she didn't, " want someone breathing down my neck all the time watching when I come and go."  She went on to say that she should have been consulted about the move.

I said that I thought once she made the move and gave it a try, she would really enjoy working over here, and find it very exciting.  I emphasized the way we all work as a team here and that included Occupational Health.  LTC Gallimore talked of plans to get Ms Pruitt enrolled into some computer courses and that she had submitted the paperwork needed to enroll Ms Pruitt in the up and coming HIV/AIDS Sixth Biennial  Symposium in New Jersey.

Ms Pruitt reiterated again that she would come over here if she had to, in order keep her job, but that she didn't think that she could be made to move over to the hospital.  She then said "I guess I'll come if I have to because I need a job."

I told her that I thought her maturity and experience with the HRA program could be better utilized by her position being physically located aside the other offices of Preventive Medicine.

Ms Pruitt said that it would not.

LTC Gallimore said the decision was made for the benefit of  the PM Department in its support of the Command's Mission.

I then changed the subject by saying, " Since I was going to be her rater and supervisor, I needed to cover some things with her."

Ms Pruitt then asked me if I knew for sure that I was going to be her rater because it was her understanding that I was not and that we had better be checking with personnel and the union, because she didn't think it was right.

I said that as far as I knew, I was.  I asked LTC Gallimore if she had heard anything to the contrary.  She replied that she had not and that I was to be her rater and

**page 3**
**Memorandum for Record**
**Initial Counseling Session with Ms Brenda Pruitt 24 July 1996**

supervisor. But, if Ms Pruitt would like, LTC Gallimore continued, she could check again.

I then went on to discuss the following issues.

(1) PM's focus on health education to individuals and groups about risks, protective factors, and adopting healthy lifestyles, via Military Units, Military Facilities, and Civilian Worksites.

(2) Creating and presenting classes that coordinate learning needs of:

(a) Well Women's Clinic
(b) Occupational Health
(c) Internal Medicine
(d) OB/GYN
(e) Family Practice

(3) Eventually having an automated system to do patient tracking, but until then it is very, very important to implement a tracking system. Set up whatever kind of system works for you. Make it simple and easy.

(4) It is time consuming to become organized, but it is a profitable investment because of all the time and energy that is saved once the plan is implemented.

(5) Meeting suspenses is imperative because of the domino type of impact it has on the department. Your end of the month reports must be submitted by 1600 the third working day of the first week.

(6) Access CHCS and cc:mail at least once a day. Utilize the computer system as much as possible to simplify and expedite communication between co-workers and MEDDAC staff in general

(7) Minimize the amount of time spent away from the clinic area. We are a walk-in clinic and our goal is to meet the patient's needs as expeditiously as possible.

(8) Keep staff apprised of your whereabouts and approximate time of return when leaving the area. A sign out board is in Automation Clerk's Office. When working at the Kamish Clinic, put a message on the computer to Kamish staff and notify the switchboard and the Chief, of Nursing, when you are going to be away from your job.

**page 4**
**Memorandum for Record**
**Initial Counseling Session with Ms Brenda Pruitt 24 July 1996**

(9) It is mandatory to attend the once a month Civilian Training Sessions for the entire period of instruction.

(10) All STD referrals need to be reported to STD nurse the same day they are received.

(11) A tracking system for HRA patients needs to be formalized and implemented.

(12) Referrals from other medical departments should be logged in and organized in a manner that facilitates a three day turnaround, leaves an audit trail, and provides for a follow-up suspense system.

Session ended. CHN meeting with Major Dryer, LTC Gallimore, Ms Pruitt, and myself followed the initial counseling.

Shelby J. Butler, R.N., CHN
Shelby J. Butler, R.N., CHN
Preventive Medicine

24 July 1996  Early afternoon

Had a visit from Mr. Dungee. He brought me a form to fill out for the initial counseling of an employee and stated that Ms Pruitt had been to his office questioning the legality of me being her supervisor and if her rights had been violated by making her move from the TMC to the hospital.

The following is what Mr. Dungee stated to me.

(1) It is in my job description to be the HRA nurse's supervisor.

(2) There is no violation of any kind to having her relocate to the hospital.

(3) The duties discussed in her counseling session were clearly in her job description. Perhaps she had not done them before, but they were in her job description, and did not warrant a new job description being written, nor did it require her job to be upgraded.

(4) It is usually the case that the supervisor will counsel the employee but wait to give the employee his/her copy for the employee's file until after the hand written notes and discussion has been put into a more legible/typed readable form.

I thanked him and told him I was planning on typing the counseling and then would meet with Ms Pruitt again for us to each sign the agreement that these things had been discussed and I would at that time give her a copy of the document.

Shelby J. Butler, R.N., CHN
Preventive Medicine

24 July 1996  Early afternoon

Had a visit from Mr. Dungee. He brought me a form to fill out for the initial counseling of an employee and stated that Ms Pruitt had been to his office questioning the legality of me being her supervisor and if her rights had been violated by making her move from the TMC to the hospital.

The following is what Mr. Dungee stated to me.

(1) It is in my job description to be the HRA nurse's supervisor.

(2) There is no violation of any kind to having her relocate to the hospital.

(3) The duties discussed in her counseling session were clearly in her job description. Perhaps she had not done them before, but they were in her job description, and did not warrant a new job description being written, nor did it require her job to be upgraded.

(4) It is usually the case that the supervisor will counsel the employee but wait to give the employee his/her copy for the employee's file until after the hand written notes and discussion has been put into a more legible/typed readable form.

I thanked him and told him I was planning on typing the counseling and then would meet with Ms Pruitt again for us to each sign the agreement that these things had been discussed and I would at that time give her a copy of the document.

*Shelby J. Butler, R.N., CHN*
Shelby J. Butler, R.N., CHN

000006

24 July 1996   1430

Ms Pruitt walked in and said that she, "Knew where this whole thing got started and LTC Candler was the one responsible."

I told her she was starting all over again as far as her accountability and job performance. "We are starting a new slate. This will benefit you as much as anybody."

Ms Pruitt:  Well, I am telling you right now, I am going to fight this.  I am going to find another job.  I will just be honest with you.

I told her I was so disappointed about the move.  I saw it as a good career move since the Army is very interested in health promotion, now.

Ms Pruitt said that it might be a good career move, but she didn't want to do it, and was going to fight this.

Ms Pruitt left.

Shelby J. Butler, R.N., CHN
Preventive Medicine

**Date:** 25 July 1996, 0730 hrs

**Memorandum for Record**

**Subject:** Visit from Ms Pruitt

**Attendance:** Ms Pruitt and myself

      Ms Pruitt came over to make out leave slips for her vacation and past leave taken for illness. States she was VERY upset about the move and believed the only reason she was being brought over here was because of a "certain person."

      I reminded her of our conversation that took place soon after I came to work here. She had been very upset with her job and I had asked her what would make her happier in her job. You told me you wanted training, TDY, and to get to go out to the units and teach. I reminded that she also had stated she felt isolated at the clinic and that she did not get along with the TMC people very well.

      I expressed disappointment because I thought coming over at the hospital would get you away from the persons you could not get along with. You have already been put in for TDY and AIDS training. You are going to have a lot more teaching opportunities and you won't be isolated from PM anymore. What is the problem?

      Ms Pruitt said she knew the ONLY reason she was being brought over here was Maj. Candler, because, "He wants to know where I am all the time. I don't need someone breathing down my neck watching me do my job. I'm telling you right now, I'm going to him and tell him how I feel about this and then I'm going to Col Carter and tell him. I'm not moving over here. I can see civilians and family members where I am at. Besides, **I am the HRA specialist!** Nothing should have been done without talking to me, first! I don't know where LTC Gallimore got her figures from, but they are wrong. She hasn't been here long enough to know anything about the TMC and the number of patients I see. I know who's behind this and I'm going to tell him so. You can't sit there and tell me I'm wrong either, can you? Can you? He just wants to know where I am."

      I replied that, "No I wasn't going to deny that he wants to know where you are because of the complaints of you not being on your job. I have even experienced a lot of people telling me the same thing. But that is not the major reason for the move. I don't understand why you can't see all the plusses for yourself in making this move. It's a great opportunity. I really think you'll get excited about the job once you get over here. You're going to find no one's breaths down anyone's neck here. We're too busy. We really need you here to help us. We're so low staffed that it takes all of us working together to get the job done. I help Judy, she helps me, and as for LTC Candler, he is so busy you'll be lucky if you even see him.

      Ms Pruitt replied that she was not doing anything for OCC Health, it was not in her job description and that I could not expect her to do it, then she added, "and you're not going to throw this under, and all other duties assigned."

**page 2**

**Date:** 25 July 1996, 0730 hrs

**Memorandum for Record**

**Subject:** Visit from Ms Pruitt

**Attendance:** Ms Pruitt and myself

I explained helping Judy only entailed things like giving directions to someone. Greeting, offering pts coffee, and putting patients in the waiting room until Judy arrived. Take messages. If Judy was going to be gone, she might ask us to give someone a chart or a letter, etc. It is a small part of the teamwork. Judy does the same for me. Even Cpt Copeland helps us. It was just the little things that helped the day go easier for all of us since we are doing secretary and medical clerk duties on top of our regular daily tasks.

"Well, I want to sit down and look at my job description because I have got enough of my own work to do and I am not doing Occupational Health work and I'm not going to let anybody tell me that's under, "other jobs as assigned." If I do more, then I am going to get an upgrade with more pay."

*(evaluation)*

I replied, "Well, maybe you **won't** like it over here because we do work as a team and focus more on getting the job done, rather than who's job it is to do it. But, we really do need you."

"I'm going to talk to Candler now. I'm going to let him know I know why he's bringing me over."

*(retaliation)*

**I** am the HRA specialist, not anybody else! He has no right to bring me over here and I'm going to fight it."

Ms Pruitt finished filling out four leave slips and left.

Shelby J. Butler, RN, CHN
Preventive Medicine

**Date:** 25 July 1996, 0900 hrs

**Memorandum for Record**

**Subject:** Re-Visited by Ms Pruitt

**Attendance:** Ms Pruitt and myself

Ms Pruitt here after visiting Dr. Candler. She states he was moving her for that reason. I asked for what reason? She answered, "Because he wants to watch what I am doing. He also wanted to know about my leave slip for 5 July 1996. I can't remember whether I worked then or not. Do you know whether I worked on that day?"

I told Ms Pruitt that I had no idea because that was the period I was on vacation.

She said Maj Candler said it had not been decided yet whether she was moving over here or not and would like for her to wait until the decision was made before going to Col. Carter. She said that she would wait.

*accountability*

Shelby J. Butler, RN, CHN
Preventive Medicine

000010

**Date:** 25 July 1996  1400

**Memorandum for Record**

**Subject:**  Visit #3 today from Ms Pruitt

**Attendance:**  Ms Pruitt and myself

Ms Pruitt came over again.  Wanted to know what SFC Williams would be doing. I told her he would be doing in-processing.  She wanted to know what else.  I said Judy needed him, he would be pulled over to help, but that would not be on a regular basis, probably.

Ms Pruitt answered, Well, **I'm** the HRA specialists.  What does he know about doing that job?"

I told Ms Pruitt that SFC Williams was under the supervision of LTC Gallimore and that I didn't care what he was doing, when or where, as long as the mission was being accomplished.

Ms Pruitt left.

Shelby J. Butler, RN, CHN
Preventive Medicine

000011



**Date:** 30 July 1996

**Memorandum for Record**

**Subject:** Continuity of Care for the HRA Clinic's Patients in the Absence of Ms Pruitt

**Attendance:** Ms Pruitt, LTC Gallimore, and Mrs. Butler (Ms Pruitt's office)

Discussed with Ms Pruitt the coverage that would be needed to care for the service members and their families scheduled for HRAs while she was on leave.

The following is an evaluation of the administrative aspect of the HRA program and some suggestions / recommendations for improving the monitoring and tracking of patients to better insure continuity and thoroughness of care.

(a) A recording system for individual patient follow-up is needed. (there are no patient or convenience files set up)

(b) Patient suspense files are needed to insure patient is notified of his abnormal labs, will be followed up by his primary care giver, and given the appropriate preventive medicine education. (no suspense file system)

(c) A system is needed to follow-up in a consistent and timely manner referrals, both incoming and outgoing. (no consistent referral is in place)

(d) A system to be in place that facilitates timely retrieval of patient information . (there is no organization of labs, consultations, referrals in and out, or workload).

(e) There was no health appointment's system set up for service members and their families. All service members and their families are to have a DA Form 4700 MEDDAC OVP 12 Medical Record-Supplemental Medical Data Sheet (Health Maintenance Form) in their record. (no health appointments have been set up for consultation or teaching).

f) An audit trail has not been established to facilitate optimal health care recording and validates the promotion of health care for the preventive of illness and disease. (there is no system in place to track continuity of patient care through the HRA clinic.

(g) Consistency in processing HRAs and following up in a timely manner.

**page 2**

**Date:** 30 July 1996

**Memorandum for Record**

**Subject:** Continuity of Care for the HRA Clinic's Patients in the Absence of Ms Pruitt

**Attendance:** Ms Pruitt, LTC Gallimore, and Mrs. Butler (Ms Pruitt's office)

LTC Gallimore discussed the following matters:

    (a) a log for referrals

        date, name, SSN#, reason referred, who, when, why,

    (b) importance for having an audit trail.

    (c) proper distribution of copies of consults

        one to records, one to the consultant, and one to Ms Pruitt

    (d) three day turnaround of suspense items

    (e) CHCS mailman and importance of communication with TMC and
        PM.

*Shelby J. Butler, R.N., CHN*

**Date:** July 31, 1996

**Memorandum for Record:**

**Subject:** Telephone call with Ms Pruitt

Called Ms Pruitt to inquire RE: patients she had made appointments for so I could keep them while she is gone and to inquire of what the status was on her STD cases.

Ms Pruitt said she had no appointments on her calendar. She went on to say she, "had forgotten yesterday that her Doctor appointment wasn't yesterday, but was really for today, so she would be leaving early today." She said that she was going to one stop and to in-processing. She said that yesterday she put information into the computer about leaving, but she shouldn't have to do it today, if no one was there at Kamish.

I told her if no one was there and since she was letting me know now that she was leaving, then just for today, she didn't have to put it into the computer.

She said she thought LTC Gallimore and myself "had gone a little overboard asking her to report where she was going to be. She said, "It wasn't anybody's business where she went. It is like hanging my personal business out for everybody over here to know."

I said it was necessary so her co-workers would know where she was and when she would be back to be available for patients.

She said, "they don't need to know. LTC Ivey and the supervisor at the Kamish were the only ones that needed to know before."

I said it was appropriate for her to put her absence into the computer so people that needed her would know where she was like appointment, personnel, lunch and when she would be back. If co-workers didn't check the computer to find out when her office would be open again and someone complained of her being gone for long period of time, she could account for absence by the computer. It would be their fault for not checking the computer, if they needed her. This way if the doctors wanted her, they would have an idea when she would be back in her office, and if they needed her right away, they could find her.

She smartly asked, "Well, do YOU ALL tell the whole hospital where you are?"

I said that we make sure the people in our department know where we are and when we will be back. I gave an example, "Like today, I came back from lunch and put a message in the computer saying that my door will be shut, but I am available if my co-workers need me. It is closed to cut down on the people passing by talking to me so I can concentrate on some things that I have to get done.

"Do you tell the whole hospital?" she asked again.

000014

**page2**
**Date:** July 31, 1996
**Memorandum for Record:**
**Subject:** Telephone call with Ms Pruitt

I said we let all our co-workers know, then if anyone from the hospital needs us, they will know what to tell them. I even put this message on the computer to you also, only I put yours on CHCS instead of cc: Mail because I know you don't have cc:mail. Not everyone has CHCS here, so I put it on cc:mail.

I said we are not asking you to do anything we aren't doing ourselves and it is of benefit to you to have accountability.

I know, but I want to know who the people are that are lying on me and saying they don't know where I am. Who are they?

I said it isn't important who they are. The important thing is starting you a new record.

Ms Pruitt, "LTC Ivey said it was a need to know basis and I just report to her and to the supervisor at Kamish."

Me, "You, LTC Gallimore and I have already discussed this. We are wiping the slate clean and starting over. It's important for you to be accountable of your time like every one else."

Ms Pruitt, "I want to know who complained about me. I always told LTC Ivey where I was going to be."

Me, "LTC Ivey is gone now and I want to be able to reach you when necessary. It is the way it is going to be for now."


Shelby J. Butler, R.N., CHN
Preventive Medicine

Mr. Prince

Please answer the following questions

1. What I understood I was supposed to be trained in today.

2. What I was shown today.

GREAT smo...f.

THE THIRD THURSDAY OF NOVEMBER

1. Ans. to #1

I understand I'm to work in the mass office Rm 267 on Wed. mornings 0730-1130 Check patients in during Clinic, Pull charts?? Put Chart on doctor Clinic door and have pt to wait in waiting room Answer the telephone and take messages on All telephones that don't have any answer Machine on it

I observed
2. How to Put Charts together
I observed How to do AOS Sheets
How to put Charts on Doctor Clinic door And how to put patient in Waiting Area

#3 Charts will Always be pulled the day before Clinic by Renea And I'm to only Check it in and out Cliert in doctor Clinic door And seat patient in waiting room due to I'm not to pull Any Charts of lab due to the fact I'm on restriction.

**Memorandum for Record**

**Subject:** Conversations with Ms Pruitt, first day back from a month's vacation

### 1. SF 71s

Informed Ms Pruitt that leave slips for her doctor visits and trips to physical therapy from June/July need to be turned in.

Ms Pruitt's reply was that she couldn't remember the dates of doctor visits or what days she went to physical therapy.

I stressed that they were overdue and needed to be turned in right away.

Ms Pruitt answered, "I guess I'll just have to guess then."

My reply was, "You can get the dates from your physical therapists and your doctor.

### 2. SFC Williams cross-training with Ms Pruitt/Home Inspections

Me: One day this week SFC Williams will arrange a day with you to go over to Kamish and train for HRA Program.

Ms Pruitt: He doesn't need training. He already knows how to do it.

Me: No. He needs to be trained. Show him how to generate the HRAs, where equipment is located, where supplies are. Show him your training materials. Educate him on all aspects of your job.

Ms Pruitt: O.K., I want him to cross-train me on home inspections anyway.

Me: No. Inspecting homes is not in your job description.

Ms Pruitt: I did it with SFC Wiggins when she was here.

Me: I am aware of that, but home inspection is not in your job description. You will not be doing any home inspections.

Ms Pruitt: All right then.

### 3. Civilian Training.

Me: There is civilian training on Wednesday at the Oasis Club.

**page 2**

**Date:** 9 September 1996, 0730

**Memorandum for Record**

**Subject:** Conversations with Ms Pruitt, first day back from a month's vacation

> Ms Pruitt:  At the Oasis Club?

> Me:  Yes, and we are suppose to be there on time, because they are saying they are going to lock the doors.

> Ms Pruitt:  OK

**4. Commander's change of military and civilian training.**

> Informed Ms Pruitt of the new training times; Thursdays from 0800-1000.

Shelby Butler, R.N., CHN
Shelby Butler, R.N., CHN
Preventive Medicine

**Date:** 11 September   6, 0850

## Memorandum for Record

**Subject:** Phone conversation with Ms Pruitt

Discussed the following with Ms Pruitt:

> Me: By Friday, Judy and I hope to have a schedule made out for your and SFC Williams' cross-training. Judy and I met with LTC Gallimore yesterday, and now Judy and I have to go over the particulars of getting you over here and SFC Williams adjusted over there.

> Ms Pruitt: I don't see how he is going to work over here and over there, too. There needs to be someone here all the time.

> Me: He will be over there the majority of the time, but Judy needs his help sometimes, too. I can't give you any details now, because I am not sure of just exactly what you and SFC Williams will be doing for Judy, but by Friday, Judy and I will have sat down and ironed out the wrinkles and will get with you and SFC Williams. Nothing will be left up in the air if we can help it. The four of us ought to be able to come up with a schedule that suits both of you. We are looking at Oct 1 as the date for the switch, so we want to give you and SFC Williams all the orientation we can before then.

> Ms Pruitt: If I am going to be doing the same thing SFC Williams and SFC Wiggins are doing then I want a 7. That's what they are. There aren't a 5.

> Me: That may eventually be feasible. First, though, we need to train you. I think you are going to be very happy over here and I am excited about you coming over. We sure do need you.

> Ms Pruitt: I am glad you are excited, I'm sure not. I am suppose to go see the union steward today. Is it O.K. if I go?

> Me: Sure. Of course, you can go. Just leave enough time for you to get finished there so that you won't be late for civilian training at the Oasis today.

> Ms Pruitt: All right then, bye.

> Me: Bye

Immediate call back to Ms Pruitt.

**page 2**
**Date:** 11 September 1996, 0850
**Memorandum for Record**
**Subject:** Phone conversation with Ms Pruitt

        Me: Hi! Sorry to call back, but I forgot to remind you to be sure you let the people at the Kamish Clinic know that you are leaving and tell them to call over here if they need us for anything. See you at the training.

        Ms Pruitt: O.K., bye.

                                     *Shelby Butler*, RN,CHN
                                     Shelby Butler, R.N., CHN
                                     Preventive Medicine

000020

**Date:** 19 September 1996

**Memorandum for Record**

**Subject:** Lack of knowledge in completing Walter Reed Report Form

Ms Pruitt handed in an incomplete Preventive Medicine Medical Report Form that is provided to Walter Reed Hospital by Fort Wainwright, Fort Greely, and Fort Richardson. The following is a list of information missing from that form.

1. FMP #
2. Disease category #
3. Unit (written in was N/A)
4. Duty phone (written was N/A)
5. Diagnosis code #
6. Whether the test was confirmed or not
7. What the method of confirmation was
8. The medication the patient received

I handed the form back to Ms Pruitt and asked her to fill in all the blanks. She said, "Where?"

I began pointing to the blank information squares, and Ms Pruitt took the form from me. In a few minutes, she came back and handed me the form again. She had filled in the diagnosis code that she had obtained from LTC Gallimore and had placed an N/A in the Unit information and duty phone blocks.

I said that it was still incomplete, but she could finish it first thing in the morning. She said O. K. she would take it home and bring it back in the morning, but then she looked at me and said, "Oh, no, I can't do that, can I?" I said no, you can't do that. She laid it down on the desk, and I reached over and picked it up and told her it needed to be locked up. I said I would get it out for her in the morning and she could complete it then.

Shelby Butler, R.N., CHN
Shelby Butler, R.N., CHN
Preventive Medicine

**Date:** 20 September 1996

**Memorandum for Record**

**Subject:** False and Incomplete Information/Breach of Confidentiality

Ms Pruitt handed in an STD report today, and there were multiple errors on the Walter Reed Form and some misinformation that set the stage for a breach of confidentiality.

I was not aware Ms Pruitt was working this person's STD case. I received a positive lab identifying a sexually transmitted disease and began filling out the patient's information from the computer onto a Walter Reed Reporting Form. I did not call the patient, because I wasn't sure the doctor had informed the patient of her results, so I was very surprised when Ms Pruitt turned in the completed case.

As I looked over the report, I noticed some of the patient's information was different than what I had found in the computer. One of the most obvious differences was in the address. I thought this might be because my information had come from the computer and Ms Pruitt had interview this person, so possibly the patient had moved and the file had just not been updated. I wanted to be sure, so I telephoned the patient to confirm her address and discovered the address listed on Ms Pruitt's form was not the address of the patient's but rather the CONTACT!

I researched and tried to confirm the rest of the information on the document and discovered the incorrect date of birth and phone number.

When I questioned Ms Pruitt, she stated that she got the information from the woman's OB record. When asked to complete the form, it took two more tries before she was able to finish it. Ms Pruitt's statements were, "Well, I couldn't find that," or where do you think I should look for that," or, "I didn't know I had to fill that block in." She appears to have difficulty in problem solving and working independently.

*Shelby Butler, R.N., CHN*
Shelby Butler, R.N., CHN

**Date:** 20 September 1996

**Memorandum For Record**

**Subject:** Incomplete and Inaccurate Patient Information

**S:** Ms Brenda Pruitt took care of an STD case and turned the report into me today.

**O:** The first two numbers before the social security are missing.
There is no category code listed.
There is no unit listed.
The confirmed status is missing.
The method of confirmation is missing.
The name of the medication is missing.
The birthdate is wrong.
The address is wrong.
The phone number is wrong.
All applicable blocks must be filled in before the report can be transmitted to Walter
Reed.

**A:** Ms Pruitt's report is inaccurate and incomplete.
Ten out of twenty pieces of information are either recorded inaccurately or missing.

**P:** Address inaccurateness and incompleteness of report with Ms Pruitt.


*Shelby Butler, R.N., CHN*
Shelby Butler, R.N., CHN

**Date:** 7 October 1996

**Memorandum for Record**

**Subject:** MP Call at 1315

     MP Station called at 1315 today requesting I give permission and instruct Ms Pruitt go over to the MP Station. I stated that I would and then told Ms Pruitt, the MPs wanted her to go over to the Station.

     Ms Pruitt said, "O.K."

     At 1330, I asked Ms Pruitt if she was going over to the MP Station now. She said that she didn't know and "I've gotta call somebody, then I will know."

     I said, O.K. Let me know.

     At 1340, I checked to see if Ms Pruitt had left yet. She had not. I ask her if she found someone to go to the MP Station with her. She said that she was waiting on a call from her lawyer.

     Ms Pruitt left at 1500 to go to physical therapy.

*Shelby Butler R.N., C.H.N.*
Shelby Butler, R.N., C.H.N.

**Date:** 1 October 1996, 1530

**Memorandum for Record**

**Subject:** Visit with LTC Lewis

**Attendance:** LTC Lewis, Ms Pruitt, and Mrs. Butler

Ms Pruitt states she has an appointment at 1600 with LTC Lewis. I asked her where she had been since lunch and she stated she had been over to the Kamish talking to the Investigator. States the investigator didn't even take a statement because he said there wasn't any reason to because she had three witnesses that said the floor wasn't messed up when she left.

Accompanied Ms Pruitt to see LTC Lewis. During the course of the conversation, he asked her who had given her permission to remove the carpet. She replied that LTC Gallimore had, and then went on to say that it was her carpet anyway so she had the right to take it up if she wanted to. When LTC Lewis glanced over to me, I shook my head, no, because I knew LTC Gallimore's stand on the issue.

Ms Pruitt and LTC Gallimore had already discussed the carpet in my presence, and the Colonel said that the most important thing right now was to get the move accomplished, and then there would be time to find out about taking up the carpet. She suggested to Ms Pruitt that she get moved and then at a later time she could check with Safety and look into what all it would take to move the carpet. Brenda replied that she thought she would have to talk to OSHA, too. This is as far as the issue was addressed and I felt like the issue was closed and I have no reason to believe that LTC Gallimore thought any other way, either.

I noted that Brenda stated that the carpet was government property this morning and now she was saying the carpet was hers.

When we left, LTC Lewis asked Ms Pruitt if she was going to see Colonel Carter, because if she was, he wanted to brief him on their conversation. She didn't answer him at first, but said she was looking for Joyce. I asked her if she was going to see Colonel Carter and she said yes.

I thought it interesting that Ms Pruitt did not ask LTC Lewis at any time if he or    someone else would escort her to the MP Station, since this was the reason she had given me for going to headquarters in the first place.

Shelby Butler, R.N., CHN
Preventive Medicine

00025

**Date:** 1 October 1996 (afternoon)

**Memorandum for Record**

**Subject:** Visit with LTC Lewis

**Attendance:** LTC Lewis, Ms Pruitt, and Mrs. Butler

Accompanied Ms Pruitt to see LTC Lewis. During the course of the conversation, he asked her who had given her permission to remove the carpet. She replied that LTC Gallimore had, and then went on to say that it was her carpet anyway so she had the right to take it up if she wanted to. When LTC Lewis glanced over to me, I shook my head, no, because I knew LTC Gallimore stand on the issue.

Ms Pruitt and LTC Gallimore had already discussed the carpet in my presence, and the Colonel said that the most important thing right now was to get the move accomplished, and then there would be time to find out about taking up the carpet. She suggested to Ms Pruitt that she get moved and then at a later time she could check with Safety and look into what all it would take to move the carpet. Brenda replied that she thought she would have to talk to OSHA, too. This is as far as the issue was addressed and I felt like the issue was closed and I have no reason to believe that LTC Gallimore thought any other way, either.

I noted that Brenda stated that the carpet was government property this morning and now she was saying the carpet was hers.

I thought it interesting that Ms Pruitt did not ask LTC Lewis at any time if he or someone else would escort her to the MP Station, since this was the reason she gave me for going to headquarters in the first place.

*Shelby Butler*, R.N., CHN
Shelby Butler, R.N., CHN
Preventive Medicine

**Date:** 1 October 1996, 1000

**Memorandum for Record**

**Subject:** Ms Pruitt/MPs

Ms Pruitt said she was going to the MP station to talk to someone. I said, "What is wrong?" She said, "You haven't heard?" I said, "Heard what? I've had patients all morning. Today is my TB Clinic."

Ms Pruitt pulled on my arm taking me into her office.

Ms Pruitt said that someone was just causing her trouble.

Me: "What kind of trouble?"

Ms Pruitt: "You mean you don't know?"

Me: "All I know is that when you and I were discussing some of your work, someone called Tate called saying there was an emergency and she had to talk to you immediately, and now you are telling me you have been told to go to the MP Station."

Ms Pruitt: "About the carpet."

Me: "What about the carpet?"

Ms Pruitt: Oh, just something Dr. Candler caused.

Me: What did he cause?

Ms Pruitt: He knows me well enough to know that I would never take anything. He could have stopped all this.

Me: I thought Dr. Candler was going to Anchorage today.

Ms Pruitt: He went over to the TMC before he left. There isn't anything they can do to me. It is government carpet, from a government building, and it was put in a government vehicle on government property. They can't prove anything.

Me: Wait a minute, I thought this was all about you damaging the floor when you were taking the carpet up.

Ms Pruitt: No. They knew they couldn't prove that about the floor because too many other people can get in there. So now they have gone and made this up.

Me: Well, let me know what happens.

*Shelby Butler*, R.N., CHN
Shelby Butler, R.N., CHN
Preventive Medicine

**Date:** 1 October 1996, 1130

**Memorandum for Record**

**Subject:** Ms Pruitt, Lunch, and Personal Belongings at the TMC

Brenda just stuck her head in the door and said that she was leaving now for lunch and had a 12:30 appointment with LTC Lewis.

I informed her SFC Williams had come by and he wanted her to get her things at the TMC right after lunch, so please come back to the unit before going to any appointment.

She said that she would. I asked her again who she was going to see and she said LTC Lewis. I asked her why? She replied, "Because they want to try to keep me from having to go over to the MP Station, which Major Candler should have done in the first place."

I went down to the Commander's office to verify Ms Pruitt's appointment, and I was told by Joyce that Ms Pruitt had no 1230 appointment with LTC Lewis.

*Shelby Butler, R.N., CHN*
Shelby Butler, R.N., CHN
Preventive Medicine

00028

**Date:** 1 October 1996, 1125

**Memorandum for Record**

**Subject:** Ms Pruitt, MP Station, and Major Tenhet

Ms Pruitt called. and said she was over in Joyce's office waiting to see Colonel Carter. States she saw Maj Tenhet. Said she had to go through the chain of command in order to see Colonel Carter. She wanted to go to lunch, now.

I said, "You told me you were going over to the MP Station when you left here."

She replied that she was trying to get someone to go with her to the MP Station.

I said, "You didn't say anything to me about wanting someone to go with you to the MP Station. We just had a discussion a few days ago about going through the proper channels to get something accomplished. Why didn't you go up the chain of command. You should have first told **me** that you wanted someone to go with you."

Brenda: "I wanted someone that was higher than Maj. Candler." I am going to lunch now and just wanted to let you know."

Me, "Come back to the unit when lunch is over."

*Shelby Butler, R.N., CHN*
Shelby Butler, R.N., CHN
Preventive Medicine

Date: 18 October 1996

Ms Brenda J. Pruitt,

This letter of reprimand is in reference to our conversation on 10 October 1996, regarding disapproval of your leave request for 11 October 1996. You were instructed that due to the inadequate amount of training time caused by your absenteeism from the work place (302.5 hours since 5 August 1996), and the backlog of work our department is carrying because of limited personnel, I was disapproving your 8 hours annual leave. You said you had made two appointments for that day. I stated, we would work around them, but it was very important to get you trained in performing your duties. The training holiday provided an excellent opportunity for training, and the specific training we were going to do only occurs every three months.

I have been informed by LTC Gallimore that on 10 October 1996, the very day I disapproved your leave, you went to her, in total disregard to our conversation, and requested she sign for your leave. .

Actions of this nature cannot be tolerated by myself or this department and must be corrected immediately. Additional infractions of this type will be met in the same manner or referred up the chain of command for further action.

Employee loyalty and honesty is of the utmost importance in both our department and in the profession of nursing.

Copy of this letter will be turned over to CPO for placement in your official file.

*Shelby J. Butler, R.N., C.H.N.*
Shelby J. Butler, R.N., C.H.N.
Preventive Medicine

*Sent to Jerry Payne,*
*Friday October 25, 1996*

*Advised by Mr Payne*
*and requested per*
*LTC Gaallimore to hold for*
*now. sjb*

u-5

000030

Date: 22 October 1996

**Memorandum of Counseling**

**Subject:** Patient Complaint/Breach of Confidentiality

**Attendance:** LTC Gallimore, Ms Wand͵ *Wanda Laliberte* Ms Pruitt, and Mrs. Butler

On 21 October two patients, husband and wife, came into my office stating:

a. Ms Pruitt had called the husband at his work place and requested his wife come in to the clinic for a three month HIV. (Protocol to have an HIV drawn three, six, and twelve months after an STD.)

b. Ms Pruitt called the wife without first identifying herself. She stated she had to ask Ms Pruitt three times before Ms Pruitt would identify herself and was actually yelling at her by the third time.

c. Ms Pruitt called wife on the morning of 21 October 1996 and told the patient she needed to have another Chlamydia culture done when she comes in for the HIV test.

Both parties were extremely upset and embarrased. They both stated, it isn't any wonder patients do not want to come in to be checked. The wanted to make a complaint. Dr. Candler was called in to talk with spouses.

The sensitive and highly personal nature of STD information requires that you observe strict confidentiality in dealing with the nonmedical public. Program success and your success depends on whether patients believe the program observes this principle by our demonstrated commitment to it.

A test for Chlamydia is only ordered by PA and physicians. It is a doctor's or PA's responsibility, not a nurse. If you have reason to believe the patient may need one (reinfection) notify her caregiver.

When calling patients identify yourself by name, facility, department, and your position (LPN). It is professional, courteous, and communicates clearly your credentials. Effective communication consists of using specific and efficient approaches to delivering and obtaining information, and the ability to resolve problems which arise in those interactions.

*Shelby Butler, R.N., CHN*

*Ms Pruitt denied all accusations. Ms Laliberte said this was not a counseling session and all of this could have been solved by discussion. Informed Ms Lab Laliberte whether it is called counseling or discussion, it was Ms Pruitt's choice to not discuss this without Union Representation and that*

HSUC-PM(690-700a)                                          October 28, 1996

MEMORANDUM FOR Ms. Brenda J. Pruitt, Practical Nurse, GS 620-05, BACH, Preventative Medicine, Community Health, Ft. Wainwright, AK

SUBJECT: Official Memorandum of Reprimand

1. This is a Memorandum of Reprimand for failure to provide complete and accurate information when requesting annual leave. This memorandum will be made a part of your Official Personnel Folder for one year from the date you receive this document.

2. On 10 October 1996, you followed proper procedures and requested from me a day of annual leave. I discussed with you the requirements of the department and discussed your lack of attendance during the past several months. I disapproved your request for annual leave for that day and gave adequate reasons for the need for your attendance. You appeared to understand my disapproval of your request. Later on that same day without mentioning it to me, you went to LTC Gallimore the next line supervisor, and requested she sign for your annual leave. (You did this without mentioning to her that I had disapproved your leave or explaining in any way your attempt to have me approve your leave.) Your actions were in my opinion deceptive and unprofessional. Your act of going to LTC Gallimore with your SF-71 and attempting to have her sign it without an explanation of my disapproval clearly indicates to me that you were being manipulative and dishonest in your attempt to have the leave approved.

3. When deciding the proper penalty to assess in this situation, I was guided by the table of suggested penalties in AR-690-700, chapter 751, the Douglas factors and your entire work record. I am convinced that your misconduct warrants this Official Memorandum of Reprimand and that it is the least form of formal disciplinary action that I can take in this situation to correct what I feel is a serious breach of integrity on your part. I caution you that further misconduct on your part could lead to my consideration of other forms of disciplinary measures. You need to heed this action as a warning that I will not condone misconduct and that I feel your integrity has been damaged by your actions.

4. If you feel this action is unjustified, you may file a grievance under the negotiated grievance procedure. I have included instructions to follow if you elect to pursue a grievance.

                              SHELBY J. BUTLER, R.N.
                              BACH, Prev Med

000032

**Date:** 1 November 1996

**Memorandum for Record**

**Subject:** Incomplete and Inaccurate Patient Information

This briefing is a reiteration of our conversation on September 20, 1996, regarding false documentation and incomplete information. I am making a formal documented record now to insure you understand the gravity of accurate recording.

It is a health care provider's legal and moral responsibility to record truthfully, accurately and completely the patient's health care information. False and inaccurate information placed in a record could have tremendous impact upon the patient. It is vital that you create records that give truthful, accurate, and complete information. Records are legal documents and errors in them can have a negative impact upon the hospital as well.

Do not fill in false information in order to meet a suspense. If you have problems meeting the suspense of a case, let me know. It can be worked out.

Also, I am providing you with a copy of the medical surveillance code book. It is a handy reference tool. Utilize it in all your epidemiological reports. I use it frequently.

Signing this document is attesting to the fact, I have discussed this information with you, you understand the information, and I have provided you with the medical surveillance code book referred to above.

_____                    _Shelby Butler, R.N., CHN_
Brenda Pruitt, L.P.N.                        Shelby Butler, R.N., CHN

2 Nov 96  Mrs Pruitt accepted surveillance code
          book, but she refused to sign I had
          provided her with it. sjb

          Carole E Hallmore
          LTC C ACHN

          another STD case
          Not the one for
          arbitration.

**DATE:** 1 November 1996

**Memorandum for Record**

**Subject:** Transportation of Confidential Records (Ms Brenda Pruitt, L.P.N.)

Ms Pruitt, this is an educational counseling statement.

During a telephone conversation on 19 September, 1996, it was brought to my attention that you were unsure as to how STD records are transported from the Kamish clinic and forwarded to the hospital. Your suggestions for getting the patient's record to the hospital included a shotgun envelope and/or taking the record home with you and bringing them back in the morning. At that time, I requested you to do neither, but instead to bring the record to the hospital for lock up, before going home. That way it would be here for you in the morning, and no patient confidentiality would be jeopardized.

We had a discussion about confidentiality and the safeguarding of patient information. It was pointed out that shotgun envelopes and/or taking the patient's information home with you, both had the potential to compromise the patient's confidential information. I discussed what MEDDAC'S policy for transporting confidential information was.

The instructions for sending STD information is outlined in the USA MEDDAC-AK, Epidemiology SOP and reads (in reference to sending STD information in mail) "Send to Preventive Medicine in a **sealed** envelope **marked** "CHN EYES ONLY!"

Attached is the Standing Operating Procedure for the Epidemiology Program, Preventive Medicine Department, USA, MEDDAC-AK, Fort Wainwright, AK, dated 9 January 1996. It gives guidance on sending sensitive/confidential information to Preventive Medicine. It is the one I have referred to on occasion and is provided to give guidance on sending documents of the same nature in the future.

This briefing is a reiteration of our conversation in September, however, I am making it a formal record now, and I am providing you with the SOP. Confidentiality is both an ethical and legal nursing responsibility, and it is vital that you know and implement this policy.

**Page 2**

**DATE:** 1 November 1996

**Memorandum for Record**

**Subject:** Transportation of Confidential Records (Brenda Pruitt, L.P.N.)

   Signing this document is attesting to the fact, I have discussed this information with you, you understand the information, and I have provided you with the Preventive Medicine Epidemiology SOP referred to above.

_____     *Shelby Butler*, R.N., CHN

Brenda Pruitt, L.P.N.        Shelby Butler, R.N., CHN
Preventive Medicine        Preventive Medicine

2 Nov 96 Ms Pruitt accepted surveillance code book and PM Epidemiology SOP, but she refused to sign stating I had provided these for her. sjb

*Carole Hallmark*
LTC C AC HN

Date:  21 November 1996

MEMORANDUM FOR RECORD/Counseling

To:  Ms Brenda Pruitt, L.P.N.

Subject:  Removal of Confidential Access

On 21 October 1996, I received a substantiated complaint in reference to breach of confidentiality and privacy.  This was a written complaint and was presented to me by the patient's husband.  This incident was discussed with you on 22 October 1996 and again on 29 October 1996.

As of this date, the letter is nothing more than a formal complaint lodged against you and reflects no more than that! These are **only allegations**.

For the protection of all involved, you are temporarily removed from having access to CHCS, working with patient records, giving direct patient care, or any assignments or responsibilities that pertain to confidentiality until this matter is settled. You will retain your other duties as outlined in your job description or assigned.  At the present time, you will remain in Preventive Medicine

This directive is in **NO WAY** disciplinary.  This is being accomplished **ONLY** for legal reasons.  This is to protect you, myself and all of  MEDDAC in the event there would be other patient complaints filed during the time of this investigation.

*Shelby J. Butler, R.N., CHN*
SHELBY J. BUTLER, RN, CHN
Preventive Medicine

CONCUR/NONCURRANCE
*Carole E. Gallimore*
Carole E. Gallimore
LTC, AN
C, ACHN

cf: Maj Instut

000036

MEMORANDUM FOR   Mr. Jerry Payne, Personnel Manager Specialist, CPO-FWA
SUBJECT: Recommendation for Disciplinary Action for Ms. Brenda Pruitt

25 November 1996

On 21 November 1996, I denied Ms Pruitt access to CHCS, working with patient records, giving direct care, or having any assignments or responsibilities that pertain to confidentiality. This was done after reviewing Ms. Pruitt's behavior with LTC Gallimore and LTC Candler. The following is a chronological account of the incidences that prompted me to take this action.

In July 1996, I was informed that I would be Ms. Pruitt's supervisor. On 30 July 1996, LTC Gallimore and myself met with Ms Pruitt in her office at the Kamish Clinic to discuss coverage for her patients, any referrals or suspenses she might have and what plans she had made for follow up of her patients during the time she would be on annual leave. Ms Pruitt stated she had no appointments, referrals, or suspenses. In addition, there were no patient, suspenses, or referral files set up. Lab results, consultations, and referrals in and out were piled together into two manila folders, and her appointment book was void of any patient appointments. The above facts made it quite evident that Ms. Pruitt had done very little work in the recent past inspite of extensive formalized training.

Ms Pruitt was then briefed on the importance of having an audit trail, and that she needed to have a log for referrals, filing records of consults, and a suspense system for patient follow-up. The need to use CHCS mail, and the importance of communication with the co-workers at the TMC and PM was also discussed. Ms Pruitt was shown how she could accomplish these goals, and was encouraged to ask questions of LTC Gallimore or myself, if she had any problems or questions. On 1 October, 1996, the above directives had not been acted upon. At that time, LTC Gallimore, her senior rater and I decided that Ms. Pruitt should be relocated to the main Preventive Medicine Office in Bassett Army Community Hospital where she could be more closely supervised.

Upon learning that she was being transferred to the hospital, Ms Pruitt became very angry. She warned LTC Gallimore and myself that she would be unable to do her job if she was made to make the move, and that she would look for another job. She said she had worked at the hospital before and had not gotten along with some of the employees, and she had taken the HRA position to get away from them. She also said that she had already been moved many times and didn't want to relocate again. She said the room she was in now used to be an old storage room, and she had used her own personal time to fix it up.

On 12 September 1996, Ms Pruitt entered erroneous information on a patient's Sexually Transmitted Disease (STD) Report. This action led to a very embarrassing incident and subjected the Command to potential legal liability. The incident occurred because Ms Pruitt had mixed a sexually transmitted disease patient's address with that of the patient's sexual contact. This document was returned to Ms Pruitt three times for

000037

corrections. Out of twenty blocks of information, ten had either incorrect or no information at all in them.

As I worked with Ms Pruitt on this task, I counseled her on the importance of confidentiality and accurate recording. Her first response to me was that she had copied the address down from the patient's OB record. That statement was a fabrication. When I pointed out that the address belonged to the patient's (sexual) contact, not the patient, Ms Pruitt's reply was that I should not "make a big thing of it" and went on to say, "I just got the addresses transferred." (I assumed she meant transposed). She went on to say, "I just put the contact's address down instead of the patient's."

Ms Pruitt is careless in recording medical information, and when counseled, displays a very flippant attitude toward it. She has a very difficult time assuming responsibilities for her own actions and when confronted with an issue quickly shifts the burden of responsibility to someone else, even if it means fabricating an answer.

During a conversation with Ms Pruitt on 19 September 1996, Ms Pruitt suggested taking a patient's Sexually Transmitted Disease (STD) Reports home with her and then bringing them to the hospital the following morning. I told her, no. I explained that she would be setting up an environment in which the patient's private information could easily become compromised and that it would certainly be in violation of Government regulation.

The following morning I tried to give Ms Pruitt concrete examples of the many different ways a patient's privacy can be compromised. I tried to impress upon Ms Pruitt the ethical responsibility she, as a Licensed Practical Nurse, had for her patients, and I also emphasized the legal ramifications that could happen to both her and the Command. I then focused on the Epidemiology SOP and I specifically explained to her how to properly transport patient records. When I finished, Ms Pruitt said that she already knew how to do that.

On 1 October 1996, Ms Pruitt left both STD files and STD suspense cards in a cardboard box in her Kamish Clinic office, knowing other individuals also had a key to her office. These files are required by Army Regulation to be secured by double-locks. When I confronted Ms Pruitt, she admitted the infraction. Her rebuttal was, "There was a lot going on." There were 30 patients' records in that box and eight files in the manila folder.

On 10 October 1996, Ms Pruitt started browsing through the papers on my desk. She went so far as to turn her head sideways as to better position herself to read them. I folded my arms across the papers blocking her view. These were patients' records that she had no reason to read. I informed Ms Pruitt that this conduct was improper.

On 16 October 1996, Ms Pruitt came all the way around my desk to where I was sitting. I asked her what she was doing. She said she wanted to look at the STDs (Sexually Transmitted Diseases). (These files are located to the side of my desk in a locked filing cabinet, separate from my daily files). I asked why, and she said she wanted to see who was in there. I asked if she was looking for a particular individual. She answered, "No, I was just going to look." I told Ms Pruitt that unless she needed the card of a particular individual, she had no "need -to- know" for reviewing the STD files. She said, OK., then left my office.

On 21 October 1996, a patient and her husband entered my office extremely upset and made the following allegations.

a.  Ms Pruitt had called the husband at his work place and had given him privileged information about his wife.

b.  Ms Pruitt threatened to call the husband's Company Commander if she did not come in to the hospital and have a certain diagnostic test done and take an HIV test.

c.  Ms Pruitt called the wife on the telephone the next morning and would not immediately identify herself.  The wife stated she had to ask Ms Pruitt three times before Ms Pruitt would identify herself.

When the couple finished informing me of their situation, and I had extended my deepest apologies, I asked them if they would like to speak to the Chief of PM, LTC Candler.  They both looked at each other and simultaneously said, "Yes."  LTC Candler went into my office and discussed their complaint.

When questioned about this matter, Ms Pruitt refused to respond without a union representative being present.  I made the arrangements for her to have union representation for the next morning.

The next morning the patient's allegations were read to Ms Pruitt, Ms Laliberte, (union representative) and LTC Gallimore.  Ms Pruitt denied all accusations and stated quite firmly that she knew about patient confidentiality and had never breached it.  She became angry towards me because I had not ask her to talk to the couple the day they first came to the office so she could have denied the charges.  I explained to her it was a judgment call on my part.  The couple were so angry at her at the time, I did not feel it would have been appropriate to have a person to person confrontation at that time.  When Ms Pruitt was asked why she thought these people would make such accusations against her, she answered by saying that she thought the wife was probably upset with her because the wife had told the husband that she was negative when actually, she was positive.  This was not only incorrect, but I had directed Ms Pruitt not to call them.  I told her that I would take care of it.  Regardless of what was said, it was clearly a violation of confidentiality procedures to call the husband at work.

On 28 October 1996, The patient's spouse hand-carried a letter to me explicitly spelling out their complaints with regards to Ms Pruitt.  That afternoon, I asked LTC Gallimore and Ms Pruitt to come into my office.  I showed Ms Pruitt a copy of the patient's letter of complaint.  Ms Pruitt denied the accusations.

Later, Ms Pruitt stopped me in the hall and ask me to come look at the computer.  She had pulled up the lab results on the patient and said to me, "Remember, I asked you if the report was saying she was positive or negative since both words are on the same line."  I told her the first word was the result.  I explained, it was colored red and that the negative is on the line just to define the comparative factor used in determining the results of the test.  She then said, See I told you she was positive.  I exclaimed, this is the same patient we are talking about in the letter?  She said , "Yes!  Remember.  I told you the husband said she was negative but she wasn't!"  Brenda, I stated, I told you not to call that patient.  I told you to just leave that case to me.  You smiled and said, "Why?"  I said

*Insubordination*

to you, "Just don't worry about it. I will take care of it." You were still looking puzzled, and so I repeated, "Really, don't worry, I will handle it. You said, "O.K.."

Ms Pruitt has repeatedly demonstrated disregard for authority. On 10 October 1996, Ms Pruitt requested a day of annual leave. I discussed with her the importance of this training and because of the many days she had missed from the workplace, it was important to utilize this opportunity. I disapproved her request for annual leave. I gave adequate reason for the need for her attendance. She appeared to understand my disapproval of her request. Later on that same day Ms Pruitt went to LTC Gallimore (my supervisor) and ask her to approve the eight hours of leave. LTC Gallimore told her I was her supervisor, and that it would have to be approved by me. Ms Pruitt told LTC Gallimore that I had left for the day. LTC Gallimore still refused to approve her leave.

When I asked Ms Pruitt if she had asked LTC Gallimore to grant her annual leave that day, after I had refused her, she said,"Yes,..........I wanted the day off." I warned Ms Pruitt that I would not condone misconduct, and if the incident happened again, I would write an official Memorandum of Reprimand.

When Ms Pruitt was given the letter of temporary removal of duties requiring confidentiality, she became very upset. She said the patient's husband was a liar and she threatened to call his Commander. I cautioned her and directed her to not talk to his Commander. LTC Gallimore was present and she, too, instructed her to have no contact with the husband's commander.

Ms Pruitt has failed to follow procedures clearly outlined and for which she has been extensively trained. She has failed to follow instructions on numerous occasions. Ms Pruitt's actions are a most serious breach of patient confidentiality and are in violation of both nursing and medical ethics. Her continued disregard for patient confidentiality presents a legal liability to the Command and is a potential threat to my State of Alaska Nursing License. MEDCOM Standards of Clinical Nursing Practice say, "The Registered Nurse shall retain professional accountability for nursing care when delegating nursing activities." Her failure to correct her behavior and her failure to understand the consequences of her actions leave me no choice but to recommend that she be dismissed.

Shelby J. Butler, R.N., CHN
Preventive Medicine Department

HSUC-PM(690-700a)                                                    October 28, 1996

MEMORANDUM FOR Ms. Brenda J. Pruitt, Practical Nurse, GS 620-05, BACH, Preventative Medicine, Community Health, Ft. Wainwright, AK

SUBJECT: Official Memorandum of Reprimand

1. This is a Memorandum of Reprimand for failure to provide complete and accurate information when requesting annual leave. This memorandum will be made a part of your Official Personnel Folder for one year from the date you receive this document.

2. On 10 October 1996, you followed proper procedures and requested from me a day of annual leave. I discussed with you the requirements of the department and discussed your lack of attendance during the past several months. I disapproved your request for annual leave for that day and gave adequate reasons for the need for your attendance. You appeared to understand my disapproval of your request. Later on that same day without mentioning it to me, you went to LTC Gallimore the next line supervisor, and requested she sign for your annual leave. (You did this without mentioning to her that I had disapproved your leave or explaining in any way your attempt to have me approve your leave.) Your actions were in my opinion deceptive and unprofessional. Your act of going to LTC Gallimore with your SF-71 and attempting to have her sign it without an explanation of my disapproval clearly indicates to me that you were being manipulative and dishonest in your attempt to have the leave approved.

3. When deciding the proper penalty to assess in this situation, I was guided by the table of suggested penalties in AR-690-700, chapter 751, the Douglas factors and your entire work record. I am convinced that your misconduct warrants this Official Memorandum of Reprimand and that it is the least form of formal disciplinary action that I can take in this situation to correct what I feel is a serious breach of integrity on your part. I caution you that further misconduct on your part could lead to my consideration of other forms of disciplinary measures. You need to heed this action as a warning that I will not condone misconduct and that I feel your integrity has been damaged by your actions.

4. If you feel this action is unjustified, you may file a grievance under the negotiated grievance procedure. I have included instructions to follow if you elect to pursue a grievance.

                                        SHELBY J. BUTLER, R.N.
                                        BACH, Prev Med

000041

22 October 1996

MEMORANDUM FOR RECORD

SUBJECT:  Threats of retalliation from Ms Pruitt

*Talk about breaching confidentiality*

When Ms Pruitt was informed about the letter accusing her of breaching confidentiality, she immediately became angry and threatened to call this person's commander.  She said if her commander knew about it, then she was going to call the accuser's commander and tell him about it.

LTC Gallimore and I both told her she was not to do this.  She then said, "Well his commander is going to know about it.  Again, we cautioned her not to call him.

Ms Pruitt also said three different times that LTC Candler was a racist.

*Shelly J. Butler, RN, CHN*

Date:  18 October 1996

Ms Brenda J. Pruitt,

  This letter of reprimand is in reference to our conversation on 10 October 1996, regarding disapproval of your leave request for 11 October 1996. You were instructed that due to the inadequate amount of training time caused by your absenteeism from the work place (302.5 hours since 5 August 1996), and the backlog of work our department is carrying because of limited personnel, I was disapproving your 8 hours annual leave. You said you had made two appointments for that day. I stated, we would work around them, but it was very important to get you trained in performing your duties. The training holiday provided an excellent opportunity for training, and the specific training we were going to do only occurs every three months.

  I have been informed by LTC Gallimore that on 10 October 1996, the very day I disapproved your leave, you went to her, in total disregard to our conversation, and requested she sign for your leave.  .

  Actions of this nature cannot be tolerated by myself or this department and must be corrected immediately.  Additional infractions of this type will be met in the same manner or referred up the chain of command for further action.

  Employee loyalty and honesty is of the utmost importance in both our department and in the profession of nursing.

  Copy of this letter will be turned over to CPO for placement in your official file.

*Shelby J. Butler, R.N., C.H.N.*
Shelby J. Butler, R.N., C.H.N.
Preventive Medicine

*Advised by Mr Payne*
*and requested per*
*LTC Gallimore to hold for*
*now. sjb*

*Sent to Jerry Payne*
*Friday October 25, 1996*

00043

Preventive Medicine Services
USA MEDDAC-AK
Ft. Wainwright, AK

## Occupational Health Orientation Checklist

Name _Brenda Pruitt_ Date _30 Nov '96_

The purpose of this document is to insure all newly assigned personnel are provided information about the Occupational Health Program.

Occupational Health

Date

_30 Nov '96_

- ✓ Clinic/Program SOP
- ✓ Management and filing of patient records ( Record Keeping)
- ✓ Screening of MEDDAC/DENTAC employees
- ✓ Making patient appointments
- ✓ Lab values - system for insuring RN/Physicians review
- ✓ Respiratory Therapy
- ✓ Referral
- ✓ Radiology Referral
- ✓ Use of CHCS
- ✓ Patient Education program _EAP, OWCP, HRA, PPE_
- ✓ Overview of AR-40-5 - OH Programs
- ✓ OMIS overview - MIMS, HHIMS, HERRS
- ✓ Scheduling of Patients
- ✓ Support of other hospital providers
- ✓ Vision conservation Program
- ✓ Hearing Conservation Program

I have received an information briefing on the Occupational Health Section and have been offered an opportunity to discuss the listed programs.

CC _Mrs. Butler_
_" Pruitt_

CHECKLIST FOR MS PRUITT'S OH/CH ORIENTATION

WARD ORIENTATION
1. SOPs
2. KEY BOX
3. FILE CABINETs
   a. Location of blank forms
   b. Patient records
4. PAMPHELETS
5. EXAMINATION ROOM
6. SUPPLY ROOM
7. IMMUNIZATION CLINIC
8. PAD
9. DISTRIBUTION

OH ORIENTATION
1. INFORMATION NEEDED FOR SCHEDULING APPOINTMENTS
   a. Last name, first name
   b. Date of birth
   c. Full social security number
2. TAG PRE-EMPLOYMENT PHYSICALS
   a. Manilla folder
   b. Privacy act statement
   c. Ches form
   d. Sf 600
   e. Master problem form
   f. Immunization record form
   g. Yellow lab result form
   h. White medical card
   I. Medical survallience cards
3. NAF/LIGHT DUTY PHYSICALS
   a. Blue folder
   b. Appropiate stamps on cover
   c. White label on right side
   d. Privacy act statement
   e. Ches form
   f. Sf 600
   g. Form from job site
   h. White medical card
   I. Master problem form
   j. Immunization record form
   k. Yellow lab result form
   l. Completed QA form
   m. Medical survallience cards
4. MEDICAL CLEARANCE CARDS
   a. CDC PERSONNEL
   b. HOUSE KEEPING PERSONNEL
   c. FCC PROVIDERs
   d. May only receive the card after their ppd has been read by medical personnel/ or if they are tb pos.
   A CXR within the last 4yrs.
5. CHCS
   a. Register a client into the system
   b. Order /review labs
6. MISC.
   A. Form for white medical cards and where to drop off

000045

b. Slip for immunization

7. INPROCESSING RECORD SCREENING

   a. Current HIV

   b. Immunization up to date

   c. Order appropiate immunizations/labs

   d. Medical survallience cards

   e. Sf 600

MEMORANDUM FOR   Mr. Jerry Payne, Personnel Manager Specialist, CPO-FWA
SUBJECT: Recommendation for Disciplinary Action for Ms. Brenda Pruitt

25 November 1996

On 21 November 1996, I denied Ms Pruitt access to CHCS, working with patient
records, giving direct care, or having any assignments or responsibilities that pertain to
confidentiality. This was done after reviewing Ms. Pruitt's behavior with LTC Gallimore
and LTC Candler. The following is a chronological account of the incidences that
prompted me to take this action.

In July 1996, I was informed that I would be Ms. Pruitt's supervisor. On 30 July
1996, LTC Gallimore and myself met with Ms Pruitt in her office at the Kamish Clinic to
discuss coverage for her patients, any referrals or suspenses she might have and what plans
she had made for follow up of her patients during the time she would be on annual leave.
Ms Pruitt stated she had no appointments, referrals, or suspenses. In addition, there were
no patient, suspenses, or referral files set up. Lab results, consultations, and referrals in
and out were piled together into two manila folders, and her appointment book was void
of any patient appointments. The above facts made it quite evident that Ms. Pruitt had
done very little work in the recent past inspite of extensive formalized training.

Ms Pruitt was then briefed on the importance of having an audit trail, and that she
needed to have a log for referrals, filing records of consults, and a suspense system for
patient follow-up. The need to use CHCS mail, and the importance of communication
with the co-workers at the TMC and PM was also discussed. Ms Pruitt was shown how
she could accomplish these goals, and was encouraged to ask questions of LTC Gallimore
or myself, if she had any problems or questions. On 1 October, 1996, the above directives
had not been acted upon. At that time, LTC Gallimore, her senior rater and I decided that
Ms. Pruitt should be relocated to the main Preventive Medicine Office in Bassett Army
Community Hospital where she could be more closely supervised.

Upon learning that she was being transferred to the hospital, Ms Pruitt became
very angry. She warned LTC Gallimore and myself that she would be unable to do her job
if she was made to make the move, and that she would look for another job. She said she
had worked at the hospital before and had not gotten along with some of the employees,
and she had taken the HRA position to get away from them. She also said that she had
already been moved many times and didn't want to relocate again. She said the room she
was in now used to be an old storage room, and she had used her own personal time to fix
it up.

On 12 September 1996, Ms Pruitt entered erroneous information on a patient's
Sexually Transmitted Disease (STD) Report. This action led to a very embarrassing
incident and subjected the Command to potential legal liability. The incident occurred
because Ms Pruitt had mixed a sexually transmitted disease patient's address with that of
the patient's sexual contact. This document was returned to Ms Pruitt three times for

corrections. Out of twenty blocks of information, ten had either incorrect or no information at all in them.

As I worked with Ms Pruitt on this task, I counseled her on the importance of confidentiality and accurate recording. Her first response to me was that she had copied the address down from the patient's OB record. That statement was a fabrication. When I pointed out that the address belonged to the patient's (sexual) contact, not the patient, Ms Pruitt's reply was that I should not "make a big thing of it" and went on to say, "I just got the addresses transferred." (I assumed she meant transposed). She went on to say, "I just put the contact's address down instead of the patient's."

Ms Pruitt is careless in recording medical information, and when counseled, displays a very flippant attitude toward it. She has a very difficult time assuming responsibilities for her own actions and when confronted with an issue quickly shifts the burden of responsibility to someone else, even if it means fabricating an answer.

During a conversation with Ms Pruitt on 19 September 1996, Ms Pruitt suggested taking a patient's Sexually Transmitted Disease (STD) Reports home with her and then bringing them to the hospital the following morning. I told her, no. I explained that she would be setting up an environment in which the patient's private information could easily become compromised and that it would certainly be in violation of Government regulation.

The following morning I tried to give Ms Pruitt concrete examples of the many different ways a patient's privacy can be compromised. I tried to impress upon Ms Pruitt the ethical responsibility she, as a Licensed Practical Nurse, had for her patients, and I also emphasized the legal ramifications that could happen to both her and the Command. I then focused on the Epidemiology SOP and I specifically explained to her how to properly transport patient records. When I finished, Ms Pruitt said that she already knew how to do that.

On 1 October 1996, Ms Pruitt left both STD files and STD suspense cards in a cardboard box in her Kamish Clinic office, knowing other individuals also had a key to her office. These files are required by Army Regulation to be secured by double-locks. When I confronted Ms Pruitt, she admitted the infraction. Her rebuttal was, "There was a lot going on." There were 30 patients' records in that box and eight f iles in the manila folder.

On 10 October 1996, Ms Pruitt started browsing through the papers on my desk. She went so far as to turn her head sideways to better position herself to read them. I folded my arms across the papers blocking her view. These were patients' records that she had no reason to read. I informed Ms Pruitt that this conduct was improper.

On 16 October 1996, Ms Pruitt came all the way around my desk to where I was sitting. I asked her what she was doing. She said she wanted to look at the STDs (Sexually Transmitted Diseases). (These files are located to the side of my desk in a locked filing cabinet, separate from my daily files). I asked why, and she said she wanted to see who was in there. I asked if she was looking for a particular individual. She answered , "No, I was just going to look." I told Ms Pruitt that unless she needed the card of a particular individual, she had no "need -to- know" for reviewing the STD files. She said, OK., then left my office.

On 21 October 1996, a patient and her husband entered my office extremely upset and made the following allegations.

00048

a. Ms Pruitt had called the husband at his work place and had given him privileged information about his wife.

b. Ms Pruitt threatened to call the husband's Company Commander if she did not come in to the hospital and have a certain diagnostic test done and take an HIV test.

c. Ms Pruitt called the wife on the telephone the next morning and would not immediately identify herself. The wife stated she had to ask Ms Pruitt three times before Ms Pruitt would identify herself.

When the couple finished informing me of their situation, and I had extended my deepest apologies, I asked them if they would like to speak to the Chief of PM, LTC Candler. They both looked at each other and simultaneously said, "Yes." LTC Candler went into my office and discussed their complaint.

When questioned about this matter, Ms Pruitt refused to respond without a union representative being present. I made the arrangements for her to have union representation for the next morning.

The next morning the patient's allegations were read to Ms Pruitt, Ms Laliberte, (union representative) and LTC Gallimore. Ms Pruitt denied all accusations and stated quite firmly that she knew about patient confidentiality and had never breached it. She became angry towards me because I had not ask her to talk to the couple the day they first came to the office so she could have denied the charges. I explained to her it was a judgment call on my part. The couple were so angry at her at the time, I did not feel it would have been appropriate to have a person to person confrontation at that time. When Ms Pruitt was asked why she thought these people would make such accusations against her, she answered by saying that she thought the wife was probably upset with her because the wife had told the husband that she was negative when actually, she was positive. This was not only incorrect, but I had directed Ms Pruitt not to call them. I told her that I would take care of it. Regardless of what was said, it was clearly a violation of confidentiality procedures to call the husband at work.

On 28 October 1996, The patient's spouse hand-carried a letter to me explicitly spelling out their complaints with regards to Ms Pruitt. That afternoon, I asked LTC Gallimore and Ms Pruitt to come into my office. I showed Ms Pruitt a copy of the patient's letter of complaint. Ms Pruitt denied the accusations.

Later, Ms Pruitt stopped me in the hall and ask me to come look at the computer. She had pulled up the lab results on the patient and said to me, "Remember, I asked you if the report was saying she was positive or negative since both words are on the same line." I told her the first word was the result. I explained, it was colored red and that the negative is on the line just to define the comparative factor used in determining the results of the test. She then said, See I told you she was positive. I exclaimed, this is the same patient we are talking about in the letter? She said , "Yes! Remember. I told you the husband said she was negative but she wasn't!" Brenda, I stated, I told you not to call that patient. I told you to just leave that case to me. You smiled and said, "Why?" I said

000049

Date: 21 November 1996

MEMORANDUM FOR RECORD/Counseling

To: Ms Brenda Pruitt, L.P.N.

Subject: Removal of Confidential Access

On 21 October 1996, I received a substantiated complaint in reference to breach of confidentiality and privacy. This was a written complaint and was presented to me by the patient's husband. This incident was discussed with you on 22 October 1996 and again on 29 October 1996.

As of this date, the letter is nothing more than a formal complaint lodged against you and reflects no more than that! These are only allegations.

For the protection of all involved, you are temporarily removed from having access to CHCS, working with patient records, giving direct patient care, or any assignments or responsibilities that pertain to confidentiality until this matter is settled. You will retain your other duties as outlined in your job description or assigned. At the present time, you will remain in Preventive Medicine

This directive is in NO WAY disciplinary. This is being accomplished ONLY for legal reasons. This is to protect you, myself and all of MEDDAC in the event there would be other patient complaints filed during the time of this investigation.

*Shelby J. Butler, R.N., CHN*
SHELBY J. BUTLER, RN, CHN
Preventive Medicine

CONCUR/NONCURRANCE

*Carole E. Gallimore*

Carole E. Gallimore
LTC, AN
C, ACHN

cf: Maj Intent

4 - 3

000050

MCUC-PM-CHN                                    16 J.   1997

MEMORANDUM FOR Chief, Preventive Medicine Service, USA MEDDAC-AK

SUBJECT:  Supervisory Chain for Ms. Brenda Pruitt

1.  In my absence, the following Preventive Medicine personnel have agreed to act as Ms. Pruitt's supervisor.  The chain of command is in the order in which they appear:

    a.  Carole E. Gallimore, LTC, C, ACHN

    b.  Ms. Judy Wahl, RN, OHN

    c.  Bradley Hummel, 2LT, C, EH

    d.  Dr. Mike Coker, C, IH

2.  POC is the undersigned.

                                 Shelby Butler, RN, CHN
                                 Preventive Medicine Service

CF:  LTC Gallimore
     J. Wahl
     2LT Hummel
     Dr. Coker
     B. Pruitt ✓

MEMORANDUM FOR RECORD

21 JAN. 1997

ATTENDING: MS. BUTLER, CHN
            MS. WAHL, COHN
            MS. MORONEY
            MS. PRUITT

THE FOLLOWING WAS AGREED UPON BY THE ABOVE INDIVIDUALS:
     1. ON WEDNESDAY MORNINGS 0730 HRS. TO 1130 HRS. MS. PRUITT WILL WORK IN
THE MAIN OFFICE OF P.M. SHE WOULD ASSIST DURING THE PHYSICIAN CLINIC.  ON
TUESDAY MS. MORONEY WOULD HAVE THE OH CHARTS READY FOR THE PHYSICIAN.  ON
WEDNESDAYS MS. PRUITT WILL CHECK THE PATIENTS IN, PULL THE RECORDS AND PUT
THEM IN THE PHYSICIANS BOX TO BE SEEN. SHE WILL REQUEST THE PATIENT WAIT IN THE
WAITING AREA UNTIL THE APPOINTMENT TIME. THE PATIENTS SCHEDULED FOR THE CHN
WOULD ALSO BE HANDLED IN THE SAME MANNER.

     2. MS. PRUITT HAS BEEN PROVIDED A WORK DESK AND TELEPHONE. SHE WAS
PROVIDED THE NUMBERS OF THE TELEPHONE EXTENSIONS THAT SHE WOULD BE
RESPONSIBLE FOR ANSWERING. ALL OTHER INCOMING CALLS GO TO THE DEPARTMENTS
ANSWERING MACHINE AND SHE IS NOT RESPONSIBLE FOR THESE CALLS.  SHE IS TO TAKE
MESSAGES AND PUT THEM UP IN THE BOX OF THE INDIVIDUAL THE CALL IS FOR.  SHE IS
NOT RESPONSIBLE FOR ANSWERING QUESTIONS THAT INVOLVE MEDICAL ANSWERS.

     3. WHEN MS. MORONEY IS AT WORK , INDIVIDUALS ARE NOT TO USE HER DESK OR
TELEPHONE. WE ALL HAVE OUR DESKS OR WORK AREAS THAT IS CONSIDERED ONES
"TURF".  THIS ALSO INCLUDES LUNCH BREAKS WHEN SHE IS NOT AVAILABLE BUT WILL BE
RETURNING.

POC FOR THIS MEMORANDUM IS J.WAHL. 353-5162