EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
SEATTLE DISTRICT OFFICE
909 FIRST AVENUE, SUITE 400
SEATTLE, WASHINGTON

|  |  |
|---|---|
| The Complaint of: | ) |
| | ) |
| BRENDA J. PRUITT, | ) |
| | ) |
| Complainant, | ) |
| | ) |
| and | ) |
| | ) |
| LOUIS CALDERA, | ) |
| Secretary of the Army, | ) |
| | ) |
| Respondent Agency. | ) |

EEOC No. 380 98 8198X
Agency No. SAC-97-AR-0479-E

## FINDINGS OF FACT, CONCLUSIONS OF LAW

I.    INTRODUCTION

Pursuant to 29 C.F.R. Section 1614.109[1] of the Equal Employment Opportunity Commission's regulations, I held a hearing on May 11 and 12, 1999, at Fort Wainwright, near Fairbanks, Alaska, on the discrimination complaint filed by Brenda J. Pruitt ("Pruitt" or "complainant") against Louis Caldera, Secretary of the Army ("Army" or "agency").

During the relevant time period in this case, Ms. Pruitt was a licensed practical nurse and worked for the Army as an assistant community health nurse in the Preventive Medicine section of the

---

[1]  On November 9, 1999, revised regulations governing the EEOC's federal sector complaint process went into effect. These regulations apply to all Federal sector EEO complaints pending at any stage in the administrative process. Consequently, the Commission will apply the revised regulations found at 64 Fed. Reg. 37,644 (1999), where applicable, in deciding the present case. The regulations, as amended, may also be found at the Commission's website at WWW.EEOC.GOV.

EXHIBIT W

Army hospital.   Soon after the events in this case, the Army terminated Pruitt's employment.

The complainant alleges that the Army discriminated against her on the bases of race (African American), color (black), sex (female), and age (DOB: December 16, 1946), by subjecting her to a hostile environment and disparate treatment on a continuing basis between September 1996 and February 1997.

A total of 14 witnesses, including the complainant, testified at the hearing.

Based on my review of the entire evidentiary record, including the evidence taken into the record during the agency investigations, the evidence taken into the record at this hearing, and for all the reasons which I will explain in this decision, I find that the agency did subject complainant to a hostile environment based on race and color, but not sex or age.   I find that the agency did not subject complainant to disparate treatment because of her race, color, sex, or age.   Finally, I find that the Army unlawfully interfered with the EEO process in violation of 29 C.F.R. § 1614.105(g), when its Fort Richardson EEO officer refused to accept Pruitt's informal complaint in October 1996.

## II.   BACKGROUND

The following is a chronology of the events which led to this hearing.   The Army hired Brenda J. Pruitt in 1989 as an LPN in the Surgical Clinic at Bassett Army Community Hospital (the "hospital"), Fort Wainwright, Alaska.   In 1994, the agency relocated Ms. Pruitt's office to the Troop Medical Center, known as the Kamish Clinic, one mile away from the hospital.

-2-

In July 1996, the Army assigned new supervisors for Pruitt, who directed that Pruitt relocate back to the hospital effective September 30, 1996. Pruitt was opposed to the move. On September 16, 1996, Pruitt contacted the Army EEO office in Fort Richardson, Alaska (300 miles away), requesting information about filing a discrimination complaint. See Report of Investigation ("ROI"), page 22. Complainant alleges that on September 19, 1996, someone placed a written racial slur on her desk at the Kamish Clinic. On September 30, 1996, Pruitt moved her office belongings from the Kamish Clinic and attempted to pull up the carpet squares on the floor of her old office to bring to her new office at the hospital. Removing the carpet and the adhesive for the carpet caused some damage to the underlying tile. Employees at Kamish believed that Pruitt "trashed the office" and called the Military Police ("MP's") who investigated the matter.

In October 1996, one of the two NCOIC's (non-commissioned officer in charge) at the Kamish Clinic, a White female, sent e-mails to White co-workers referring to the clinic as the "Black Palace," and expressing the intent "to push all the Blacks out of the clinic," or to "clean out the Black Palace." The Army did not disclose copies of the e-mails at the hearing or during the investigation.

On October 21, 1996, after Pruitt had relocated and was performing her new duties, the Army accused complainant of releasing a patient's confidential medical diagnosis involving a

sexually transmitted disease to the patient's spouse.[2]

On October 25, 1996, Pruitt signed and attempted to file her informal EEO complaint with the Fort Richardson, Alaska, EEO officer.  On that same date, Pruitt sent a letter to the Army headquarters in Arlington, Virginia, accusing the Fort Richardson EEO officer of refusing to accept her complaint and of interfering with the EEO process for her and others. *See* ROI, pp. 23-27, 28, 36.

On November 6, 1996, the Army's Compliance and Complaints Review Agency in Virginia referred Pruitt's complaint to Fort Shafter, Hawaii.  ROI p. 35.  The Hawaii office referred the complaint back to Fort Richardson on November 20, 1996.  ROI p. 37.

Finally, on November 29, 1996, the Army provided EEO counseling to Pruitt and counseling concluded without resolution on January 21, 1997.  Pruitt filed her formal discrimination complaint on February 6, 1997.

Pruitt alleged in her complaint that the forced relocation was her fourth move in two and a half years; the agency fabricated a false police report against her accusing her of destroying her office at the Kamish Clinic and stealing the carpet; and once she reported to the hospital, her supervisors gave her less responsibility and a smaller office with no key.

The agency accepted the complaint on March 26, 1997, and

---

[2]   Later, in April 1997, the Army fired Pruitt for this offense.  Pruitt filed a second informal EEO complaint in March 1997, but then opted to file a union grievance on the removal issue.  An arbitrator found against the complainant.  Copies of the grievance proceedings are attached.

conducted an investigation between July and October 1997. During the course of the investigation Pruitt alleged that further harassment occurred in October 1996, when a White officer sent e-mail's to White employees referring to the Kamish Clinic as the "Black Palace." The agency investigated the "e-mail" issue and both parties presented testimony about the e-mails at the hearing.

The Army issued its Report of Investigation on February 26, 1998, more than one year after Pruitt filed her formal complaint. Complainant received the notice of her right to a hearing on March 3, 1998, and requested a hearing on March 30, 1998. The agency forwarded the case to the EEOC on April 21, 1998.

**III. Issues:**

The issues presented in this case are whether the Army discriminated against Brenda Pruitt on the bases of race (African American), color (black), sex (female), and age (DOB: December 16, 1946), by subjecting her to a hostile environment and disparate treatment on a continuing basis between September 1996 and February 1997.[3] Also at issue is whether the Army interfered with the EEO process by refusing to accept Pruitt's informal complaint in October 1996.

---

[3] Initially, the accepted issues in this case were fragmented into six separate incidents: 1) someone placed a racial slur on complainant's desk, 2) the agency failed to investigate the slur, 3) the agency fabricated a false police report against complainant regarding the carpet in her old office, 4) the agency moved complainant to a new job with less responsibility, 5) the agency refused to give her keys to her office, and 6) this was her fourth move in two and a half years. By re-defining the claim as above, the proscription against fragmentation in the Commission's MD-110, Chapter 5, is met.

## IV.  APPLICABLE LAW

In any proceeding, either judicial or administrative, involving a charge of discrimination, it is the burden of the complainant to initially establish that there is some substance to her allegations of discrimination.  In order to accomplish this burden, the complainant must establish a prima facie case of discrimination.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Furnco Construction Co. v. Waters</u>, 438 U.S. 567 (1978). This means that the complainant must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur.

To establish an unlawful disparate treatment violation based on race, color, or sex, complainant must show that 1) she is in a protected group or a different group, 2) complainant suffered an individual harm with respect to a term, condition, or privilege of employment as a result of the agency's action, while 3) a similarly situated employee outside the protected group was treated differently, or treatment is under circumstances that give rise to an inference of unlawful discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.

The <u>McDonnell Douglas</u> formula is applicable to the Age Discrimination in Employment Act.  <u>O'Connor v. Consolidated Coin Caterers Group</u>, 517 U.S. 308 (1996); <u>Stinnett v. Dept.of Navy</u>, EEOC 01821387 (1983).  In order to establish discrimination under the ADEA, complainant must show that age was the determinative factor in the sense that, "but for" her age, she would not have been subjected to the action at issue.  <u>Compton v. Veterans</u>

-6-

Administration, EEOC Appeal No. 01880166 (1988).

If the complainant meets her burden of presenting a prima facie case of disparate treatment then the agency has the burden of production to articulate legitimate, nondiscriminatory reasons for its actions. If the agency meets this burden, then the complainant has the burden to demonstrate that the agency's articulated reasons are a mere pretext for unlawful discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

The St. Mary's case held that even if some pretext or cover-up is shown, a finding of unlawful discrimination is not automatic, because the employer's cover-up may be for something other than discrimination. In other words, the critical factor is that the fact finder must be persuaded that it was discrimination that motivated the agency to act as it did.

Under the "hostile environment" theory, complainant must first establish a prima facie case showing that complainant is a member of protected group based on race, color, sex, or age, complainant was subjected to unwelcome race-, color-, sex-, or age-based conduct that was so severe or pervasive as to alter the work environment, and the agency had notice of the harassment.

Similarly, the EEOC notes that "sex-based harassment"--that is, harassment not involving sexual activity or language--may also give rise to Title VII liability (just as in the case of harassment based on race, national origin, or religion) if it is "sufficiently patterned or pervasive" and directed at employees because of their sex (or race). Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415

-7-

(10th Cir. 1987); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985). See EEOC Compliance Manual, Vol II, Sec. 615, "EEOC Policy Guidance on Current Issues of Sexual Harassment." 3/19/90.

If a prima facie case of harassment is established, then the burden to come forward shifts to the agency to present its rebuttal evidence, to either deny elements of prima facie case (e.g., the conduct was not "unwelcome," not "race, color, sex, or age based," not sufficiently "severe or pervasive," or the agency had no notice), or to raise an affirmative defense (e.g., the agency is not liable because it took "prompt and appropriate remedial action"). The complainant retains the burden of persuasion at all times to demonstrate discrimination by a preponderance of the evidence. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993); Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986); Intlekover v. Turnage, 973 F.2d 773 (9th Cir. 1992); Ellison v. Brady, 924 F.2d 872 (9th Cir. 1991); EEOC v. Hacienda Hotel, 881 F.2d 1504 (9th Cir. 1989).

If the evidence shows that the agency had mixed motives (i.e., unlawful as well as lawful factors motivated an employment decision), then unlawful discrimination occurred. But if the agency can show by "clear and convincing" evidence that the personnel action would have occurred even absent the discrimination, then liability is limited. 29 C.F.R. § 1614.501 (b)(2), (c)(2). Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

Direct evidence of race or sex bias, standing alone, does not necessarily prove that a discriminatory motive was responsible for

-8-

a particular employment action.  As the Supreme Court stated in Price Waterhouse:

> [r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision.  The plaintiff must show that the employer actually relied on her gender in making its decision.

Price Waterhouse v. Hopkins, 490 U.S. at 251.  In other words, direct evidence of racial or sexual "discrimination in the air" will not by itself prove discriminatory motive for an action; rather, the discrimination must be shown to have been "brought to ground and visited upon an employee."  Id.  *See also EEOC Compliance Manual*, Vol. II, Sec. 604, "Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory." 7/14/92.

Regarding interference with the EEO process, the Commission's regulations mandate that an EEO counselor shall not attempt in any way to restrain the aggrieved person from filing a complaint.  29 C.F.R. § 1614.105(g).  Attempting to intimidate a complainant by warning him or her that he or she "has no case," is a *per se* violation of the EEOC's regulations.  Pruette v. USPS, EEOC Appeal No. 01951567 (March 10, 1998); Reloj v. VA, EEOC Appeal No. 01982921 (April 30, 1999).  Filing a subsequent formal complaint after interference in the informal counseling stage, does not mean that complainant is no longer aggrieved.  Johnson v. Army, EEOC Request 05921027 (March 18, 1993).

## V.  ANALYSIS

### A.  This Complainant's Prima Facie Cases

It should be recognized that each complainant's allegation of

-9-

discrimination is premised upon a particular set of facts and, therefore, the evidence required to establish a prima facie case must of necessity vary from one case to the next.

### 1. Hostile Environment

I conclude that complainant has established a prima facie case of hostile environment discrimination based on race and color, but not sex or age.

Brenda Pruitt testified at the hearing and provided sworn testimony during the investigation. Pruitt said she started at the hospital in Fort Wainwright in 1989 as an LPN at the Surgical Clinic. In February 1994, Pruitt moved to Preventive Medicine at the Kamish Clinic. In July 1996, Pruitt was told she had to move back to the hospital on September 30, 1996. *See* Hearing Transcript, page 143-145 ("HT p. 143-145").

Prior to moving, Pruitt alleges that someone placed a document with a racial slur on her desk at the Kamish Clinic on or about September 19, 1996. The document is a page out of some type of military training manual with typewriting and handwriting on it. The typewritten portion states:

> "Practical Exercise 3-2. SITUATION: While walking through your unit area, you overhear an African-American soldier refer to another African-American soldier as 'Homy.' QUESTION: What do you think of the term 'Homy' in this context?"[4]

In complainant's exhibit the first reference to "Homy" is crossed out in ink, and the words "My nigger" are inserted. The second

---

[4] "Homy" or "homie" in this context is a slang abbreviation for "homeboy," described by <u>Merriam-Webster's Collegiate Dictionary</u> as 1. someone from one's neighborhood, hometown, or region; 2. a fellow member of a youth gang.

-10-

reference to the word "Homy" is also crossed out and the word "nigger" is inserted. *See* ROI p. 146.

Pruitt testified that she showed the document to a co-worker, SPC Anna Tate, a Black female, and they "chuckled about it." Tate said Pruitt should do something about it, but Pruitt said, "I'm not going to give them the pleasure." Then she showed it to SGT Frederick Wells, a Black male, who told her "if you want to, Ms. Pruitt, I'll take it up the chain." Pruitt declined, saying it was not going to do any good. HT p. 150-151, 185.

Pruitt stated that after seeing the document, she went along with her business as if it didn't happen, and ignored it. Pruitt told the EEO investigator during the investigation in July 1997, that she had called her supervisor, Shelby Butler, a White female, and told her about the note on the same day she found it. ROI Transcript ("ROI TR") p. 8. However, Pruitt admits she did not show the document to her supervisor. HT p. 178.

Pruitt testified that she and the other Black workers learned of e-mail messages that were sent by a Caucasian NCOIC at the clinic, Sergeant First Class Sara Schultz. The e-mails were sent to other White co-workers in October 1996, referring to Kamish Clinic as the "Black Palace" and celebrating the fact that the "Black Witch was gone." Pruitt believed the reference was to her. Pruitt never saw the e-mails, either on a computer screen or in hard copy. Pruitt said other e-mails involved KKK meetings and slurs. Pruitt said that she and other Black workers did not have e-mail access. Pruitt said management did nothing to deal with the e-mails. HT p. 148, 151.

-11-

Pruitt also said she received messages on her telephone answering machine with someone playing the nursery rhyme, "Baa, baa, black sheep, have you any wool." Pruitt said that in 1994, someone spray-painted her car with the "n-word" and she called the police. Also, Pruitt said someone at the clinic complained about her flowers in her office being a fire hazard and removed her "out of the office" signs from her door. HT p. 148-149, 177, 194.

Pruitt called Francine James, formerly Sgt 1st Class James, as a witness. Ms. James, a Black female, was the other NCOIC at the Kamish Clinic along with SFC Schultz. James said two individuals at the clinic subjected her to racial slurs: SFC Sara Schultz and MAJ Joyce Wilson, both White females. James testified that MAJ Joyce Wilson told her the only way SFC James got her "stripes" was because of her race. James said Schultz sent several e-mails with racial slurs to hospital and clinic employees, and James saw two of them. James explained that everyone on the hospital network at that time could look at all the e-mails. One e-mail referred to Kamish as the Black Palace. HT p. 52, 54. Another e-mail was:

> "pertaining to primarily the Blacks that worked in the
> clinic. She was not happy with myself because I was her
> supervisor, and she did not feel that was right even
> though we both were the same rank. And she felt also
> that she did not need Ms. Pruitt over in the clinic, and
> as soon as SFC Schultz got there that was one of her
> issues, and MAJ Wilson's issues, to push all of the
> Blacks out of the clinic."

James said Schultz hated her because of her race and Schultz and Wilson felt that having a Black supervisor was going to bring down the quality of the clinic. HT p 52, 54, 74-75.

James said she complained about both e-mails and Schultz'

-12-

hatred to her chain of command and took hard copies to the
commander, COL Carter. James said she never heard whether Carter
disciplined Schultz, but all employees were told there was to be no
more personal messages sent by e-mail. James testified that
Sergeant Major Robert Wilson told her he would speak with SFC
Schultz and give her a letter of reprimand, but James did not know
if that occurred. HT 53-54. James said one of Schultz' e-mails
referred to "getting rid of the witch," which James believed meant
herself. James admitted that the reference to "witch" was not
racially motivated. HT p. 74.

James said Ms. Pruitt was aware of the e-mails because James
discussed them with her staff. HT p. 75-76.

Regarding the written document found on Pruitt's desk, James
could not recall seeing it and could not describe it. James said
Pruitt did inform her of some racial slurs. James told Pruitt to
document slurs and report it to the EEO office. HT p. 70-72.

Regarding the call to the military police on October 1, 1996,
James testified that SFC Schultz and MAJ Joyce Wilson initiated the
calls. HT p. 59. James said Schultz and Joyce Wilson later moved
into Pruitt's former office. HT p. 62-64.

The complainant called SGT Berreta Wiggins, a Black female, as
a witness. SGT Wiggins was an assistant community health nurse,
LPN, who worked with Pruitt. Wiggins testified that she discussed
the racial slurs and the e-mail with Pruitt and described Pruitt as
"upset." Wiggins said Pruitt believed the e-mail referred to
Pruitt and the e-mail showed how the White "higher up positions"
viewed the rest of the staff who are minorities. HT p 87. Wiggins

-13-

said she experienced racial discrimination at the hospital in 1995 from Sergeant Major Robert Wilson, who singled her out after he heard there was a Black woman with a non-Army regulation hair cut. According to Wiggins, Robert Wilson spotted Wiggins and presumed she was the offending soldier simply because she was the first Black female that he saw.  HT p. 88-89.

Pruitt called SGT Gloria Evans, a Black female, as a witness. SGT Evans was the NCOIC in the Preventative Medicine department and worked with Pruitt after she moved to the hospital in October 1996. Evans said there was a big rumor that SFC Sara Schultz, a White female, sent an e-mail to the White workers, mostly doctors, referring to the Kamish Clinic as the Black Palace.  Evans said one of the doctors, Dr. Mee, turned Schultz in, and Schultz was given a verbal counseling and sent back to work.  Evans said the lower ranking soldiers and workers did not have e-mail or cc-mail access at that time.  Evans said the Army moved SFC Francine James, Schultz' co-worker and co-NCOIC, away from the Kamish Clinic and away from Schultz at that time.  HT p. 46-47.

I relied on the affidavit by Dr. Rick P. Mee.  Dr. Mee stated that SFC Schultz sent an e-mail message that he found offensive, but it was not directed at Ms. Pruitt.  "I took offense to the message because it contained derogatory information directed at one of the NCO leaders in the clinic originating from another NCO leader."  ROI p. 140-141.

Command Sergeant Major Robert Wilson was called as a witness. SGM Wilson testified that SFC James brought some racially offensive e-mails to his attention that had been sent by SFC Sara Schultz.

-14-

Wilson said James brought him a copy; however, he could not recall
what it said.    Wilson said he remembered it was very
unprofessional.  Wilson could not recall whether the words "Black
Palace" were used.   Wilson said the reason he could not recall
specifics, "is because I dealt with a lot of e-mails, with a lot
problems with e-mail down at Bassett [Hospital] up until I left."
HT p. 207-208.

Robert Wilson said he discussed the e-mails with SFC Sara
Schultz, who denied that she meant anything racial or that the e-
mail pertained to SFC James.  Wilson took the matter to the JAG
office and a determination was made that Schultz should be
reprimanded and receive formal counseling.  Wilson said he gave
Schultz a severe oral reprimand; her written counseling was kept
locally.  HT p. 209.

Robert Wilson denied that he singled out SGT Berreta Wiggins
or any Black female because of her race or color.  HT p. 211.

Robert Wilson said there was a long history of disputes
between SFC James and SFC Schultz because they were the same rank,
i.e., senior non-commissioned officers, working at a small clinic.
Wilson said there was a lot of polarization going on at the Kamish
Clinic and soldiers would back either James or Schultz.  Wilson
said it filtered down to the lower enlisted people and everybody
within the clinic.  However, Wilson denied that the polarization
was based on race.  HT p. 213-215.

Complainant called Anna Tate as a witness.  Ms. Tate, a Black
female, and formerly SPC Tate, testified that she was a medical
immunization technician at the Kamish Clinic.  Tate said she heard

-15-

about the "black witch" e-mail, but "they would not let us see it,"
alluding to the "higher-ups" in command.   Tate said MAJ Steven
Phillips, M.D., pulled the e-mail out of the computers.   Tate said
she saw the written document with a racial slur the day after
Pruitt got it, but could not remember what the slur was or what the
paper looked like.   Tate said Pruitt was very upset about it.   HT
p. 236-239, 242-243.   Tate said there was racism at the Kamish
Clinic and the environment got hostile because SFC Schultz, MAJ
Joyce Wilson, and SGT Gail Telegrin wanted all the black people
out.   HT p. 248-249.

    I also relied on SFC Sara Schultz' affidavit in the ROI.
Schultz sworn statement contains a "pregnant denial" and seemingly
contradicts the sworn statement by Dr. Mee and the sworn testimony
of SGM Robert Wilson.   Schultz was asked:

    Q.   Did you write a computer message and send it to
    select employees making a reference to cleaning out the
    black palace (Kamish Clinic)?  If so why?

    A.   I did not say that and I never heard anything like
    that before. I never saw any message like that.

ROI p. 135.   (The Army's EEO investigator should have followed up
on that line of questioning and obtained copies of the e-mails
during its one-year investigation of Pruitt's complaint.)

    Finally, I relied on the fact that hard copies of the e-mails
were not made available as part of the investigation or at the
hearing.   Since I did not order the agency to provide copies, I
will not make a specific negative inference.   However, I find that
the agency failed to controvert Francine James' and SGM Robert
Wilson's testimony that SFC Schultz sent racial slurs and racially

-16-

offensive e-mails that were brought to Wilson's attention.

I find these facts are sufficient to establish a prima facie case of hostile environment discrimination based on race and color. I find that race permeated the atmosphere at the Kamish Clinic and touched down on the Black employees there, including Brenda Pruitt. Negative, unprofessional messages from the NCOIC of a small clinic referring to the race or color of the staff were certainly unwelcome and meet the prima facie requirements for both "severity" and "pervasiveness." The messages came from the officer in charge, or management, so the "notice" requirement is met. Additionally, SFC James did report the racially offensive e-mails "up the military chain," so the agency was placed on notice.

Regarding Pruitt's written document, again it involved unwelcome conduct and it was race-based. One use of the "n-word" does not necessarily meet the severity standard, but when considered with the racially offensive e-mails, it can add to the pervasiveness. However, as to the notice requirement, there is no evidence that the document came from management, a co-worker, or a patient. Pruitt asserts she told her supervisor about the document on the day she received it, but admits she never showed it to her. Pruitt did give a copy to the EEO investigator, and it is part of the ROI at page 146. However, Pruitt's supervisor, Shelby Butler, denies that Pruitt told her about it, and the agency disputes the authenticity of Pruitt's document. None of Pruitt's witnesses could describe the document. Nonetheless, for prima facie case purposes, the agency is placed on notice at the time of the informal EEO complaint.

-17-

Pruitt also alleges that her forced relocation, the false police report against her, her diminished responsibility, and her smaller office with no key or computer access, are all part of a pattern of harassment. Since I find that a prima facie case for race-based harassment has been met, I will address each of these incidents in the agency's rebuttal and in the discussion of disparate treatment below.

I find Pruitt made no showing that any of the slurs were gender-based or age-based, and therefore she did not establish a prima face case of sex or age harassment.

The burden to come forward on race- and color-based harassment shifts to the agency.

### 2. Disparate Treatment:

Complainant alleges the Army subjected her to disparate treatment based on race, color, sex, and age, when it caused the forced relocations, the false police report, the diminished responsibility, and the smaller office with no key. Pruitt does not name comparators, but merely alleges she was the oldest Black woman at the hospital and no one else was treated the same way.

I conclude that Pruitt showed 1) she is a Black female in the protected age group, and 2) the forced move, the call to the police, the diminished responsibility at her new location, and no key to her new office, each affect terms, conditions, or privileges of employment.

While there is no direct comparator, I conclude that Pruitt's allegations about her treatment describe circumstances giving rise to an inference of unlawful discrimination. First, she is

-18-

transferred out of her "beautiful" office.  After she moved out,
her former co-workers, two younger White females, call the police
on her.  Then Pruitt hears that the same two move into her former
office.  Meanwhile, the Army gave Pruitt diminished responsibility
at her new position with no key to her office.  And all of this
occurred at a time when the Kamish Clinic was polarized with
employees backing either SFC James (a Black) or SFC Schultz (a
White).

I think those facts are sufficient to establish a prima facie
case of disparate treatment, based on race, color, sex, and age.
The burden to come forward shifts to the agency.

### 3.  Interference with the EEO Process:

Pruitt testified that she had a hard time filing her EEO
complaint.  Pruitt tried to file an EEO in Alaska in September and
October 1996.  Pruitt said she wrote to the Army headquarters, and
that office eventually routed her case back to Alaska.  HT p. 181,
198-199.  The ROI reflects that Pruitt sent a letter to the Army
headquarters in Arlington, Virginia, accusing the Fort Richardson
EEO officer of refusing to accept her complaint and of interfering
with the EEO process for her and others.  ROI, pp. 23-27, 28, 36.

The Army did not rebut Pruitt's allegations.

I find that refusing to accept Pruitt's complaint in October
1996 is a *per se* violation of 29 C.F.R. § 1614.105(g).  Pruette v.
USPS, Reloj v. VA, *supra.*

To summarize, the above facts are sufficient to establish
prima facie cases of race- and color-based harassment, and

-19-

disparate treatment based on race, color, sex, and age.  The burden
to come forward shifts to the agency on those issues.

The facts in this case are not sufficient to establish a prima
facie case of harassment based on sex or age.

### B.   Agency Burden

While I have concluded that the complainant did not establish
a prima facie case of sex or age harassment, the agency did
nonetheless come forward both during the investigation and during
the hearing of this case to bring its evidence on these allegations
into the record, and my decision here is based on the evidence in
its entirety and not just that evidence going to the question of
whether a prima facie case was established.

In support of its burden, the Army called Pruitt's direct
supervisor, Shelby Butler, a White female, as a witness.  Butler
worked as a civilian community health nurse at the hospital in Fort
Wainwright since 1995.   Butler testified that Pruitt's former
supervisor, Lt.Col. Hazel Ivey, told her that she would soon be
supervising Pruitt, and LTC Ivey told Butler some of Pruitt's
concerns.  Pruitt was requesting more training, more travel, more
home inspections (although these were not part of the job
description), and a higher grade.  Butler became Pruitt's
supervisor in July 1996.   HT p. 251-253.

Butler testified that her first discussion with Pruitt after
becoming her supervisor involved the need to move her office over
to the hospital.  Butler gave two reasons for the move.  The first
was that the doctors at the Kamish Clinic wanted Pruitt's room.
Butler said the doctors did not want Pruitt at the Clinic because

-20-

she was not available when they needed to send patients to her. The doctors alleged that Pruitt would leave and no one knew where she went. Also, Pruitt was not accountable for her time. The second reason was the Preventive Medicine and Occupational Health departments in the hospital had staffing shortages and both needed Pruitt. Butler said a military nurse at the hospital, SGT Kevin Williams, a Black male, was going over to the Kamish Clinic to do Pruitt's prior work. Butler said Pruitt was opposed to the move and Butler did not blame her because Pruitt had made herself a beautiful office. Butler testified that Pruitt did not like working at the hospital and Pruitt said she did not want "anybody looking down her neck all the time." Pruitt did not want to work with LTC Candler, M.D. Pruitt said she would fight the move. Butler had several discussions with Pruitt and took notes of the discussions. *See* ROI p. 223-251. Butler said she tried to convince Pruitt that the transfer was a good career move with more responsibility, training, and duties. Butler promised her that Candler was too busy to worry about her. Nonetheless, Pruitt was unhappy with the new office, did not want to move again, and did not want to do any Occupational Health work because that was not in her job description. HT p. 254-257.

Butler said that Army employees move a lot, and she had moved three times in her first eighteen months and three more times since. Butler said the decision to move Pruitt was made by Occupational Health, the Automation Technician, Dr. Candler, LTC Gallimore, and herself. Butler said Dr. Mee at Kamish told Dr. Candler that he wanted Pruitt's room for other workers because

-21-

Preventive Medicine was not helping them.  According to Butler, SFC
Schultz and SGT Kevin Williams, a Black male, ended up in Pruitt's
room.   HT p. 257-258, 292-293.

Butler testified that she did not know about the written
racial slur left on Pruitt's desk at the Kamish Clinic until the
EEO counselor asked her, although she heard a rumor about it the
day before.  Butler said when the EEO counselor told her about it
she broke down and cried.  Butler said she cared a lot for Pruitt
and asked Pruitt why she named Butler as one of the alleged
discriminating officials.  Butler said Pruitt told her that her
case would be considered stronger if she named a first-line
supervisor.  Pruitt told her she initially named only LTC Gallimore
and LTC Candler as the alleged discriminating officials.  HT p.
258-259.

On the day of Pruitt's move to the hospital, October 1, 1996,
Butler said she was busy at work at the hospital when she was
interrupted by a MAJ Tenhet, who informed her that the Military
Police were going to the hospital to pick up Pruitt.   Pruitt,
however, was not at the hospital yet.  Butler had been trying to
reach Pruitt because there was a training session set up for Pruitt
on her first day and Pruitt had not arrived.  When Pruitt finally
arrived Pruitt said "they had accused her of stealing carpet" and
Dr. Candler was behind it.  Butler said at first Pruitt told her it
was government carpet, but later she said it was her carpet because
she had put it down.    Butler testified that LTC Gallimore
specifically told Pruitt not to take her carpet.   Butler told
Pruitt that the Military Police wanted her to go over to the

-22-

station, but Pruitt said she was going to talk to the Commander. Pruitt did not go the police for several days.  HT p. 260-266.

Butler said one morning after the transfer, at 7:50 a.m., she observed Pruitt eating a full breakfast in her office.  Since the work day started at 7:30 a.m., Butler told Pruitt to eat before 7:30 a.m., but denied telling Pruitt she could not eat in her office.  HT p. 265.

Butler said Pruitt's new office had a computer, but did not have e-mail or cc-mail, and the "reader" was broken.  Butler said Pruitt did not need the reader to perform her duties.  Regarding the keys, Butler said Dr. Candler took Pruitt's key away when the Military Police charged her with theft, because Candler thought Pruitt might steal a computer.  Butler said Dr. Candler and Commander Carter were very upset about Pruitt's torn up office at Kamish.  HT p. 272-273.

Butler said Pruitt's access to patients' records was restricted only after October 21, 1996, when a husband and wife came to the hospital and complained that Pruitt divulged the confidential results of the wife's sexually transmitted disease to the husband.  Since this act exposed the hospital to serious liability and could affect Butler's license as a registered nurse, management and Butler "adjusted Pruitt's situation" by changing her duties to keep her away from the records.  HT p. 275-276.

Butler recalled Pruitt having a medical problem at work in January 1997.  Butler knew that Pruitt had dangerously high blood pressure, but did not know whether Pruitt had an anxiety attack or forgot to take her medication.  Butler HT p. 279-282.

-23-

Regarding the e-mails, Butler said she did not have e-mail. HT p. 285. Butler said she heard rumors that SFC Schultz sent an e-mail celebrating the fact that Pruitt was gone. When asked why anyone would celebrate that Pruitt left, Butler said that Pruitt did not get along with too many people at Kamish Clinic. Butler said people had a terrible time trying to get along with her, and there were complaints that her door remained locked, there was too much socializing, and Pruitt came and went as she pleased. HT p. 302-303.

Butler said she kept notes of her discussions with Pruitt starting in July 1996, because Pruitt came to her office four times on Butler's first day as supervisor, complaining about the upcoming move. Butler said Pruitt wanted to stop the move from the Kamish Clinic and filed a union grievance. HT p. 304. When asked if Pruitt's former supervisor, LTC Ivey, was too easy on complainant, Butler said Ivey was very busy and Pruitt's time seemed to be unaccounted for. HT p. 308. Butler said her main concern was not to keep a better eye on Pruitt, but to replace lost personnel at the hospital with Pruitt. HT p. 310.

The Army called LTC William Candler as a witness. Dr. Candler, a White male, was the department chief of Preventive Medicine at the hospital, and was Pruitt's second- or third-line supervisor or rater. Candler testified that he approved the proposal to move Pruitt from Kamish to the hospital. He said LTC Carole Gallimore initially proposed the move. Candler said there was constant moving of people and doctors into different offices for more efficiency. Candler said he was not directly involved in

-24-

making the moves, but on one occasion, he prevented yet another move by Pruitt. Candler said Gallimore's reasons for Pruitt's move was work performance. According to Gallimore and Butler, Pruitt had failed to keep any records of her patient contacts while at Kamish. Also, Candler said Pruitt was often hard to find, and there were discrepancies with her time cards. Pruitt had taken leave and had not turned in a leave slip. Candler said LTC Gallimore had a different opinion than LTC Ivey on how Pruitt was to do her work. According to Candler and Gallimore, either Pruitt needed more training in the area of "Wellness," or she had a lack of initiative. They believed that moving Pruitt to Bassett Hospital, would give Pruitt a clean slate and allow Pruitt to learn new areas of work around the hospital. HT p. 313-316, 320-321.

Candler was near Anchorage on the day of Pruitt's actual move and received a phone call from Gallimore about the damage to the office. Candler said the matter was turned over to the MP's. The hospital Commander initially was going to charge Pruitt with theft, but later it was changed to destruction of property. Candler believed the destruction was in the amount of $2,000. However, there never was any prosecution, because they could not tell whether Pruitt did it maliciously. Candler said the carpet was government property. HT p. 324-328.

Candler said he asked witnesses about the condition of Pruitt's Kamish office before she fixed it up, and learned that it was "dingy," but no tiles were broken. HT p. 336.

Regarding a key for Pruitt's new office, Candler testified that it was withheld because there was concern over Pruitt's state

of mind, particularly whether she was angry. After a few weeks, Candler relented and let her have a key. HT p. 329.

Regarding lack of equipment for Pruitt, Candler said Pruitt's only essential equipment was a computer. Candler said the department could not afford automatic blood pressure cuffs as complainant requested. HT p. 322-323.

Candler said he first heard of the written racial slur when the EEO counselor asked him about it. Candler said he then took immediate action and asked everyone around Pruitt and within his department if they knew about the note or who might have written it. No one knew about it. Candler testified that no one ever told him about telephone messages playing "Baa Baa Black Sheep." HT p. 318-319.

As to LTC Ivey's supervision of Pruitt, Candler said that on two occasions, he received complaints from a physician's assistant at the clinic, Ed Raby, that Pruitt could not be found in the clinic. Candler called Ivey about it and Ivey said she would take care of it. Candler did not believe that Ivey trained and supervised Pruitt appropriately, nor did Gallimore. HT p. 344. Candler said Pruitt had time card discrepancies and he instructed Butler to make sure that Pruitt accounted for her leave. Candler told Butler to document any disciplinary, counseling, or problems carefully. HT p. 346-347.

The agency called MAJ Joyce Wilson, the head nurse at the Kamish Clinic. Wilson, a White female, testified that she was transferred into the Kamish Clinic in April 1996. Wilson said soon after she started, she toured the offices and saw Pruitt's office.

-26-

Wilson thought it was big enough for three people and she made that comment to Pruitt and others. Wilson said the rest of the clinic was cramped for space. However, Wilson said she did not make any type of recommendation or suggestion to change things. Wilson said once she learned that Pruitt was to be moved, she and Dr. Mee decided to move two or three people into Pruitt's former office. Wilson said she and SGT Kevin Williams moved into Pruitt's former office. HT p. 349-351. Wilson testified that SFC Sara Schultz did not move into Pruitt's office. HT p. 370.

Joyce Wilson said that when Pruitt moved out, Pruitt pulled up the carpet tiles which caused the adhesive to pull up the hard tile underneath, which caused a big mess. Wilson saw the damage on the morning after. Wilson said the office door was open, she saw the damage, and she notified Dr. Phillips, who called MAJ Tenhet, who called the MP's. Wilson said she thought the office had been vandalized and the damage to the floor was significant. Wilson said there were a lot more than a dozen tiles broken, maybe half the office, and the adhesive from the carpet was exposed. Wilson said she stuck to the floor when she attempted to walk on it. HT p. 352-354. Wilson insisted that she did not call the MP's, even though the police report has her name on it. Wilson did speak to the MP's when they arrived. HT p. 365-366. Wilson said she did not think the office had been intentionally vandalized but could not understand why, after the first few hard tiles came up, Pruitt did not stop to prevent further damage. HT p. 368.

Joyce Wilson said she did not supervise Pruitt, but saw on several occasions that Pruitt was not in her office at Kamish and

had not called in sick, so Pruitt's patients were left standing in the hall waiting for her. Wilson thought this was unforgivable and she reported it to LTC Gallimore. HT p. 355-356.

Wilson testified that she saw an unprofessional e-mail from SFC Sara Schultz, but she would not call it racist. Wilson said the e-mail referred to the former NCO, SFC Francine James, as a witch. Wilson said the e-mail was supposed to be a private reply e-mail, but unfortunately, it went to everyone on the user group list. Wilson said Dr. Mee and MAJ Tenhet did a lot of counseling to Wilson after that incident. Wilson in turn discussed the matter with Schultz. Wilson said Tenhet's real concern about the e-mails was the use of familiar names when referring to NCO's and the failure to use the proper military rank. In the e-mail, Schultz used Wilson's first name rather than her rank; however, Wilson did not have a problem with this because she and Schultz were friends. Wilson did not see an e-mail referring to the Black Palace. HT p. 356-359.

Wilson testified that as the Kamish Clinic grew in personnel, there was more and more shuffling of offices, and Black employees were shuffled at the same rate as Whites. HT p. 360.

The Army called MAJ Robert Tenhet as a witness. Tenhet was the chief of the clinical support division. Tenhet testified that his position provides administrative oversight of all clinical activities. Tenhet said on one occasion Dr. Phillips complained about some patients not being able to find Pruitt. Tenhet became involved with Pruitt's office after Dr. Phillips called him and told him about extensive damage to the room. Tenhet said the

-28-

carpeting was torn up, there was some damage to the walls where there had been pictures, and there were keys broken off in the desk and file cabinet. Tenhet said he called the MP's because he wanted the damage to government property documented with pictures in order to recoup the costs. He later provided the MP's with documentation of ownership of the carpeting and estimation of the cost. Tenhet said he was awestruck by the damage. Tenhet said he spoke with MAJ Joyce Wilson at the scene and she told him they thought Pruitt did it as a vendetta against the clinic for moving her out of there. HT p 372-379, 383, 386.

Tenhet testified that a few days later he met Pruitt for the first time. Pruitt wanted to see the Commander and someone referred her to him. Pruitt told him she had been singled-out for the move and now was accused of destroying her office. Tenhet said he told Pruitt at this point that it was he who had called the MP's. Tenhet said he informed Pruitt that she was under investigation. HT p. 380-381, 385.

The agency called LTC Carole Gallimore as a witness. Gallimore was the chief of Army Community Health Nursing. Gallimore testified that she took over LTC Hazel Ivey's place in July 1996. Gallimore assigned Shelby Butler to be Pruitt's direct supervisor, making Gallimore two levels above Pruitt. Gallimore said it was her idea to move Pruitt back to the hospital. Gallimore said she wanted to have more direct supervision over her. Gallimore testified she went to the Kamish Clinic to assess Pruitt's past patient records, but there were none available because Pruitt had no tracking system. Gallimore said there was no

-29-

way to tell which patients Pruitt had seen or what she had done. Gallimore got the impression that there were problems in the clinic.    Also, Gallimore wanted to expand the health promotion program in the hospital, which was Pruitt's area of work. Gallimore said SGT Kevin Williams would be transferred to Kamish since Gallimore wanted to put an active duty soldier at Kamish, rather than a civilian, to deal with the active duty patients. Gallimore said SGT Williams would be doing the health risk appraisals that Pruitt had been doing at Kamish, but SGT Williams would also have to do his NCO duties.   Pruitt was very opposed to the move, because she had problems with people at the hospital. Gallimore testified that Pruitt said she would be unable to do her job if she had to move.   Gallimore tried to convince Pruitt that she would get more responsibility and more training which would enhance her career.   The plan was for Pruitt to do more health promotion work.   HT p. 101-104, 113-114, 126-127.

Gallimore said Pruitt could not account for her time off to go to a doctor's appointment.   HT p. 127.

Gallimore considered Pruitt's office at the Kamish Clinic to be the entire Wellness Center, and thus more than just Pruitt's personal office.   HT p. 116-117.

Gallimore stated that Pruitt mentioned the carpet to her the week before she moved.   Gallimore said she told Pruitt not to do anything with the carpet.   Gallimore said the day after the move, SGT Williams asked her to look at Pruitt's old office and she saw that the carpet was up and the floor was torn apart.   The floor was too sticky to walk on.   HT p. 106, 118.

Gallimore said it is common in the Army to have your office moved, and she has moved several times. Gallimore said she had never seen or heard about the written racial slur reported by Pruitt. Regarding office equipment, Pruitt had a computer, but no automatic blood pressure cuff. Gallimore said she did not have an automatic blood pressure cuff and Pruitt did not need one for her job, since Pruitt was not doing health risk appraisals in large quantities. HT p. 108-112.

The agency called Barbara Gilson, the receptionist at the Kamish Clinic. Ms. Gilson testified that she observed Pruitt and SFC Francine James removing the carpet in Pruitt's old office and saw hard tile getting broken when the carpet tape stuck to it. Gilson stated that Pruitt said she was taking the carpet with her because she had put it in. HT p. 218-221.

Gilson said Pruitt showed her the written note with a racial slur on it, some time before Pruitt moved in October. Gilson recommended that Pruitt show it to the "chain of command," but Pruitt declined, saying she would use it later on. HT p. 222-223.

Gilson stated that as the receptionist she took messages for Pruitt, but it was very difficult to locate Pruitt. On one occasion, Gilson told Pruitt to let her know where she was because someone was looking for her. Pruitt responded that the only person who needed to know Pruitt's location was LTC Ivey. Gilson replied that it was LTC Ivey who was looking for Pruitt. HT p. 226-227.

At the hearing the agency argued that the written note with the slurs was fabricated and suggested that the handwriting was Pruitt's. I reviewed the note and other handwriting by Pruitt in

-31-

the ROI and could not make a determination either way.

I relied on Shelby Butler's notes and "memoranda for record" in the ROI which document the personnel issues Butler had with Pruitt. *See* ROI p. 231-256. The memo's are dated, extensive and contain quotes of conversations. Although these memo's are written from Butler's point of view and Butler said she relied on these notes to refresh her memory for the hearing, I find that they further document a trail of trouble with Pruitt starting in July 1996.

The notes show Pruitt could be difficult at times and show she was very upset about the move to the hospital and blamed MAJ Candler in July 1996. Pruitt said she refused to move and refused to cooperate. ROI p. 231. The memo for July 25, 1996, reflects that Pruitt could not account for her time off on July 5, 1996. ROI p. 233. The July 26, 1996 memo by MAJ Candler documents his conversation with Pruitt about her not being present at work in the afternoons and her failure to turn in a leave slip for July 5, 1996, a day she did not work. ROI p. 235. On July 31, 1996, Pruitt told Butler she did not want to tell everyone where she was all the time. ROI p. 236. In September 1996, Pruitt still had not turned in leave slips for July, balked at training SGT Williams to do work at Kamish, and insisted on doing home inspections even though it was not part of her job. ROI p. 239.

On September 11, 1996, Pruitt purportedly said that if she was going to be doing the same work as SFC Williams and SFC Wiggins, then she wanted the same grade level. Pruitt said she was going to talk to the union steward. ROI p. 241. There are several memo's

-32-

dated October 1, 1996, the day after the carpet was torn up. One reflects that Pruitt said she had permission from LTC Gallimore to take up the carpet, but that Butler knew otherwise. ROI p. 248.

Several memo's reflect Pruitt's job duties and training after the move, including Pruitt's handwritten description of her duties. ROI p. 252-255. The November 21, 1996 memo from Butler to Pruitt contains notice of removal of Pruitt's confidential access to the patient computer records, because of the October 21, 1996 breach of medical confidence incident. ROI p. 251.

I also read and relied on the MP report. ROI p. 159-181. That report lists Wilson as the person who called the MP's. However, after hearing Tenhet's testimony, I find that Tenhet initiated or ordered that someone call the MP's.

Therefore, the agency's legitimate non-discriminatory justification can be summarized as follows. Regarding harassment, Pruitt never reported the written racial slur until the informal EEO complaint and therefore the agency was not put on notice and could not attempt to investigate or remedy the alleged conduct until it got notice, and once Candler learned of it he did investigate it. As to the e-mails, the agency disputes they were race-based or they were aimed at Pruitt, and argues that they were not severe or pervasive, and finally that Schultz was reprimanded and the conduct stopped.

Regarding the forced relocation, the agency contends that office moves are frequent in the Army and Pruitt's move was warranted because of staffing needs and to better supervise Pruitt, who was having attendance problems. The agency withheld Pruitt's

-33-

key because of her anger about being moved and the fear she might steal or damage items in her new office like she had in her old office. Pruitt's new office was smaller, but all the offices at the hospital were smaller. The agency contends it gave Pruitt all the necessary tools to do her job, but removed her access to patient records after the breach of patient confidentiality issue arose. The Army denies that there was any move to get "Blacks out of Kamish," and in fact, SGT Kevin Williams, a Black male, switched from the hospital to the Kamish Clinic to perform Pruitt's duties and worked in her old office.

Regarding the false police report, the agency contends that MAJ Tenhet, who did not know Pruitt, and other employees, believed that Pruitt intentionally damaged the office after being forced to vacate it. The call to the MP's was to document the damage by an independent third party, and to investigate whether it was vandalism or theft.

### 1. Hostile Environment:

After reviewing the testimony and documentary evidence, I find that the agency has not met its burden regarding racial harassment hostile environment, based on the e-mails. I find the e-mails caused racial tension throughout the Kamish Clinic and the hospital. Every African-American witness described the workplace as racial. SFC Francine James, the NCOIC at Kamish reported the racially offensive e-mails "up the military chain," and SGM Robert Wilson acknowledged that there were racially offensive e-mails and he gave SFC Sara Schultz a verbal reprimand. Nonetheless, racial issues still pervaded the air for all the other employees at Kamish

-34-

and the hospital, including Pruitt.  And the Army never remedied this problem for the Black employees.  The Black employees believed that the White NCOIC at the Kamish Clinic, SFC Schultz, was a bigot, and the Army tolerated her behavior.  Whether or not Schultz actually was a bigot, the Army failed to dispel the racial atmosphere and remedy the situation.

## 2.  Disparate Treatment:

After reviewing the testimony and documentary evidence, I find that the agency has articulated legitimate, nondiscriminatory reasons for its actions as to the allegation of disparate treatment.  Those reasons are sufficiently specific and clear to allow the complainant the opportunity to demonstrate that the articulated reasons are a mere pretext for unlawful discrimination. The burden on disparate treatment, therefore, shifts to the complainant.

## C.  Pretext

At this point, complainant bears the burden of proving that the agency's articulated reason is a mere pretext for discrimination. Generally speaking, "pretext" may be shown two different ways:  by using either direct evidence or circumstantial evidence.  Direct evidence includes some overt act, admission, or document showing an impermissible bias against the complainant (for example, evidence showing a bias based on race, color, sex, or age).  Usually, however, pretext is shown by indirect circumstantial evidence tending to call into question the believability of the agency's stated reasons for its actions and tending to show that the real reasons are instead impermissible ones, (such as bias based on

-35-

race, color, sex or age).   The complainant must show that this discriminatory reason "more likely than not" motivated the agency, by showing that the agency's proffered explanation is not worthy of belief.   Texas Department of Community Affairs v. Burdine, St. Mary's Honor Center v. Hicks, *supra*.

In support of her burden to show pretext for the allegation of disparate treatment, Ms. Pruitt offered the following evidence through testimony and cross-examination.  The complainant, Pruitt, testified that she was an LPN working as an assistant community health nurse doing health promotion.  Pruitt had been moved around several times in the hospital and over to the Kamish Clinic.  The agency eventually assigned her to an old storage room that no one wanted.  Pruitt said before she moved into the office it had broken tile on the floor, a broken window, and a broken lock on the door. She fixed and cleaned the room and used extra carpeting from the hospital to make the office look very nice.   Pruitt said co-workers, particularly MAJ Joyce Wilson and SGT Sara Schultz, both White females, coveted the office.  HT p. 152-157, 170.

Pruitt referred to the carpet as "my carpet," because it was "trash carpet and it was given to me.".  Pruitt said she was told that if she ever moved from the office she was supposed to leave the office the way she found it.  HT p. 158.

Pruitt testified that on moving day, September 30, 1996, no one came to help her so she asked SFC Francine James, one of the clinic NCOIC's, for use of the hospital van.  Pruitt had already removed the carpet squares from the floor when her supervisor, Shelby Butler, called her and told her not to take the carpet.

-36-

Butler told Pruitt to report to the hospital immediately, and Pruitt said she went to the hospital and never returned to the Kamish Clinic again.  Pruitt described the hard floor tiles under the carpeting as stiff, brittle, yellowed, and broken.  At the hearing, Pruitt said removing the carpet did not damage the tile. Pruitt said that the next day, October 1, 1996, she was charged with stealing the carpet.  Pruitt said everyone knew she was taking the carpet to her new office at the hospital.  HT p. 159-166.

Pruitt said Butler told her that one reason for her move to the hospital was so "they would stop picking at me" at Kamish.  HT p 179.

Regarding her performance while at Kamish, Pruitt said that when she left her office to do work elsewhere, she always left notes on her door, but someone pulled them down.  HT p. 171-172.

Pruitt testified that Shelby Butler was "legit," meaning that her actions were not motivated by discrimination; however, Butler wanted to keep her job, so she had to do what others told her to do.  HT p. 199-200.

Pruitt called LTC Hazel Ivey, a Black female, as a witness. LTC Ivey was the chief of Community Health Nursing and supervised Pruitt until July 1996.  LTC Ivey testified that Pruitt was to be the technical expert with Health Risk Appraisal and she provided counseling, and worked with the doctors.  Pruitt worked in the area of sexually transmitted diseases and cold weather injuries.  LTC Ivey thought Pruitt was extremely capable and had a professional manner.  The Army sent Pruitt to San Antonio for two weeks training in the area of sexually transmitted diseases.  HT p. 13-15.

-37-

On cross-examination by the Army, LTC Ivey said that a doctor at Kamish complained about Pruitt's availability. Ivey determined that it was a communications problem, and told Pruitt to put notes on her door when she was out. HT p. 15-16.

Former SFC Francine James testified that Pruitt assisted at the clinic by training patients on communicable diseases, giving shots, and assisting in the nursing department when short staffed. HT 50-51. Ms. James saw Pruitt's office in the afternoon of September 30, 1996, and testified that most of the carpet was up, but the tile was not destroyed. James said the next morning, however, a lot of tile was destroyed. James said several people had access to the keys to the room, including Schultz and Joyce Wilson. James said Schultz and Joyce Wilson moved into Pruitt's former office within 30 days, as soon as the tile was repaired. HT p. 62-64. James did not see any carpet tape on the tile. HT p. 68. James said SGT Kevin Williams, a Black male, moved from the hospital to the clinic to perform Pruitt's duties. HT p. 77.

Pruitt called SGT Gloria Evans, a Black female, as a witness. SGT Evans was the NCOIC in the Preventative Medicine department and worked with Pruitt after she moved to the hospital in October 1996. Evans testified that Shelby Butler kept tight supervision of Pruitt. Evans said the Army swapped Pruitt with SGT Williams, who went to Kamish, while Pruitt was to assist with health inspections in housing, see patients on the Wellness aspect, and counsel them on sexually transmitted diseases. However, Pruitt never went out on inspections. HT p. 23-24.

SGT Evans testified that Butler limited Pruitt's lunch break

-38-

to one hour and told Pruitt to let Butler know when she took breaks. Evans overheard a conversation where Pruitt asked Butler why she didn't trust her. Butler said, "Brenda I don't trust you, my job is on the line here. I've been told that I'm supposed to watch everything that you do." Evans said she heard Butler tell Pruitt that she could not eat breakfast in her office anymore. Evans testified that no one else was treated this way. HT p. 26-27. Regarding the carpet, SGT Evans said she finished moving Pruitt's furniture and was told to put the carpet in storage. SGT Kevin Williams told Evans they did not want Pruitt to move the carpet from the Kamish Clinic. Evans said the hard tile on the floor of the office was intact. HT p. 27-29.

Former SPC Anna Tate testified that she saw Pruitt's office after she moved out of it and saw SFC Schultz and MAJ Joyce Wilson walk over the sticky tile, which pulled up more of the hard tile. Then Schultz and Wilson took pictures of the room. Tate said the condition of the room before Pruitt fixed it up was terrible. HT p. 239-241.

Pruitt called SGT Berreta Wiggins, a Black female, as a witness. SGT Wiggins was an LPN, assistant community health nurse, who worked with Pruitt. Wiggins testified that she assisted Pruitt in setting up her office at the Kamish Clinic. Wiggins said she got a detail together to lay the carpet and make her office presentable. HT p. 84-85.

During complainant's cross-examination of MAJ Joyce Wilson, Wilson admitted that SGT Kevin Williams did not stay at the Kamish Clinic long, and went back to the hospital in November 1996.

-39-

Wilson said she moved out a short time before Williams moved.
However, Wilson insisted that Williams performed most of his duties
at the Kamish while he was there. HT p. 361-362.

Regarding complainant's damages, Pruitt testified that there
was a critical illness in her family involving her youngest brother
and she went to the "lower 48" from December 1996 through January
1997. HT p. 145-146, 191-192. Pruitt stated she was having blood
pressure problems from the stress at work. HT p. 193. Pruitt said
she had a "heart attack," "stroke," or "TIA" while at work on or
about January 23, 1997. Pruitt filed a claim for occupational
disease compensation. HT p. 188.

The agency's motion for summary judgment with enclosures was
admitted into evidence at the hearing. See "Brief in Support of
Request for Findings and Conclusions Without a Hearing," with
enclosures, attached. The enclosures include Pruitt's discovery
disclosures of her medical treatment.

Medical records from Pruitt's family practitioner, Stephen
Grandstaff, M.D., show a report dated January 24, 1997, the day
after her "attack" or "TIA" at work. Dr. Grandstaff diagnosed
Pruitt with hypertension and anxiety. Grandstaff wrote that Pruitt
said her supervisors at work are trying to get rid of her. The
report reflects that Pruitt had been taking Paxil for stress at
work since September 1996. There is no reference to race.

The submitted medical records also reflect psychiatric
treatment after May 1977 for depression and stress. The
psychiatric evaluation by Anthony Blanford, M.D., says most of
Pruitt's difficulties came from losing her job in April 1997. Dr.

-40-

Blanford writes that Pruitt believed her situation at work changed in July 1996 when her supervisor left; thereafter Pruitt was written up almost daily by her new supervisor.  Pruitt told the psychiatrist that Dr. Candler was behind everything and race was an issue because she was the only Black civilian female in preventative medicine.  Also, Pruitt said race was a factor because there were allegations that her prior Black supervisor "cushioned her."

Other medical reports show continued treatment for depression through May 1998.  Dr. Barbara Creighton said Pruitt described herself as being "depressed and oppressed."

Pruitt called Geraldine McAllister as a witness to describe damages.  Ms. McAllister is a friend of Pruitt's and described how Pruitt used to be outgoing, nice, and energetic.  McAllister spoke to Pruitt during her move from Kamish and the hospital and Pruitt said she was going through hard times.  Afterwards, McAllister saw Pruitt at her home, totally withdrawn from everyone, and sleeping on the floor.  HT p. 129-135.

SGT Evans described an incident at the hospital on or about January 23, 1997, where Pruitt had to be taken to the emergency room for high blood pressure.  Evans said Butler did nothing to help and the next-in-line superior, LTC William Candler, dismissed the incident as Pruitt's failure to take her blood pressure pills. HT p. 30-33.

Based on my review of the entire evidentiary record, including the evidence taken into the record at the hearing and that taken into the record at the agency's investigation, I find that the

-41-

complainant did not meet her burden to show by a preponderance of the evidence that the agency's articulated reasons for moving her, calling the MP's, changing her job responsibilities, and withholding her key, were a pretext for race, color, sex, or age discrimination.

I find that there is no direct evidence of sex or age discrimination. That is, there was no overt action or statements pertaining to Pruitt's sex or age. However, since I found there was a racially hostile environment, it follows that there is evidence of racial bias.

The complainant relies on this bias and indirect circumstantial evidence to attempt to show pretext for her disparate treatment claim. Pruitt's theory is that Caucasian employees, Candler, Gallimore, Schultz, and Joyce Wilson, plotted against her and used Butler as a tool. Also, Schultz and Wilson coveted her nice office and conspired to get her out. Complainant suggests that Schultz and Wilson went into her old office after she removed the carpet and destroyed the hard tile to make it look like Pruitt vandalized the room. Calling the police on a co-worker and accusing her of theft was unjustified. Then, according to Pruitt, once they moved her to the hospital, she was set up for failure by Candler and Gallimore.

Pruitt offered evidence to prove that theory of pretext, namely her testimony and the testimony of Ivey, James, Evans, Wiggins, Gilson, and Tate.

The first problem I have with complainant's theory is that Pruitt did not make a very good witness: her answers rambled and

-42-

were unresponsive. Although I already found that the agency was not put on notice regarding the written document with the slur, I am not convinced that it is authentic: it appeared out of nowhere three days after Pruitt tried to file her informal EEO complaint and after she was told she needed more evidence. Only one of complainant's witnesses could describe the document.

There are other instances of Pruitt's credibility problems. Complainant told the MP's that she got the carpet from an "unknown source." At the hearing Pruitt said this was because she did not know which "one of the guys" brought her the box of carpet. Later, Pruitt said she and SGT Wiggins installed the carpet. HT p. 175-176.

I found Shelby Butler to be credible when she said Pruitt told her that her complaint would be stronger if Pruitt included her first line supervisor as a harassing official. Pruitt agreed that Butler was "legit." All in all, I was more persuaded by the e-mail evidence presented by Francine James and Robert Wilson, than I was by Pruitt's testimony.

I find that Gallimore was the decision maker in July 1996 to move Pruitt, and there is no tie between Schultz's racially offensive e-mails in October 1996 and Gallimore. I found Gallimore's testimony to be credible in her reasons for moving Pruitt over to the hospital and that she told Pruitt ahead of time not to move the carpet. Nearly all of the witnesses agreed that moving offices occurs frequently within the Army.

Regarding the allegation of a false police report, at first I was amazed that workers would call the police on a fellow worker.

-43-

However, I found the testimony of Tenhet, who did not know Pruitt,
convincing:  he wanted to document the damage that appeared to be
vandalism.  Pruitt did not convince me that Schultz, Joyce Wilson,
or anyone else, caused more damage to make the room look worse.
There was enough testimony that lifting the carpet and carpet tape
caused the old and brittle tile to crack.  Walking on the sticky
tile probably caused more tiles to crack.  However, Pruitt should
have stopped after the first few tiles were damaged.  I find Pruitt
had objected so strenuously and loudly about her move from July
through September, that when fellow employees saw her damaged
office it is easy to believe Pruitt must had a "if I can't have
it, neither can you" attitude.  Regarding no key at the new office,
I find that Candler was justified in withholding the key for a
short period of time to make sure Pruitt was not going to do
anything vindictive at the hospital.

Regarding different job responsibilities, Pruitt did not
establish that she had to do anything out of her job description or
that she had less responsibility during the time period between her
move on October 1, 1996, and her breach of confidentiality on
October 21, 1996.  After that period, she was denied access to
patient files and her duties did change.    Pruitt's written
description of her responsibilities is in the ROI at p. 255.

I was concerned about Butler's heightened scrutiny of Pruitt.
However, I found that Butler was justified in keeping an eye on
Pruitt, even if Gallimore and Candler ordered her to, because of
the allegations that Pruitt could not always be found at the Kamish
Clinic when she was needed.  Also, Pruitt had been lax in her leave
slips.  I find that race, color, sex, and age were not factors in

-44-

the need to keep an eye on Pruitt's attendance and performance.

In short, Pruitt got herself in trouble. When the racial e-mails and accusations started flying in the air and the atmosphere got ugly, Pruitt tried to tie the two together. Although there was racial tension "in the air," I find that regarding Pruitt's move, the call to the MP's, the withholding of the key, and for her changed job responsibilities, Pruitt did not show that the discrimination was "brought to ground." Price Waterhouse v. Hopkins, *supra*. In other words, Pruitt did not show that the Army relied on her race, color, sex, or age, when taking its actions.

There is no dispute as to Pruitt's belief that something unfair must have occurred. While I can sympathize with complainant over her misfortunes, I find that the evidence in this case shows that there is no nexus between the move, the call to the MP's, and the diminished job responsibility, and the complainant's race, color, sex, and age.

## VI.  FINDINGS AND CONCLUSIONS

To summarize, I find that the complainant has established a prima facie case of hostile environment discrimination on the basis of race and color (but not sex or age), with regard to her work atmosphere in October 1996. I find that the complainant established a prima facie case of disparate treatment based on race, color, sex, and age. I find that refusing to accept Pruitt's complaint in October 1996 is interference with the EEO process and is a *per se* violation of 29 C.F.R. § 1614.105(g).

I also find that the agency did not rebut complainant's allegations of race-based hostile environment regarding the e-

-45-

mails, but did for the written document. I find the agency did meet its burden to articulate legitimate, nondiscriminatory reasons for moving complainant, calling the military police about her damaged office, withholding her key, and giving her different assignments.

Finally, I find that the complainant has not demonstrated that the articulated reasons for the agency's actions are a mere pretext for unlawful discrimination.

Based upon these findings, my conclusions are that the agency did discriminate against the complainant on the basis of race and color for the racially charged atmosphere caused by racially offensive e-mails in October 1996. Also, the agency interfered with the EEO process in October 1996 when its Fort Richardson EEO office failed or refused to take complainant's complaint. I find that the agency did not discriminate against the complainant when it relocated her, called the police about her former office, withheld her key, and modified her work assignments.

## VII. REMEDIES

Based on my conclusions that unlawful discrimination occurred, it ordered that the Department of Army provide the complainant with the following remedies:

A.   The agency shall pay the complainant all costs to which she may be entitled under Federal law in connection with this complaint. 28 U.S.C. § 1920, 29 C.F.R. 1614.501. The agency shall pay the complainant's reasonable attorney's fees. The complainant's attorney shall submit a certified statement as described in 1614.501(e) within

-46-

thirty (30) days of receipt of this decision. Attorney's fees will be allowed only for the issues where the complainant prevailed.

B.    The agency shall take no retaliatory action against the complainant for having filed and prosecuted this discrimination complaint.

C.    The agency shall pay compensatory damages as follows:

1.    Pecuniary Damages:  The complainant was treated by several medical doctors and provided medical records; however, no medical bills were submitted into evidence. Therefore, there are no pecuniary damages.

2.    Non-pecuniary Damages:  I find complainant established that the hostile environment caused by the racial e-mails in October 1996 caused her to be upset and caused unwarranted stress.  I find that complainant should be compensated in the amount of one thousand dollars ($1,000.00) for emotional distress caused by the hostile environment from the e-mails.

I also find that the agency's refusal to accept or process her informal EEO complaint in 1996 also caused her to be upset and caused stress.  I find that complainant should be compensated in the amount of one thousand dollars ($1,000.00) for emotional distress caused by the agency's interference with the EEO process. I note however, that complainant had other stressors going on in her life and she was affected by many other events that I found were not unlawful, including a serious illness in her family in November and December

-47-

1996, and an anxiety attack in January 1997 during the time of her possible termination for release of confidential information.

Complainant did submit medical records to further support her claim for compensatory damages and those records plainly state that her biggest concern was getting fired. I took these factors into consideration when determining and mitigating complainant's damages.

I found that the agency did not discriminate on the basis of disparate treatment. Therefore, the agency is not liable for damages caused by those events and there should be no award for compensatory damages.

D.  The agency shall insure that in the future the complainant and all other Black employees at the Bassett Army Community Hospital and the Kamish Clinic are not subjected to the same, similar, or any acts of race-based harassment.

E.  The agency shall insure that in the future there will be no interference of the EEO process in Alaska and any complainant who wishes to initiate or file an EEO complaint is permitted to without delay.

F.  The agency shall conduct EEO training for managers, supervisors, and employees at Bassett Army Community Hospital and the Kamish Clinic to insure that they become aware, and continue to be aware of, their obligations, responsibilities, and rights under EEO, including the rights to work in an environment free from race discrimination and to use the EEO system to remedy

-48-

perceived violations of EEO laws.

G.    The agency shall post, at all facilities within the authority of Bassett Army community Hospital and the Kamish Clinic, a copy of a notice, sufficient under Commission standards, advising employees of this finding of discrimination.  The notice should be signed by a duly authorized agency representative, and should be posted immediately upon the agency's issuance of the final order.  The notice should be maintained for a period of at least 90 days in conspicuous places where the agency customarily posts notices that it expects its employees and applicants for employment to see.  The agency should take all reasonable steps to insure that the notices are not altered, defaced, or covered by any other material. The notices should advise employees and applicants of their rights to be free of employment discrimination, and their EEO remedies.

## VIII.   NOTICE

This is a decision by an Equal Employment Opportunity Com-mission Administrative Judge issued pursuant to 29 C.F.R. §§ 1614.109(i).  **With the exception detailed below, the complainant may not appeal to the Commission directly from this decision.** EEOC regulations require the agency to take final action on the complaint by issuing a final order notifying the complainant whether or not the agency will fully implement this decision within forty (40) calendar days of receipt of the hearing file and this decision.  The complainant may appeal to the Commission within

thirty (30) calendar days of receipt of the agency's final order.

The agency's final order shall notify the complainant whether or not the agency will fully implement this decision and shall contain the notice of the complainant's rights set out in sections 1614.110 and 1614.401 through .403.

If the agency has not issued its final order within forty (40) calendar days of its receipt of the hearing file and this decision, the complainant may file an appeal to the Commission directly from this decision. In this event, a copy of the Administrative Judge's decision should be attached to the appeal. The complainant should furnish a copy of the appeal to the agency at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such service was made on the agency.

All appeals to the Commission must be filed by mail, personal delivery, or facsimile to the following address:

> Director, Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848, Washington, D.C. 20036
> Fax No. (202)663-7022

Facsimile transmissions over 10 pages will not be accepted.

The complainant also has the right to file a civil action in federal district court within ninety (90) days of any final action by the agency or by the EEOC on her complaint. The complainant may also file in federal district court after one-hundred eighty (180) days from the date that the formal administrative complaint was filed, or one-hundred eighty (180) days after filing an appeal with

///

///

///

-50-

the EEOC's Office of Federal Operations.

Any prehearing memoranda, correspondence, or orders in this case are considered to be part of the record, and both parties are already in possession of copies of all documents.

**IX.  SIGNATURE AND DATE**

Date _July 6, 2000_

Steven R. Gaffin
Administrative Judge