IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BRENDA J. PRUITT<br><br>          Plaintiff,<br><br>     v.<br><br>R.L. BROWNLEE, Acting Secretary<br>of the Army<br><br>          Defendant. | Case No.  3:04-cv-0086-RRB<br><br>[Proposed] ORDER GRANTING THE<br>MOTION FOR SUMMARY<br>JUDGMENT |

## I.     INTRODUCTION

The Court has granted R. L. Brownlee, the Acting Secretary of the Army's

(the "government's") motion for summary judgment on Brenda Pruitt's ("Pruitt's")

claims that she was discriminated against and harassed based on her race, sex, and

age and her claim for wrongful discharge.  (Docket No. 28).  Pruitt did not oppose

the Motion.  Pursuant to the Court's request, (Docket No. 29) the government

submits a proposed order

## II.     FACTUAL SUMMARY

Pruitt, an African-American licensed practical nurse, started working for the

Preventive Medicine Department ("Department") at Bassett Army Community

Hospital located at Fort Wainwright, Alaska in 1989.  In February of 1994, the

Department relocated her to the Kammish Clinic ("Clinic"), which is about a mile

from the hospital and managed by the Primary Care Department.  Within the

Department, Colonel William H. Candler, M.D., a Caucasian military doctor, was

the Chief and Hazel Ivey, an African-American, military registered nurse ("R.N."),

was Pruitt's supervisor.  After Ivey left in July, 1996, Carole Gallimore, a

Caucasian military R.N., took her place, but she was Pruitt's second level

supervisor.  Shelby Butler, a Caucasian civilian R.N., worked for Ivey and after

Ivey left, Butler became Pruitt's first level supervisor.  All Department employees,

except for Pruitt, were located at the hospital.

    While at the Clinic, Clinic managers moved Pruitt to a different office four

times over two and a half years.  Her last move was in 1995, when she was moved

into a room that had been used for storage.  Pruitt decorated the office and laid

down carpet.  She was by herself and she could maintain her own schedule at the

Clinic.

    When Gallimore and Butler took charge in 1996, they had some concerns

about  Pruitt's work performance.  They believed Pruitt did not keep adequate

records and was frequently not available at her office.  There were also

discrepancies with  Pruitt's time cards regarding leave that was taken and not

recorded.  Gallimore decided to transfer Pruitt back to the hospital because she

wanted to supervise her more closely and to analyze whether she needed more

training.

On July 24, 2006, Butler spoke to Pruitt about the move to the hospital.

Pruitt was adverse to the move, in part, because she had made a beautiful office for

herself.  She said she would not go to the hospital and that she would fight the

move.  Pruitt was on leave for all of August and part of September.  On her first

day back, September 9, 1996, Butler spoke with Pruitt about the move and the

training Pruitt would get after the move.  On September 11, 1996, they again

discussed the move.  Pruitt informed Butler that she had a meeting with her union

steward about the move.  On September 16, 1996, Pruitt contacted an EEO

counselor and requested forms and information about how to file an EEO claim.

On September 19, 1996, Pruitt found a paper on her desk which she

perceived as being a "racial slur."  The paper was a typed practice exercise and

stated: "While walking through your unit area, you overhear an African-American

soldier refer to another African-American soldier as "Homy." . . .What do you

think of the word Homy in this context?"  Someone had crossed out the word

"Homy" and inserted the words "my nigger" in the first place, and "nigger" in the

next place.  Pruitt suspects that someone from the Clinic left it.  Pruitt first told

Anna Tate, a Clinic employee, about the paper and they chuckled about it.  She

then told Clinic employee Sgt Wells.  Tate and Wells both suggested that she do

something about it, but she declined.  Pruitt told the EEO investigator that she told

Butler about the slur, but she did not expect any reaction out of Butler or for her to

do anything.  At the EEO hearing, Ms. Pruitt testified that she told her supervisor

Ms. Ivey, not Ms. Butler, about the racial slur, but she did not give Ms. Ivey a

copy of the paper.  As a result of her report, Pruitt stated that meetings took place

to explore whether racial issues were present at the work place.  At the EEO

hearing,  Pruitt testified that she was not going to do anything about the note

because she was not going to give whoever did it the pleasure.

On September 30, 1996, Pruitt moved to the hospital.  In the process, Pruitt

pulled up the carpet squares from her office.  Some of the old, vinyl tiles

underneath the carpet squares either cracked during the process or were previously

cracked.  Pruitt believes that she had the right to take the carpet squares because

she had personally obtained them either from a contractor, who left a box of carpet

squares for her, or from a dumster.  Some Clinic employees, including Maj. Joyce

Wilson, noticed the activity and someone contacted Maj Robert Tenhet, Chief of

the Clincal Support Division at the Clinic.  He observed significant damage to the

tiles and called the Military Police ("M.P.").  After Pruitt moved, the Department

assigned Kevin Williams, an African-American military duty soldier, to the Clinic to do some of Pruitt's assignments.

On October 26, 1996, Pruitt signed an informal EEO complaint. She stated that October 1, 1996 was the last date of the events that were discriminatory. She claimed discrimination and harassment on the basis of race, color, and sex. She listed Maj Wilson, Maj Tenhet, Dr. Candler, Nurse Gallimore and Nurse Butler as the individuals responsible for the discrimination. For the discriminatory events, Pruitt listed the racial slur, the failure of her supervisors to take any action regarding the slur, the fabrication of a lie that she stole carpet, her move to a smaller office in the hospital, Dr. Chandler's refusal to giver her a key to her office, and her multiple moves in the past two and a half years. For a remedy she sought an end to the racial treatment, her old job and office back, equipment to do her job, equal treatment, the cessation of racial and derogatory comments on her desk, and an apology for the wrongful accusation that she stole her carpet. In her formal EEO complaint, Pruitt added age as a basis for discrimination.

During the course of the EEO investigation, Pruitt remained in her position at the hospital. In October, Butler asked Pruitt to follow-up several patients who had tested positive for sexually transmitted diseases. One patient and her husband complained to Butler that Pruitt had inappropriately called the husband about his

wife.  They also complained about Pruitt's unprofessional behavior on the

telephone.  Thereafter, Pruitt was taken off of patient duties, restricted from the

computer, and on January 9, 1997, Pruitt was given a proposal for removal.  On

March 21, 1997, Pruitt contacted an EEO counselor.  On April 1, 1997, Dr.

Chandler notified Pruitt that she was terminated for breach of patient

confidentiality.

On May 15, 1997, the EEO counselor wrote a "Notice of right to file a

discrimination complaint" to Pruitt in which she outlined Pruitt's allegations that

her work conditions and termination constituted reprisal for prior EEO activity and

discrimination based on race, color, sex, and age.  On the same day, Pruitt signed

the memorandum acknowledging its receipt.  The Notice informed Pruitt that she

had "15 calendar days" from receipt of the notice to file a formal complaint of

discrimination.  Pruitt did not file a formal complaint.  She filed a grievance

through her union.

On July 23, 1997, the EEO investigator interviewed Pruitt and was told

about an alleged e-mail with racial overtones which was circulated in the Clinic in

October, after Pruitt had left.  Pruitt mentioned a single e-mail, which she had

never seen, which was sent by Clinic employee Sgt. Sarah Schulze.  In the e-mail,

Schulze wrote that they were "cleaning up the black palace," referring to the

Clinic.  At the time of the EEO investigation there was no discussion about additional e-mails, but at the EEO hearing Pruitt testified that Schulze sent a second e-mail in which she referred to Sgt Francine James, an African-American Clinic officer, who was leaving the clinic, as a black witch.  Schulze admitted that she sent an e-mail that referred to James as a witch, but denied that the e-mail referred to a black witch.  The e-mails were sent after Pruitt had left the clinic and Pruitt never received a copy.

Schulze, who worked directly for Primary Care at the Clinic, had no official contact with Pruitt, and Pruitt only spoke casually with her.  In her EEO testimony, Pruitt testified that she never saw the e-mails, but she heard about one about a "black palace" and one about a "black witch."  At her deposition, she testified that she saw the e-mail about the witch.

Maj Wilson, who saw the e-mail, said the e-mail referred to a witch and not "black witch," and it was about James.  Dr. Mee saw the e-mail and confirmed that it had derogatory language about an officer, but he did not confirm that it referred to a "black witch."

## III.  SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine issue of material facts and if the

moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact. The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact. Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial. All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant. However, the nonmoving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.

## IV.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Pruitt claims that the Army discriminated against her on the basis of race (African-American), color (black), sex (female) and age (DOB 1946) by subjecting her to disparate treatment and to a hostile work environment. Title VII prohibits discrimination in employment decisions on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Prior to initiating a federal court suit for a claim of employment discrimination under Title VII, a federal employee must bring a timely administrative complaint to the agency and

exhaust all applicable administrative remedies.  <u>Brown v. General Services Administration,</u> 425 U.S. 820, 829 (1976); 29 C.F.R. § 1614.  Under Title VII's statutory scheme, a federal employee must notify an EEO counselor of discriminatory conduct within 45 days of the alleged conduct.  29 C.F.R. § 1614.105(a)(1).  Wrongful termination is a discrete act which is not actionable, even when it is related to acts alleged in timely filed charges, if the complainant does not exhaust administrative remedies as to that act.  <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 102 (2002).  <u>Morgan</u> bars the litigation of discrete events which occur after a separate valid claim is filed, if the complainant fails to exhaust her administrative remedies.  <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210-11 (10th Cir. 2003).  EEO regulations provide that after a complainant receives notice of the right to file a formal complaint, the failure to file a formal complaint within fifteen days of the notice of right to file precludes a plaintiff from pursuing a discrimination claim in federal court.  <u>Girard v. Rubin</u>, 62 F.3d 1244, 1246 (9th Cir. 1995).

In disparate treatment cases brought under Title VII, the complainant must establish a prima facie case of discrimination.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  To establish a prima facie case of disparate treatment, she must show that she (1) belongs to a protected class; (2) was

qualified for the position; (3) was subjected to adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004).

Any action that is "reasonably likely to deter employees from engaging in protected activity" is an adverse employment action. Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000). The Supreme Court has cited "hiring, firing, failing to promote, reassignment with significantly different responsibilities [and] a decision causing a significant change in benefits" as examples of adverse employment actions. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

If the complainant succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the illegal act. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The complainant then retains the opportunity to show that the employer's reason is pretext, that a discriminatory reason is more likely, or that the proffered explanation is unworthy of belief. Id. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Id.

Pruitt v. Brownlee
3:04-cv-0086-RRB                    -10-

To prevail on a hostile work environment claim based on race, a complainant must show: (1) that she was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and, (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir.1998) (citation omitted); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986).  To be actionable, a hostile environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Farragher v. Boca Raton, 524 U.S. 775, 787 (1998).  To determine whether an environment is hostile or abusive, the court is to look at the totality of the circumstances, including "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (citation omitted).  The court "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . ." Id.

"The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the

eradication of discrimination by employers against employees." Silver v. KCA,
586 F.2d 138, 141 (9th Cir. 1978). "Even a continuing course of racial harassment
by a co-employee cannot be imputed to the employer unless the latter both knows
of it and fails to take remedial action." Id. at 142.

###   A.    The Preventive Medicine Department's Management Team Did Not Treat Pruitt Differently Based on Her Race, or Sex.

Gallimore decided to move Pruitt back to the Department's main office in
the hospital and Dr. Candler approved the decision.  Gallimore made this decision
because the Clinic doctors did not perceive that Pruitt was helping them and they
wanted the office space for its employees.  Gallimore wanted to supervise Pruitt
because she was the only employee off site, she was unaccountable for her time,
and the Department had lost three employees at the hospital and it needed help.
These are legitimate business reasons for relocating an employee.  The decision to
move Pruitt was made long before the racial slur appeared on Pruitt's desk and
Schulze, a Clinic employee,  sent the e-mails with racial overtones.  Gallimore was
not located at the Clinic where the events with racial overtones took place.
Further, the Department moved an African-American, military soldier to the Clinic
to take over some of Pruitt's duties, which shows that the Department was not
aiming to eliminate African-American employees from the Clinic.  There is no

evidence that race or sex played any role in Gallimore's decision to move Pruitt back to the main hospital Department.

During the move from the Clinic to the hospital, Pruitt decided to take the carpet squares from her Clinic office to her new office. The tiles under the carpet were old and cracked either before the carpet was installed or they cracked in the process of removing the carpet. Although Pruitt gave inconsistent statements about where the carpet was obtained, she professed an honest belief that the squares were hers to take. On move day, Clinic employees observed the damage and Tenet, a Clinic employee called the M.P.'s Military Police ("M.P.") about possible theft of the carpet or damage to government property. Because Pruitt's supervisors, Dr. Candler, Gallimore and Butler, were located at the hospital, they played no part in the event. Tenet, who made the report to the M.P.'s has no connection with Preventive Medicine and he had previously reported Caucasian employees to the M.P.'s for problem. There is no evidence that Pruitt's race or sex played a role in Tenet's decision to report the unusual activity.

Pruitt claims that she was treated differently on the basis of race or sex because she was moved four times in two and a half years and that Caucasian employees were not moved. Pruitt was the only employee of Preventive Medicine to be housed in the space allocated to the Clinic. Dr. Candler did not initiate the

moves because the Clinic space was not in his department.  Pruitt did not formally complain about the moves within the Clinic when they occurred and as a result there is no evidence about who decided to move her and why, and there is no evidence that Pruitt's race, sex or age had anything to do with the decisions.  As a result Pruitt cannot meet her burden to show that the moves were anything other than legitimate business decisions made by Clinic management.  There is evidence that within the Department, Caucasian, female employees were also moved. Within a year and a half, Butler had moved offices three times, and after Pruitt's move, she has been moved an additional three times.  As to the final move from the Clinic to the hospital, the government has articulated legitimate business reasons for the move and Pruitt has failed to prove that the reasons were pretext for discrimination.

After the move to the hospital, Pruitt claims that she was treated differently from other employees because she was denied an office key, given a smaller office, deprived of essential equipment and her computer was removed.  Dr. Candler did not give Pruitt a key to her hospital office because the M.P.'s were still investigating the allegation of theft of the carpet and destruction of government property, and he had concerns about Pruitt's anger about the carpet incident.  After a couple of weeks, when Pruitt could not do her job without a key

to her office, she was given a key.  Management offered a legitimate non-discriminatory reason for restricting Pruitt's access to her office.  Only Pruitt was the subject of an M.P. investigation for theft, and therefore, she was the only one given restricted access to her office.  There is no evidence that Dr. Candler made his decision based on race and sex.  He had been the Chief for a long time before the theft allegation and did not restrict her access before then.  In fact, he allowed her to work independently away from the main office.

Pruitt got a small office when she moved to the hospital because it was the only place available.  Butler, Pruitt's supervisor, had also occupied the same office.  As African-American and Caucasian employees occupied the same small office, there was no disparate treatment in the assignment of offices.

Pruitt stated that her duties changed and she was not not given a computer to allow her to do her job.  When she first came to the hospital, Pruitt had a computer at her desk and continued to follow-up on patients.  Management restricted Pruitt in her duties and the use of the computer after a patient and her husband complained that Pruitt breached patient confidentiality.  There is no evidence that management made any decision based on Pruitt's race, sex or age.  She was the only employee with a pending charge that she breached patient confidentiality.  The restrictions were a reasonable response to a serious patient

complaint.

**B.     Pruitt Did Not Subjectively Perceive the Clinic as a Racially Hostile Work Environment.**

Pruitt claims that she was subjected to a racial hostile work environment. Pruitt claims that she had messages with a recording of "Baa Baa black sheep" left on her voice mail, but she never reported this to management.  Thus, the Department is not liable for not taking any action about this event.

After Pruitt was informed that she was being moved to the hospital, Pruitt found a paper on her desk which she perceived to be a racial slur.  There is conflicting evidence about whether she informed Butler about the paper, but for purposes of summary judgment the Court assumes that Pruitt told either Butler or Ivey about the slur.  But there is no conflict about Pruitt's decision not to have anything done about the incident.  When she discovered the slur, she discussed it with two Clinic employees and informed both of them that she did not want to do anything about it.  She also stated that she did not expect any reaction out of Butler or for her to do anything.  At her EEO hearing, Pruitt testified that she was not going to do anything about the note because she was not going to give whoever did it the pleasure.  Thus, it appears that  Pruitt did not want anything done about it.  Moreover, as Pruitt was in the process of leaving the Clinic, where

the slur occurred, the move itself would remove her from the environment where the slur occurred.

After Pruitt was at the hospital, she discovered that a Clinic employee had sent two racially offensive e-mails to other Clinic employees. These e-mails were sent by an employee in a different department and they were not about Pruitt.

Looking at the totality of the circumstances, including "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," these events do not about to a hostile work environment based on race. The slur was enigmatic, not threatening, and it did not affect Pruitt's work performance. Moreover, it surfaced after Pruitt moved to the hospital. Pruitt never told management about the telephone messages on which "Baa Baa black sheep" was recorded, and therefore, management cannot be held liable for its occurrence. Lastly, accepting as true that both e-mail messages were sent and that they were racially offensive, they were sent by a Clinic employee to Clinic employees, after Pruitt was no longer at the Clinic, and thus, they did not affect Pruitt's working conditions.

In order to prevail on a hostile work environment claim, Pruitt must have subjectively perceived her environment as hostile. All events allegedly creating a

racial hostile work environment occurred at the Clinic. No events of an overt

racial nature occurred at the hospital. Pruitt, however, fought the move to the

hospital, and, as a remedy for discrimination, sought transfer back to the Clinic,

where every alleged event with racial overtones occurred. This shows that Pruitt

did not subjectively perceive the Clinic as a place where racial hostility was so

severe and pervasive that it altered the terms and conditions of employment.

Rather, she perceived the hospital as a hostile work environment. The problem

with this position, however, is that there is no evidence of any racially motivated

activity that occurred at the hospital.

　　　Pruitt's working environment at the Clinic was also not objectively hostile.

All the events with racial overtones together do not amount to employer action of

a racial nature that was severe and pervasive, such that it altered the conditions of

Pruitt's employment. The e-mails were created long after Pruitt left. Pruitt never

reported the the "Baa Baa black sheep" message. There was no evidence that

Tenet reported the theft of carpet because of Pruitt's race. As to the slur, this was

an isolated incident at the Clinic. Collectively, the events did not alter a term and

condition of Pruitt's employment because Pruitt was already in the process of

moving to the hospital before the reported events occurred. The condition of

Pruitt's employment that were altered later were in reaction to the report of the

theft and the report of the breach of confidentiality.  Both of these reports did not involve Pruitt's race.

There is strong evidence that Pruitt's work dissatisfaction stemmed solely from the decision to move her out of the Clinic.  Before the racial slur, the e-mails, and the report of theft, Pruitt had already told Butler that she would fight the move, she had contacted her union steward and an EEO counselor.  It is inconsistent to present evidence of racial hostility that only occurred at the Clinic, claim that the hostility was so severe and pervasive that it altered the terms and conditions of her employment, and then request return to that hostile environment as a remedy for discrimination.

### C.    Pruitt's Claims of Wrongful Termination, Age Discrimination and Disparate Treatment in Assigning Work to Caucasian Men Fail for Failure to Exhaust Administrative Remedies.

Pruitt was notified of a proposed termination in January 1997 and she was terminated in April 1997.  She contacted an EEO counselor about the proposed termination and was notified that she had a right to sue on May 15, 1997.  Pruitt signed the notification which informed her that she had fifteen calendar days to file her formal complaint.  She never did.  Pruitt's wrongful termination claim involves a discrete act which needed to be separately exhausted.  Because she

abandoned the EEO process, by failing to file a formal complaint within fifteen days, her wrongful termination claim is time barred.

Pruitt also alleges discrimination on the basis of age.  She does not complain about any specific decision she is challenging or identify which younger employees were treated more favorably.  In her letter to EEO she stated that she was filing a case based on sex and race, and in her initial EEO interview she did not mention age.  Later she claimed that training she should have received was given to a younger employee.  She did not list this event on her EEO complaint and the EEO investigator specifically told Pruitt that training was not an accepted issue and it would not be investigated.  Pruitt's claim of age discrimination fails because she did not allege any event regarding training which occurred within forty-five days of her contact with an EEO counselor which involved disparate treatment on the basis of age.  See 29 C.F.R. § 1614.105(a)(1).

Pruitt complains that the Department took work assignments away from her and awarded them to Caucasian men.  Pruitt did not make this claim in her informal or formal EEO complaints.  She never presented evidence about what assignments were given to the males instead of her.  As this was not one of the seven events listed in her EEO complaint, she failed to exhaust her administrative remedies on this claim and it is barred.

## V.    Conclusion and Order

For the reasons stated above, the governments motion for summary judgment is granted.  In its answer, the government specifically requested that if it prevailed to be refunded $1,000 paid to Pruitt and $5,885.75 paid to Pruitt's attorney on her behalf.  As the government prevailed, the court orders Pruitt to re-pay to the Defendant Secretary of the Army, the $6,885.75 she previously received.

Date: _____          _____
                                        Ralph Beistline
                                        United States District Court Judge